In The
# United States Court of Appeals
For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

## CHARLIE WAYNE BRYANT,

*Defendant – Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
AT CHARLOTTE

———————

### JOINT APPENDIX
### VOLUME I OF II
### (Pages 1 – 203)

———————

Cindy H. Popkin-Bradley
CINDY H. POPKIN-BRADLEY, ATTORNEY AT LAW
Post Office Box 37602
Raleigh, North Carolina 27627
(919) 852-4873

Amy E. Ray
OFFICE OF THE U.S. ATTORNEY
100 Otis Street, Room 233
Raleigh, North Carolina 28801
(828) 271-4661

*Counsel for Appellant*

*Counsel for Appellee*

THE LEX GROUP ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA 23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

# TABLE OF CONTENTS
## VOLUME I OF II

**Appendix Page**

Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Indictment
      filed March 15, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Transcript of Plea and Rule 11 Hearing before
The Honorable David S. Cayer
      on December 8, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Angela Parrott's Motion to Withdraw as Counsel
      filed May 15, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Defendant's Letter to Judge
      filed May 31, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Transcript of Motion to Withdraw Hearing before
The Honorable David S. Cayer
      on June 7, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Defendant's Motion to Withdraw Guilty Plea
      filed July 9, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Government's Response to
Defendant's Motion to Withdraw Guilty Plea
      filed July 19, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Order of
The Honorable David S. Cayer
Re: Denying Defendant's Motion to Withdraw Guilty Plea
      filed July 27, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Defendant's Motion for Leave to File Objections and
Request Review of Magistrate's Order Out of Time
      filed August 22, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Order of
The Honorable Max O. Cogburn, Jr.
Re:  Granting Defendant's Motion for Leave to File
Objections and Request Review of Magistrate's
Order Out of Time; Denying Defendant's Objections to
Magistrate's Order and Motion for Review
      filed September 6, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Transcript of Sentencing Hearing before
The Honorable Max O. Cogburn, Jr.
      on October 26, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

    Testimony of Amy Silver:

    Direct Examination by Ms. Dillon . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
    Cross Examination by Mr. Tomberlin . . . . . . . . . . . . . . . . . . . . . . . . 89
    Redirect Examination by Ms. Dillon . . . . . . . . . . . . . . . . . . . . . . . . 96
    Recross Examination by Mr. Tomberlin . . . . . . . . . . . . . . . . . . . . . 98
    Further Redirect Examination by Ms. Dillon . . . . . . . . . . . . . . . . . . . 102

    Testimony of Hubert Davidson:

    Direct Examination by Ms. Dillon . . . . . . . . . . . . . . . . . . . . . . . . . . . 103
    Cross Examination by Mr. Tomberlin . . . . . . . . . . . . . . . . . . . . . . . . 109
    Redirect Examination by Ms. Dillon . . . . . . . . . . . . . . . . . . . . . . . . 114
    Recross Examination by Mr. Tomberlin . . . . . . . . . . . . . . . . . . . . . 114

    Testimony of Brandon Vallier:

    Direct Examination by Ms. Dillon . . . . . . . . . . . . . . . . . . . . . . . . . . . 115
    Cross Examination by Mr. Tomberlin . . . . . . . . . . . . . . . . . . . . . . . . 120

    Testimony of Eddie Seigle:

    Direct Examination by Ms. Dillon . . . . . . . . . . . . . . . . . . . . . . . . . . . 123
    Cross Examination by Mr. Tomberlin . . . . . . . . . . . . . . . . . . . . . . . . 133
    Redirect Examination by Ms. Dillon . . . . . . . . . . . . . . . . . . . . . . . . 141

Transcript of Sentencing Hearing before
The Honorable Max O. Cogburn, Jr.
      on October 26, 2012, continued:

Testimony of Eric Long:

Direct Examination by Ms. Dillon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142
Cross Examination by Mr. Tomberlin . . . . . . . . . . . . . . . . . . . . . . . . 150
Redirect Examination by Ms. Dillon . . . . . . . . . . . . . . . . . . . . . . . . 152
Recross Examination by Mr. Tomberlin . . . . . . . . . . . . . . . . . . . . . . 153

Testimony of Charlie Bryant:

Direct Examination by Mr. Tomberlin . . . . . . . . . . . . . . . . . . . . . . . 155
Cross Examination by Ms. Dillon . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

Defendant's Letter to Judge
      filed October 31, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

Defendant's Notice of Appeal
      filed October 31, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

Judgment in a Criminal Case
      filed November 13, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Defendant's Letter to Judge
      filed November 16, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

# TABLE OF CONTENTS
## VOLUME II OF II – UNDER SEAL

**Appendix Page**

Defendant's Motion to Request Competency Evaluation
     filed June 2, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

Order of
The Honorable David S. Cayer
Re: Granting Defendant's Motion to
Request Competency Evaluation
     filed June 3, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

Psychiatric Report
     filed June 12, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210

Order of
The Honorable Max O. Cogburn, Jr.
Re: Finding Defendant Competent
     filed June 29, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

Defendant's Objections to Presentence Investigation Report
     filed August 16, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 222

Government's Response to Defendant's
Objections to Presentence Investigation Report
     filed August 21, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

Presentence Investigation Report,
With Addendum,
     filed September 19, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Defendant's Position Concerning Sentencing,
With Exhibits,
     filed October 25, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260

Exhibits:

1.    Photographs
        dated February 8, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 265

Defendant's Position Concerning Sentencing,
With Exhibits,
    filed October 25, 2012, continued:

<u>Exhibits</u>, continued:

2.    Statement of Heather Gibson Stowe
         dated February 8, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 270

3.    Statement of Officer Seigel
         dated February 8, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 272

4.    Statement of Hubert L. Davidson
         dated February 11, 2011  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 273

5.    Statement of Brandon Vallier
         dated February 8, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

6.    Statement of Brandon Vallier
         dated February 8, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 275

7.    DD 214 Form of Defendant
         undated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 277

8.    Emergency Department Document
         dated February 8, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279

Statement of Reasons
    filed November 13, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 281

# U.S. District Court
## Western District of North Carolina (Charlotte)
## CRIMINAL DOCKET FOR CASE #: 3:11-cr-00072-MOC-1

Case title: USA v. Bryant

Date Filed: 03/15/2011
Date Terminated: 10/26/2012

---

Assigned to: District Judge Max O. Cogburn, Jr

Appeals court case number: 12-4912 4th Circuit

### Defendant (1)

**Charlie Wayne Bryant**
*TERMINATED: 10/26/2012*

represented by **Angela G. Parrott**
Federal Defenders of Western North Carolina, Inc.
129 West Trade St., Suite 300
Charlotte, NC 28202
704-374-0720
Fax: 704-374-0722
Email: angela_parrott@fd.org
*TERMINATED: 06/07/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

**Erin Kimberly Taylor**
Federal Defenders of Western North Carolina
129 West Trade St.
Suite 300
Charlotte, NC 28202
704-374-0720
Fax: 704-374-0722
Email: Erin_Taylor@fd.org
*TERMINATED: 06/07/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

**Richard H. Tomberlin**
301 S. McDowell St.
Suite 1210

Charlotte, NC 28204
704/373-0979
Fax: 704/373-1308
Email: rht@tomberlinlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Steven George Slawinski**
Federal Defenders of Western NC
129 West Trade St.
Suite 300
Charlotte, NC 28202
704-374-0720
Fax: 704-374-0722
Email: steven_slawinski@fd.org
*TERMINATED: 10/17/2011*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:111(a)(1) and (b) - ASSAULTING/RESISTING/IMPEDING OFFICERS/EMPLOYEES (1) | 130 mos. impr.; 3 yrs. s/r; $100.00 sp. asst. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

| **Plaintiff** | | |
|---|---|---|
| USA | represented by | **Jennifer Lynn Dillon** United States Attorneys Office 227 West Trade St. Suite 1650 |

Charlotte, NC 28202
704-227-0226
Email: jennifer.dillon@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/15/2011 | 1 | INDICTMENT as to Charlie Wayne Bryant (1) count(s) 1. (Attachments: # 1 Unredacted Signature Page, # 2 Cover Sheet) (mga) (Entered: 03/16/2011) |
| 03/15/2011 | 2 | Arrest Warrant Issued *(Sealed - Case Participants)* in case as to Charlie Wayne Bryant. (Attachments: # 1 Warrant Identifier Page)(mga) (Entered: 03/16/2011) |
| 03/17/2011 | 3 | Application for Writ of Habeas Corpus ad Prosequendum as to Charlie Wayne Bryant (Dillon, Jennifer) (Entered: 03/17/2011) |
| 03/18/2011 | 4 | Writ of Habeas Corpus ad Prosequendum Issued as to Charlie Wayne Bryant Signed by Magistrate Judge David S. Cayer Initial Appearance set for 4/18/2011 09:30 AM in Magistrate Courtroom, 401 W Trade St, Charlotte, NC 28202 before Magistrate Judge David S. Cayer. (mga) (Entered: 03/18/2011) |
| 03/22/2011 | 5 | Writ of Habeas Corpus ad Prosequendum as to Charlie Wayne Bryant Returned Unexecuted. (tmg) (Entered: 03/22/2011) |
| 03/23/2011 | 6 | Application for Writ of Habeas Corpus ad Prosequendum as to Charlie Wayne Bryant (Dillon, Jennifer) (Entered: 03/23/2011) |
| 03/23/2011 | 7 | Writ of Habeas Corpus ad Prosequendum Issued as to Charlie Wayne Bryant Signed by Magistrate Judge David S. Cayer. Initial Appearance set for 4/18/2011 09:30 AM in Magistrate Courtroom, 401 W Trade St, Charlotte, NC 28202 before Magistrate Judge David S. Cayer. (tmg) (Entered: 03/23/2011) |
| 04/18/2011 | | Arrest (Writ) of Charlie Wayne Bryant (tob) (Entered: 04/18/2011) |
| 04/18/2011 | | Minute Entry: INITIAL APPEARANCE as to Charlie Wayne Bryant held before Magistrate Judge David S. Cayer. Defendant advised of rights & charges. Defendant moved for appointment of counsel. Court approved appointment of counsel. Government moved for detention. Arraignment and Detention hearing set for 4/21/2011 09:30 AM in Magistrate Courtroom, 401 W Trade St, Charlotte, NC 28202 before Magistrate Judge David S. Cayer.Government attorney: Jennifer Dillon. Defendant attorney: Steve Slawinski. Court Reporter FTR. (tob) (Entered: 04/18/2011) |
| 04/18/2011 | | **ORAL ORDER as to Charlie Wayne Bryant granting Oral Motion to Appoint Counsel by Magistrate Judge David S. Cayer on 4/21/11. (tob)** (Entered: 04/18/2011) |
| 04/18/2011 | | Attorney update in case as to Charlie Wayne Bryant. Attorney Steven George Slawinski for Charlie Wayne Bryant added. (mga) (Entered: 04/18/2011) |
| 04/19/2011 | | Reset Deadlines/Hearings as to Charlie Wayne Bryant per Defendant request: Arraignment and Detention hearing reset for 4/25/2011 10:25 AM in |

| | | |
|---|---|---|
| | | Magistrate Courtroom, 401 W Trade St, Charlotte, NC 28202 before Magistrate Judge David Keesler. (tob) (Entered: 04/19/2011) |
| 04/25/2011 | | Minute Entry: ARRAIGNMENT as to Charlie Wayne Bryant (1) Count 1 and DETENTION HEARING held before Magistrate Judge David Keesler. Defendant pled not guilty. Government moved for detention. Defendant detained. Government attorney: Steve Kaufman. Defendant attorney: Steve Slawinski. Court Reporter FTR. (mga) (Entered: 04/25/2011) |
| 04/25/2011 | 8 | **SCHEDULING ORDER as to Charlie Wayne Bryant Docket Call set for 5/2/2011 09:30 AM in Courtroom 1, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr. Signed by Magistrate Judge David Keesler on 4/25/11. (mga) (Entered: 04/25/2011)** |
| 04/25/2011 | 9 | **Standard Discovery Order in case as to Charlie Wayne Bryant.. Signed by Magistrate Judge David Keesler on 4/25/11. (mga) (Entered: 04/25/2011)** |
| 04/25/2011 | 10 | **ORDER OF DETENTION as to Charlie Wayne Bryant. Signed by Magistrate Judge David Keesler on 4/28/11. (mga) (Entered: 04/25/2011)** |
| 04/26/2011 | 11 | Unopposed MOTION to Continue Docket Call/Trial by Charlie Wayne Bryant. Responses due by 5/6/2011. (Slawinski, Steven) (Entered: 04/26/2011) |
| 04/27/2011 | 12 | **ORDER granting 11 Motion to Continue Docket Call/Trial as to Charlie Wayne Bryant (1). Docket Call set for 7/5/2011 09:30 AM in Courtroom 1, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr. Signed by District Judge Max O. Cogburn, Jr on 4/26/2011. (tmg) (Entered: 04/27/2011)** |
| 05/05/2011 | 13 | Warrant Returned Executed on 4/15/2011 in case as to Charlie Wayne Bryant. (tmg) (Entered: 05/05/2011) |
| 06/02/2011 | 14 | SEALED MOTION *(Sealed - Attorney)* Unopposed Request for Competency Evaluation (available to: USA, Charlie Wayne Bryant) (Slawinski, Steven). Motions referred to David S. Cayer. (Entered: 06/02/2011) |
| 06/03/2011 | 15 | **ORDER *(Sealed - Attorney)* granting 14 Sealed Motion for Competency Evaluation (available to: USA, Charlie Wayne Bryant) as to Charlie Wayne Bryant (1). Signed by Magistrate Judge David S. Cayer on 6/3/2011. (tmg) (Entered: 06/03/2011)** |
| 06/21/2011 | 16 | Unopposed MOTION to Continue Docket Call/Trial by Charlie Wayne Bryant. Responses due by 7/1/2011. (Slawinski, Steven) (Entered: 06/21/2011) |
| 06/27/2011 | 17 | **ORDER granting 16 Motion to Continue Docket Call/Trial as to Charlie Wayne Bryant (1). Docket Call re-set for 9/6/2011 09:30 AM in Courtroom, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr. Signed by District Judge Max O. Cogburn, Jr on 6/27/2011. (tmg) (Entered: 06/27/2011)** |
| 08/19/2011 | 18 | Unopposed MOTION to Continue Docket Call/Trial by Charlie Wayne Bryant. Responses due by 8/29/2011. (Slawinski, Steven) (Entered: 08/19/2011) |
| 08/19/2011 | 19 | **ORDER granting 18 Motion to Continue Docket Call/Trial as to Charlie** |

| | | |
|---|---|---|
| | | Wayne Bryant (1). Docket Call set for 11/7/2011 09:30 AM in Courtroom, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr. Signed by District Judge Max O. Cogburn, Jr on 8/19/11. (com) (Entered: 08/19/2011) |
| 10/04/2011 | 20 | Unopposed MOTION to Continue Docket Call/Trial by Charlie Wayne Bryant. Responses due by 10/14/2011. (Slawinski, Steven) (Entered: 10/04/2011) |
| 10/17/2011 | | Attorney update in case as to Charlie Wayne Bryant. Attorney Angela G. Parrott for Charlie Wayne Bryant added. Attorney Steven George Slawinski terminated. (mga) (Entered: 10/17/2011) |
| 10/25/2011 | 21 | NOTICE *of Attorney Unavailability* by Charlie Wayne Bryant (Parrott, Angela) (Entered: 10/25/2011) |
| 10/26/2011 | 22 | **ORDER granting 20 Motion to Continue Docket Call/Trial as to Charlie Wayne Bryant (1) Docket Call reset for 1/3/2012 09:30 AM in Courtroom 2, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr. Signed by District Judge Max O. Cogburn, Jr on 10/25/2011. (bsw)** (Entered: 10/26/2011) |
| 11/18/2011 | | Attorney update in case as to Charlie Wayne Bryant. Attorney Erin Kimberly Taylor for Charlie Wayne Bryant added. (tob) (Entered: 11/18/2011) |
| 11/29/2011 | | NOTICE OF HEARING as to Charlie Wayne Bryant: Plea Hearing - Straight Up set for 12/8/2011 09:45 AM in Magistrate Courtroom, 401 W Trade St, Charlotte, NC 28202 before Magistrate Judge David S. Cayer. *This is your only notice - you will not receive a separate document.*(tob) (Entered: 11/29/2011) |
| 12/08/2011 | | Minute Entry: PLEA HEARING - Straight Up as to Charlie Wayne Bryant held before Magistrate Judge David S. Cayer. Defendant sworn and advised of rights and charges. Plea Entered by Charlie Wayne Bryant (1) Guilty Count 1. Plea accepted. Case referral terminated for Magistrate Judge David S. Cayer. Government attorney: Jennifer Dillon. Defendant attorney: Angela Parrott. Court Reporter FTR. (tob) (Entered: 12/08/2011) |
| 12/08/2011 | 23 | ACCEPTANCE and entry of Guilty Plea as to Charlie Wayne Bryant signed by Magistrate Judge David S. Cayer. (tob) (Entered: 12/08/2011) |
| 05/15/2012 | 24 | MOTION to Withdraw as Attorney by Angela Parrott. by Charlie Wayne Bryant. (Parrott, Angela) (Entered: 05/15/2012) |
| 05/29/2012 | 25 | **ORDER REFERRING MOTION as to Charlie Wayne Bryant 24 MOTION to Withdraw as Attorney by Angela Parrott. Signed by District Judge Max O. Cogburn, Jr on 5/29/2012. (tmg) Motions referred to David S. Cayer.** (Entered: 05/29/2012) |
| 05/30/2012 | | NOTICE OF HEARING ON MOTION in case as to Charlie Wayne Bryant 24 MOTION to Withdraw as Attorney by Angela Parrott. : Motion Hearing set for 6/7/2012 10:15 AM in Magistrate Courtroom, 401 W Trade St, Charlotte, NC 28202 before Magistrate Judge David S. Cayer. *This is your only notice - you will not receive a separate document.*(tob) (Entered: 05/30/2012) |
| | | |

| 05/31/2012 | 27 | LETTER by Charlie Wayne Bryant (blf) (Entered: 06/01/2012) |
|---|---|---|
| 06/01/2012 | 26 | PRESENTENCE INVESTIGATION REPORT (Draft Report) *(SEALED - Attorney)* as to Charlie Wayne Bryant. Objections to PSI due 6/18/2012. (available to USA, Charlie Wayne Bryant)(Emily E. Hood - nth) (Entered: 06/01/2012) |
| 06/07/2012 | | Minute Entry: MOTION HEARING as to Charlie Wayne Bryant held before Magistrate Judge David S. Cayer. Re 24 MOTION to Withdraw as Attorney by Angela Parrott.. Order to issue. Government attorney: Jennifer Dillon. Defendant attorney: Angela Parrott. Court Reporter FTR. (tob) (Entered: 06/07/2012) |
| 06/07/2012 | 28 | **ORDER granting 24 Motion to Withdraw as Attorney. Angela G. Parrott withdrawn from case as to Charlie Wayne Bryant (1) Signed by Magistrate Judge David S. Cayer on 6/7/12. (com) (Entered: 06/07/2012)** |
| 06/12/2012 | 29 | Psychiatric Report *(Sealed - Attorney)* as to Charlie Wayne Bryant (available to: USA, Charlie Wayne Bryant) (Court received copy of report from AUSA) (tob) (Entered: 06/12/2012) |
| 06/14/2012 | 30 | NOTICE OF ATTORNEY APPEARANCE: Richard H. Tomberlin appearing for Charlie Wayne Bryant (Tomberlin, Richard) (Entered: 06/14/2012) |
| 06/14/2012 | 31 | **CJA 20** *(Restricted)* **as to Charlie Wayne Bryant: Appoinment of Attorney Richard H. Tomberlin, Jr. for Charlie Wyane Bryant (mga)** Modified to correct text on 6/14/2012 (mga). (Entered: 06/14/2012) |
| 06/26/2012 | 32 | LETTER by Charlie Wayne Bryant (blf) (Entered: 06/26/2012) |
| 06/27/2012 | 33 | Order denying 32 letter Signed by District Judge Max O. Cogburn, Jr on 6/27/2012. (blf) Modified to correct relationship on 6/29/2012 (blf). (Entered: 06/27/2012) |
| 06/29/2012 | 34 | **SEALED ORDER** *(Sealed - Attorney)*: **as to Charlie Wayne Bryant (available to: USA, Charlie Wayne Bryant). Signed by District Judge Max O. Cogburn, Jr on 6/27/2012. (blf) (Entered: 06/29/2012)** |
| 07/09/2012 | 35 | MOTION to Withdraw Plea of Guilty by Charlie Wayne Bryant. Responses due by 7/19/2012 (Tomberlin, Richard) (Entered: 07/09/2012) |
| 07/12/2012 | 36 | TRANSCRIPT of Plea and Rule 11 as to Charlie Wayne Bryant held on 12/8/11 before Judge Cayer. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov Release of Transcript Restriction set for 10/12/2012. (Reporter: Cheryl Nuccio, 704-350-7494)** (Entered: 07/12/2012) |
| 07/19/2012 | 37 | RESPONSE in Opposition by USA as to Charlie Wayne Bryant re 35 |

| | | MOTION to Withdraw Plea of Guilty (Dillon, Jennifer) (Entered: 07/19/2012) |
|---|---|---|
| 07/23/2012 | | Motion Referred as to Charlie Wayne Bryant: 35 MOTION to Withdraw Plea of Guilty (chh)Motions referred to David S. Cayer (Entered: 07/23/2012) |
| 07/27/2012 | 38 | **ORDER denying 35 Motion to Withdraw Plea of Guilty as to Charlie Wayne Bryant (1). Signed by Magistrate Judge David S. Cayer on 7/27/2012. (tmg)** (Entered: 07/27/2012) |
| 08/16/2012 | 39 | OBJECTION TO PRESENTENCE INVESTIGATION REPORT *(Sealed - Attorney)* by Charlie Bryant; (available to: USA, Charlie Wayne Bryant) (Tomberlin, Richard) (Entered: 08/16/2012) |
| 08/21/2012 | 40 | RESPONSE to 39 Objection to Presentence Investigation Report *(Sealed - Attorney)* by USA; (available to: USA, Charlie Wayne Bryant) (Dillon, Jennifer) (Main Document 40 replaced on 8/22/2012) (eef). (Entered: 08/21/2012) |
| 08/22/2012 | 41 | MOTION for Leave to File *objections and appeal out of time* by Charlie Wayne Bryant. Responses due by 9/4/2012 (Tomberlin, Richard) (Entered: 08/22/2012) |
| 08/22/2012 | 42 | NOTICE OF APPEAL from Order of Magistrate Judge to District Court by Charlie Wayne Bryant re 38 Order on Motion to Withdraw Plea of Guilty. (Tomberlin, Richard) (Entered: 08/22/2012) |
| 09/06/2012 | 43 | **ORDER granting 41 Motion for Leave to File, denying 42 as to Charlie Wayne Bryant (1) Signed by District Judge Max O. Cogburn, Jr on 9/5/2012. (blf)** (Entered: 09/06/2012) |
| 09/11/2012 | 44 | MOTION for Inquiry of Counsel by Charlie Wayne Bryant. (Attachments: # 1 letter, # 2 Envelope)(blf) (Entered: 09/11/2012) |
| 09/19/2012 | 45 | PRESENTENCE INVESTIGATION REPORT (Final Report) *(SEALED - Attorney)* as to Charlie Wayne Bryant. (available to USA, Charlie Wayne Bryant) Schedule for Sentence on or after 9/28/2012(Emily E. Hood - nth) (Entered: 09/19/2012) |
| 10/05/2012 | | NOTICE OF HEARING ON MOTION in case as to Charlie Wayne Bryant 44 MOTION for Inquiry of Counsel : Motion Hearing set for 10/26/2012 10:00 AM in Courtroom, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr.. *This is your only notice - you will not receive a separate document.*(chh) (Entered: 10/05/2012) |
| 10/05/2012 | | NOTICE OF HEARING as to Charlie Wayne Bryant: Sentencing set for 10/26/2012 10:01 AM in Courtroom, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr.. *This is your only notice - you will not receive a separate document.*(chh) (Entered: 10/05/2012) |
| 10/25/2012 | 47 | SEALED SENTENCING MEMORANDUM *(Sealed - Attorney)* by Defendant; (available to: USA, Charlie Wayne Bryant) (Attachments: # 1 Appendix Exhibit 1, # 2 Appendix Exhibit 2, # 3 Appendix Exhibit 3, # 4 Appendix Exhibit 4, # 5 Appendix Exhibit 5, # 6 Appendix Exhibit 6, # 7 Appendix Exhibit 7, # 8 Appendix Exhibit 8)(Tomberlin, Richard) (Entered: |

| | | |
|---|---|---|
| | | 10/25/2012) |
| 10/26/2012 | | Minute Entry: SENTENCING as to Charlie Wayne Bryant held before District Judge Max O. Cogburn, Jr. Factual Basis Found. Government attorney: Jennifer Dillon. Defendant attorney: Richard Tomberlin. Court Reporter: Joy Kelly. (chh) (Entered: 10/26/2012) |
| 10/31/2012 | 48 | LETTER by Charlie Wayne Bryant (Attachments: # 1 Envelope)(blf) (Entered: 10/31/2012) |
| 10/31/2012 | 49 | NOTICE OF APPEAL by Charlie Wayne Bryant (IFP/CJA) (Judgment not yet entered) (Attachments: # 1 Envelope)(blf) (Entered: 11/01/2012) |
| 11/01/2012 | 50 | Transmission of Notice of Appeal as to Charlie Wayne Bryant to US Court of Appeals re 49 Notice of Appeal (blf) (Entered: 11/01/2012) |
| 11/01/2012 | | Original Assembled Electronic Record as to Charlie Wayne Bryant Transmitted to Fourth Circuit re 49 Notice of Appeal. (blf) (Entered: 11/01/2012) |
| 11/02/2012 | | **TEXT-ONLY ORDER finding as moot 44 Motion for Inquiry of Counsel as to Charlie Wayne Bryant (1)** *Text of Order: Pro se motion resolved at sentencing hearing So Ordered.* **Entered by District Judge Max O. Cogburn, Jr on 11/2/2012. (Davis, David)** (Entered: 11/02/2012) |
| 11/05/2012 | 51 | 4th Circuit NOTICE as to Charlie Wayne Bryant regarding Stay of appeal pending entry of criminal judgment (bsw) (Entered: 11/05/2012) |
| 11/13/2012 | 52 | **JUDGMENT as to Charlie Wayne Bryant (1), Count(s) 1, 130 mos. impr.; 3 yrs. s/r; $100.00 sp. asst.. Signed by District Judge Max O. Cogburn, Jr on 11/13/2012. (chh)** (Entered: 11/13/2012) |
| 11/13/2012 | 53 | **STATEMENT OF REASONS** *(Sealed - Attorney)* **re: 52 Judgment (available to: USA, Charlie Wayne Bryant). Signed by District Judge Max O. Cogburn, Jr on 11/13/2012. (chh)** (Entered: 11/13/2012) |
| 11/13/2012 | 55 | MOTION for Transcripts at Government Expense by Charlie Wayne Bryant. (Attachments: # 1 Envelope)(blf) (Entered: 11/14/2012) |
| 11/14/2012 | 54 | **ORDER as to Charlie Wayne Bryant re 48 Letter filed by Charlie Wayne Bryant. Notice of appeal transmitted 50 . Signed by District Judge Max O. Cogburn, Jr on 11/13/2012. (blf)** (Entered: 11/14/2012) |
| 11/16/2012 | | USCA Case Number as to Charlie Wayne Bryant 12-4912 for 49 Notice of Appeal USCA Case Manager: J Moore. (bsw) (Entered: 11/16/2012) |
| 11/16/2012 | 56 | LETTER by Charlie Wayne Bryant (Attachments: # 1 Envelope)(blf) (Entered: 11/16/2012) |
| 11/20/2012 | 57 | ORDER of USCA as to Charlie Wayne Bryant re: appointment of Cindy H. Poplin-Bradley for appeal proceedings (bsw) (Entered: 11/20/2012) |
| 11/27/2012 | 58 | Writ of Habeas Corpus ad Prosequendum Returned Executed as to Charlie Wayne Bryant on 11/20/2012. (blf) (Entered: 11/28/2012) |
| | | |

| 11/29/2012 | 59 | LETTERS from Charlie Wayne Bryant (Attachments: # 1 Envelope)(blf) (Entered: 11/30/2012) |
|---|---|---|
| 12/12/2012 | 60 | **ORDER denying 55 Motion for Transcripts at Government Expense as to Charlie Wayne Bryant (1). Denying 56 and 59 Order mailed to Charlie Bryant. Signed by District Judge Max O. Cogburn, Jr on 12/11/2012. (blf)** (Entered: 12/12/2012) |
| 12/14/2012 | 61 | USCA TRANSCRIPT ORDER ACKNOWLEDGMENT as to Charlie Wayne Bryant re 49 Notice of Appeal CRprt: C Nuccio (bsw) (Entered: 12/14/2012) |
| 01/06/2013 | 62 | TRANSCRIPT of SENTENCING HEARING as to Charlie Wayne Bryant held on 10-26-12 before Judge MAX O. COGBURN, JR., **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a** *Notice of Intent to Request Redaction* **and 21 calendar days to file a** *Redaction Request.* **If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** *(Does this satisfy all appellate orders for this reporter? - Yes.)* Release of Transcript Restriction set for 4/8/2013. (Reporter: Joy Kelly, 704-350-7495) (Entered: 01/06/2013) |
| 01/06/2013 | 63 | TRANSCRIPT of WITHDRAWAL OF COUNSEL HEARING as to Charlie Wayne Bryant held on 6-7-12 before Judge DAVID S. CAYER, **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a** *Notice of Intent to Request Redaction* **and 21 calendar days to file a** *Redaction Request.* **If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** *(Does this satisfy all appellate orders for this reporter? - Yes.)* Release of Transcript Restriction set for 4/8/2013. (Reporter: Joy Kelly, 704-350-7495) (Entered: 01/06/2013) |
| 01/22/2013 | 64 | **CJA 24** *(Sealed - Court)* **as to Charlie Wayne Bryant: Authorization to Pay Joy Kelly Voucher # 130116000039.. Signed by District Judge Max O. Cogburn, Jr on 1/10/13. (lhg) (Entered: 01/22/2013)** |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/29/2013 10:37:30 | | |
| **PACER Login:** | cp1859 | **Client Code:** |
| **Description:** | Docket Report | **Search Criteria:** | 3:11-cr-00072-MOC |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:11cr72 -MOC |
| | ) | |
| v. | ) | BILL OF INDICTMENT |
| | ) | |
| | ) | Violation: 18 U.S.C. § 111(a)(1) and (b) |
| CHARLIE WAYNE BRYANT | ) | |
| | ) | |

THE GRAND JURY CHARGES:

### COUNT ONE

On or about February 8, 2011, in Gaston County, within the Western District of North Carolina, and elsewhere,

### CHARLIE WAYNE BRYANT

did forcibly assault, resist, oppose, impede, intimidate, and interfere with "E.L.S.," an officer and employee of the United States and of an agency in a branch of the United States Government, that is, a contract protective security officer with the U.S. Department of Homeland Security Federal Protective Service, while "E.L.S." was engaged in, and on account of the performance of "E.L.S.'s" official duties, and in the commission of the offense, did make physical contact with the victim, "E.L.S.," inflicting bodily injury, in violation of Title 18, United States Code, Section 111(a)(1) and (b).

A TRUE BILL:



ANNE M. TOMPKINS
UNITED STATES ATTORNEY

*Jennifer Lynn Dillon*

JENNIFER LYNN DILLON
ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA     )    DOCKET NO. 3:11-CR-72
                               )
      vs.                    )
                               )
CHARLIE WAYNE BRYANT,        )
                               )
        Defendant.       )
_____)

TRANSCRIPT OF PLEA AND RULE 11 HEARING
BEFORE THE HONORABLE DAVID CAYER
UNITED STATES MAGISTRATE JUDGE
DECEMBER 8, 2011

<u>APPEARANCES</u>:

On Behalf of the Government:

      JENNIFER LYNN DILLON, ESQ.
      United States Attorney's Office
      227 West Trade Street, Suite 1700
      Charlotte, North Carolina

On Behalf of the Defendant:

      ANGELA G. PARROTT, ESQ.
      Federal Public Defender's Office
      129 West Trade Street, Suite 300
      Charlotte, North Carolina

Proceedings digitally recorded and transcribed by:

               Cheryl A. Nuccio, RMR-CRR
               Official Court Reporter
             United States District Court
               Charlotte, North Carolina

1                    P R O C E E D I N G S

2              (Transcript of proceedings digitally recorded on

3     December 8, 2011.)

4              MS. PARROTT:  Good morning, Your Honor.

5              THE COURT:  Good morning.

6              United States versus Charlie Bryant.

7              Sir, I'm going to ask you some questions about your

8     plea.  The clerk will place you under oath first.

9              (Defendant was sworn.)

10             THE COURT:  You understand that you're now under

11    oath and that you're required to give truthful answers to the

12    questions I'm about to ask?

13             THE DEFENDANT:  Yes, sir.

14             THE COURT:  Do you understand that if you give false

15    information under oath, you may be prosecuted for perjury or

16    false statement?

17             THE DEFENDANT:  Yes, sir.

18             THE COURT:  After consulting with your attorney, do

19    you want this court to accept your guilty plea to one count in

20    this bill of indictment?

21             THE DEFENDANT:  Yes, sir.

22             THE COURT:  Do you understand that you have the

23    right to have a United States district judge conduct this

24    proceeding?

25             THE DEFENDANT:  Yes, sir.

1       THE COURT:  Recognizing your right to proceed before
2  a district judge, do you expressly consent to proceed in this
3  court today, that is, before a United States magistrate
4  judge?
5       THE DEFENDANT:  Yes, sir.
6       THE COURT:  Are you now under the influence of any
7  alcohol or drugs?
8       THE DEFENDANT:  No, sir.
9       MS. PARROTT:  Your Honor, just for the record, it
10  doesn't affect his ability to understand today's proceedings,
11  but he does take a thousand milligrams of Depakote --
12       THE COURT:  All right.
13       MS. PARROTT:  -- twice a day at the jail.
14       THE COURT:  All right.
15       Is your mind clear and do you understand that you
16  are here to enter a guilty plea that cannot later be
17  withdrawn?
18       THE DEFENDANT:  Yes, sir.
19       THE COURT:  Have you received a copy of the
20  indictment and have you discussed its contents with your
21  attorney?
22       THE DEFENDANT:  Yes, sir.
23       THE COURT:  Would the government summarize the
24  charge and the penalty.
25       MS. DILLON:  Yes, Your Honor.

1      The charge is one violation of Title 18, United
2  States Code, Section 111(a)(1) and (b).  (b), Your Honor, is
3  an alleged enhancement that the defendant inflicted bodily
4  injury on to the victim.
5      The count charges that on or about February 8th,
6  2011, in Gaston County, within the Western District of North
7  Carolina, and elsewhere, Charlie Wayne Bryant did forcibly
8  assault, resist, oppose, impede, intimidate, and interfere
9  with E.L.S., an officer and employee of the United States and
10 of an agency and a branch of the United States government,
11 that is, a contract protective security officer with the
12 United States Department of Homeland Security, Federal
13 Protective Service, while E.L.S. was engaged in, and on
14 account of the performance of E.L.S.'s official duties, and in
15 the commission of the offense, that Mr. Bryant did make
16 physical contact with the victim, E.L.S., inflicting the
17 bodily injury.
18      THE COURT:  And the penalty is?
19      MS. DILLON:  The penalty, Your Honor, is not more
20 than 20 years' imprisonment and/or a $250,000 fine.  And
21 that's with the enhancement.
22      THE COURT:  Do you fully understand the charge
23 against you, including the maximum penalty you face if
24 convicted?
25      THE DEFENDANT:  Yes, sir.

1      THE COURT:  Have you spoken with your attorney about
2  how the U.S. Sentencing Guidelines might apply to your case?
3      THE DEFENDANT:  Yes, sir.
4      THE COURT:  Do you understand that the district
5  judge will not be able to determine the applicable sentencing
6  guideline range until after your presentence report has been
7  prepared and you've had an opportunity to comment on it?
8      THE DEFENDANT:  Yes, sir.
9      THE COURT:  Do you also understand that in some
10  circumstances you may receive a sentence that's different,
11  that is, either higher or lower than that called for by the
12  guidelines?
13      THE DEFENDANT:  Yes, sir.
14      THE COURT:  Do you understand that the court may
15  order restitution where applicable?
16      THE DEFENDANT:  Yes, sir.
17      THE COURT:  Do you understand that if the sentence
18  is more severe than you expected or the court does not
19  accept the government's sentencing recommendation, you'll
20  still be bound by your plea and you'll have no right to
21  withdraw it?
22      THE DEFENDANT:  Yes, sir.
23      THE COURT:  Do you understand that parole has been
24  abolished and if you're sentenced to a term of imprisonment,
25  you'll not be released on parole?

1            THE DEFENDANT:  Yes, sir.

2            THE COURT:  If your sentence includes imprisonment,

3    do you understand that the district judge may also order a

4    term of supervised release?

5            THE DEFENDANT:  Yes, sir.

6            THE COURT:  Do you understand that if you violate

7    the terms and conditions of supervised release, which

8    typically lasts from one to five years, you could be returned

9    to prison for an additional period of time?

10           THE DEFENDANT:  Yes, sir.

11           THE COURT:  Do you understand you have a right to

12   plead not guilty --

13           THE DEFENDANT:  Yes, sir.

14           THE COURT:  -- to have a speedy trial before a judge

15   and jury, to summon witnesses to testify in your behalf, and

16   to confront the witnesses against you?

17           THE DEFENDANT:  Yes, sir.

18           THE COURT:  If you exercised your right to trial,

19   you'd be entitled to the assistance of a lawyer.  You would

20   not be required to testify.  You'd be presumed innocent and

21   the burden would be on the government to prove your guilt

22   beyond a reasonable doubt.

23           Do you understand all of these rights?

24           THE DEFENDANT:  Yes, sir.

25           THE COURT:  By entering this plea of guilty, you're

1 waiving or giving up those rights and there will be no trial.

2 If your guilty plea is accepted, there will be one more

3 hearing where the district judge will determine whether

4 there's a factual basis for your plea and what sentence to

5 impose.

6         Do you understand that?

7         THE DEFENDANT: Yes, sir.

8         THE COURT: Are you, in fact, guilty of the count in

9 this bill of indictment to which you've come to court today to

10 plead guilty?

11         THE DEFENDANT: Yes, sir.

12         THE COURT: There's no written plea agreement in

13 this case. Are there any terms or conditions of the plea to

14 be put on the record at this time by the government?

15         MS. DILLON: No, Your Honor.

16         THE COURT: Ms. Parrott?

17         MS. PARROTT: No, Your Honor.

18         THE COURT: Has anyone threatened, intimidated or

19 forced you to enter a guilty plea today?

20         THE DEFENDANT: No, sir.

21         THE COURT: Has anyone made you any promises of

22 leniency or a light sentence to induce you to plead guilty?

23         THE DEFENDANT: No, sir.

24         THE COURT: Have you had enough time to discuss with

25 your attorney any possible defenses you may have to this

1  charge?

2          THE DEFENDANT:  Yes, sir.

3          THE COURT:  Are you satisfied with the services of

4  your attorney in this case?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  Is there anything that you'd like to say

7  at this time about the services of your attorney?

8          THE DEFENDANT:  No, sir.

9          THE COURT:  Have you heard and understood all parts

10  of this proceeding and do you still wish to plead guilty?

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  Do you have any statements or any

13  questions at this time?

14          THE DEFENDANT:  No, sir.

15          THE COURT:  Ms. Parrott, have you reviewed the

16  consequences of his guilty plea with him and are you satisfied

17  that he understands those consequences?

18          MS. PARROTT:  Yes, I have and, yes, I am, Your

19  Honor.

20          THE COURT:  All right.  I'll submit the transcript

21  for review and signature by counsel and the defendant.

22          (Pause.)

23          THE COURT:  The court finds the plea to be knowingly

24  and voluntarily made and it is accepted.

25          MS. PARROTT:  Thank you.

1          MS. DILLON:  Thank you, Your Honor.

2          (End of proceedings.)

3                              *****

4     UNITED STATES DISTRICT COURT

5     WESTERN DISTRICT OF NORTH CAROLINA

6     CERTIFICATE OF REPORTER

7

8

9          I,  Cheryl A. Nuccio, Official Court Reporter,

10    certify that the foregoing transcript is a true and correct

11    transcript of the digitally-recorded proceedings, transcribed

12    by me to the best of my ability.

13

14          Dated this 12th day of July 2012.

15

16

17                         s/Cheryl A. Nuccio
                           Cheryl A. Nuccio, RMR-CRR
18                         Official Court Reporter

19

20

21

22

23

24

25

# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | 3:11 CR 72 - MOC |
| | ) | |
| CHARLIE WAYNE BRYANT | ) | |
| | ) | |

## MOTION TO WITHDRAW AS COUNSEL

Defendant Charlie Wayne Bryant, by and through undersigned counsel, hereby requests this Court allow her to withdraw as counsel of record and appoint substitute counsel from the CJA panel. As grounds therefore, it is averred:

1.    Mr. Bryant is charged in a one-count Bill of Indictment with assaulting an officer and employee of the United States while performing his official duties, inflicting bodily injury, in violation of 18 U.S.C. §§ 111(a)(1) and (b).

2.    On April 18, 2011, Mr. Bryant made his initial appearance in this case. He was arraigned and ordered detained pending trial on April 25, 2011.

3.    On June 3, 2011, The court granted Mr. Bryant's motion for a competency evaluation. Mental health professionals at the Bureau of Prisons ("BOP") found that Mr. Bryant was competent to proceed in his case.

4.    Mr. Bryant's former attorney, Steven Slawinski, Esquire, left the Federal Defenders of Western North Carolina in October 2011. Mr. Slawinski is now an Assistant Federal Defender in the Western District of New York.

5.    On October 17, 2011, Mr. Bryant's case was reassigned to undersigned counsel.

6. On December 8, 2011, Mr. Bryant pled guilty "straight up" to the charge in the Bill of Indictment.

7. On May 10, 2012, Mr. Bryant had his presentence interview. Undersigned counsel was present. The draft Presentence report has not been disclosed.

8. Soon after Mr. Bryant's presentence interview, undersigned counsel learned that Mr. Bryant believes that undersigned counsel is incompetent and has provided ineffective assistance in his case. Counsel learned of these claims in a letter that can be provided to the Court, if necessary, *in camera*.

9. Undersigned counsel met with Mr. Bryant on May 15, 2012 to discuss his claims. After meeting with Mr. Bryant, undersigned counsel believes that she can no longer represent Mr. Bryant in this matter.

10. Irreconcilable differences have developed between the parties that have significantly impaired the attorney-client relationship to a point where both parties request the court allow counsel to withdraw.

11. Should the Court deem it necessary to have a hearing regarding this motion, undersigned counsel has the following conflicts: Counsel will be in Richmond for oral arguments before the Fourth Circuit on May 17-18, attending an out-of-state CLE conference May 29-June1, and trial before the Honorable Frank D. Whitney June 4-6 ,2012.

**WHEREFORE**, counsel, on behalf of Charlie Wayne Bryant, respectfully requests this Court allow her to withdraw as counsel of record and appoint substitute counsel from the CJA panel.

Respectfully submitted:

s/Angela Parrott
Angela Parrott

N.C. Bar # 35490
Attorney for Charlie Wayne Bryant
Federal Defenders of Western North Carolina, Inc
129 West Trade Street, Suite 300
Charlotte, NC 28202
(704)374-0720
(704)374-0722 FAX
Angela_Parrott@fd.org

May 15, 2012

# CERTIFICATE OF SERVICE

I, Angela Parrott, Assistant Federal Defender, hereby certify that I have served a copy of the attached Motion to Withdraw as Counsel on Assistant United States Attorney Jennifer Dillon by electronic filing at Jennifer.Dillon@usdoj.gov.

S/Angela Parrott
Angela Parrott
N.C. Bar # 35490
Attorney for Charlie Wayne Bryant
Assistant Federal Defender
Federal Defenders of Western North Carolina, Inc
129 West Trade Street, Suite 300
Charlotte, NC 28202
(704)374-0720
(704)374-0722 FAX
Angela_Parrott@fd.org

DATE: May 15, 2012

3:11cr72

Your Honorable Judge Conrad        5/18/12

Sir, I meet with attorney Ms. Parrott on October 25, 2011. Which she informed me that she wasn't a gambler and I shouldn't be in jail. But she don't think we could win case, because jury would take guards side because he is in law enforcement. Ms. Parrott never went over my discovery. Sent me a letter couple days later pressuring into taking guilty plea. By saying government attorney would recommend low end of guide lines (41) months. Then she would request the Court to grant a downward departure or variance in my case. Also believe can argue that I suffered from diminished capacity at the time of the offense, and an imperfect self defense. Also did not possess a weapon and the guards injury was minor. She would argue Court sentence below guidelines based on above dispute arguments and history. But if went to trial testified and lost would be looking at 70 to 87 months. Then on January 18, 2012 got another letter saying

aplied. That USSG §2A2.4 obstructing
or Impeding officer should be guideline
Which would be 30 to 37 months
with category history V. Then all time
we talked acted like would get time
served with time already done. Didn't
explain wait. Say 6 months for P.S.I. then
another 4 or 5 until sentencing hearing.
I never been in federal system, thought
would be sentenced right then. Then
after I plead guilty (Straight Up) has
she write U.S. attorney Jennifer Dillon
in her withdraw motion. I asked her
after plead guilty what about a Booker
Variance. Because she had then said
it couldn't be over looked what I
done. That she would promise to get
me 29 months. How she know what I
did when never took time to look
at case. Then on May 15, 2012 Ms.
Parrott informed I never had any
competence hearing from when I went
to have evaluation by BOP on June
20, 2011 until Sept. 20, 2011. So, how
and why let me plea guilty to
aggravated assault when I have

self said didn't apply. Because I got paper work from law library. It states meaning of 2A2.2 A) Use of weapon involved B) serious bodily injury. are C) attempt to commit another felony. I said how I wish Mr. Slawski would have finished my case, before taking job in New York. So during PSI Probation Officer Emily Hood ask did I want her to call my mother are have anything I want the Judge to know. I said no because I don't always speak at sight time being Bi-polar. First thing Mr. Panel said May 10, 2012 was ask for drug treatment, or BOP well I'm not qualified to start with for violent crime, Plus no real drug problems. Have got to stop listening to pretty woman. I haven't bought any grass since 2009 only smoke about 4 joints in 3 years. Smoke a little hard a couple times last few months before I got arrested. That was just to take woman to motel have sex all night. So your honorable Jude Conrad I ask you let

me withdraw guilty plea. Have trial by jury and appoint me a lawyer that will fight for me. There a few things I'd like you to know. First I've rededicated my life to the Lord. Even wrote Chaplain got him to start Bible study every Tuesday to help all inmates. Then before this alleged crime took place was off medication. Because Gaston County I was in court on Nov. 19, 2010 when got arrested. When got out went to Dr. N. Shukla 2-4-11 couldn't get appointment until March. Knew was getting Manic, went to Gaston Memorial 2-7-11 couldn't get script filled. Called Veterans suicide hotline received 11am 2-7-11 police came. Then ambulance took to Kings Mountain hospital. November Doctor asked how much depakote I was suppose to be on. Then said he would see in morning. I took off shoes start to lay down. The nurse said he's crashing. Then brought discharge papers, made leave hospital grounds, about one o'clock in the morning. The security guard

Walks off property. Then gives knife back. So I walk around Kings Mtn all night waiting for Mt View restion to open. Where my first Mother In Law works. Well about 7:15 am Kings Mt jury show up take to jail. Low and behold my duffle bag sitting there. Some good citizen turn in. Because I sit it down while I was walking around in my sleep. This is now Tuesday, the 8 of Feb. 2011 & I haven't been asleep since 3 AM 2/6/11 until 10 till check out when lady stuck head in room said had ten mintute to get off property. Because guy that rent room didn't know I was one started guie in 2010. I want very much get back with Dr Shukla she was my doctor for 9 year and will give right meds. Also I want you to knowl I'm done with wild woman. That I've been reading a lot of spiritial books, and must begin responsiblity. My main thing take my medicine. Chida is my thorn in the flesh but

Also I'd like to finish my second
year of colleg. For degre in auto-
motive Mech. Main thing build
my family relationship back. I have
3 children, 2 step children and 4
grandchildren I've never seen. I ask
with all due respect you will set
me a courtdate at your earliest
convenience! Mr. Howell said your a good
Judg! I sure hope so... bid you Godspeed.

P.S. Back to Kings Mt.
police Dept., They took to Sincerely
Gastonia jail for trespassing Charlie Bryant
charge. Deceased wife sister took Wayne
out I think open title. The magistrate knows
our history about that chdge. So let sign
promisery note. Then I got out of jail
about 9:30 am on 2-8-11 & went to SS office
like Mr. Simms said. They suppose to owe 1588⁰⁰
For checks dead wife tore up since 2001. Main
thing listen to older brother take meds. or
be locked up rest of my life. Because when
I get off medicine get in all kind of trouble
Just have to take meds ask God.
Well for now

Liberty
FOREVER

CHARLOTTE NC 282

24 MAY 2012 PM 6 L

Charlie W. Bryant 287910
P.O. Box 34490
Charlotte, N.C. 28234

RECEIVED
Honorable Max O. Cogburn, Jr.

Mailed From Mecklenburg
May 3 1 2012
County Jail Cental

US District Court
Asheville, NC 28801

C/O Honorable Judge Conrad
United States District Court
401 West Trade Street
Charlotte, N.C., 28502

28202185050

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


UNITED STATES OF AMERICA,      )
                               )
           Plaintiff,      )  3:11CR72
                               )  JUNE 7, 2012
     vs                      )
                               )
CHARLIE WAYNE BRYANT,      )
                               )
           Defendant.      )
_____/

TRANSCRIPT OF MOTION TO WITHDRAW AS ATTORNEY
BEFORE THE HONORABLE DAVID S. CAYER
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

FOR THE UNITED STATES:    JENNIFER DILLON
                        U. S. Attorney's Office
                        227 W. Trade Street
                        Suite 1700
                        Charlotte, NC 28202


FOR THE DEFENDANT:       ANGELA PARROTT
                        Federal Defenders of WNC
                        129 W. Trade Street
                        Charlotte, NC 28202


Proceedings digitally recorded and transcript
prepared by:


JOY KELLY, RPR, CRR
U. S. Official Court Reporter
Charlotte, North Carolina
704-350-7495

```
1              (Hearing commenced at 10:09:39 a.m.)

2         THE COURT:  Have a seat there, sir.

3         He is here as a result of a letter which was

4    received by Judge Cogburn on May 31st, and the way I read his

5    letter, he's asking to withdraw his guilty plea that was

6    previously entered, and he's asking, Ms. Parrott, for you to

7    be relieved of as his attorney.  Is that the way you

8    understand it?

9         MS. PARROTT:  Yes, Your Honor.  I did file a motion

10   in this case on the 15th, Document 24, to withdraw.

11        THE COURT:  All right.

12        MS. PARROTT:  I do believe that there have been --

13   irreconcilable differences have arisen, and that it is not in

14   either parties' best interest to continue with my

15   representation of Mr. Bryant.

16        THE COURT:  All right.  Is that what you understand

17   the posture of it is, Ms. Dillon?

18        MS. DILLON:  Yes, sir.

19        THE COURT:  Well, as far as the motion to withdraw

20   his plea, sir, you made that motion at the time that you had

21   counsel, and the local rules of this Court say that a

22   defendant can't make a motion when you have counsel.  The

23   motion has to be made by counsel.  So I'm going to deny the

24   motion to withdraw his plea, and I'm denying it without

25   prejudice to counsel raising it in the future if they think
```

1  it's appropriate to raise it.

2          Let me ask you a question, Mr. Bryant.  Stand up

3  there, sir.

4          Sir, the only thing I'm interested in today is about

5  your situation with Ms. Parrott.  And I don't want to get into

6  any of the facts of your case or any other matters other than

7  that.  And obviously what you say may be used against you, so

8  I'm repeating that admonition to you.

9          What has been your problem with Ms. Parrott?

10         DEFENDANT BRYANT:  Well, first, Your Honor, when I

11  first met her she said she wasn't -- she didn't think we could

12  win the case because the guards were law enforcement, and if I

13  took it to trial and lost and testified, I'd get 70 to 87

14  months.  I've got two letters right here.  She said if I

15  pleaded guilty, she'd probably get timed served, or at least

16  at the most 24 months.  And I did the 15 months, so I just

17  wanted to get out of jail.  She didn't tell me you had to go

18  through a PSI and wait five more months, then wait a few more

19  months to get sentenced.  Then the PSI can change because

20  Mr. Hood done changed it to 110 to 137 months.  So I pleaded

21  for it, looking for 41, 51 months.  And she said the

22  U. S. Attorney, Ms. Dillon, recommended the low end at 41

23  months.  Then she said she would ask for a downward departure

24  or variance since I was under diminished capacity at the time

25  in my defense.  And there was -- what's it say -- something

1    about imperfect self-defense, and the weapon involved with

2    regards to injury, that was minor. And then I kept asking her

3    what was she going to say in court. Then she kept giving me

4    different things. I wasn't even guilty of the charge. She

5    never went over my motion in discovery. She didn't look at

6    the film where the guard assaulted me.

7          THE COURT: All right, sir. Do you want to respond

8    to any of that, Ms. Parrott?

9          MS. PARROTT: No, Your Honor.

10          THE COURT: Sir, let me just explain two things to

11    you.

12          First of all, when you say Ms. Parrott recommended

13    against going to trial in the case, that's her job is to give

14    you legal advice. And if that's her assessment of the case,

15    that's something you should consider. You should consider her

16    advice, but ultimately the decision whether or not to go to

17    trial is your decision.

18          DEFENDANT BRYANT: Yes, sir.

19          THE COURT: So that's her professional opinion. And

20    given her experience and the fact she is representing you,

21    that's something you should take into consideration. But

22    ultimately the decision about whether or not to go to trial is

23    your decision and it's your decision whether or not to accept

24    whatever the plea offer is. So I'm just telling you that for

25    future reference.

1           DEFENDANT BRYANT:  Can I ask you something else,

2   Your Honor?

3           THE COURT:  Yes, sir.

4           DEFENDANT BRYANT:  How can I plead guilty when I

5   went to a evaluation and I hadn't even had a competency

6   hearing?  She told me May 15th.  When she come to withdraw

7   from my case, she said I was supposed to have a competency

8   hearing.  And I hadn't had that, so how can I plead guilty

9   when I haven't even been found to be competent to stand trial?

10          THE COURT:  What was the status of that,

11  Ms. Parrott?

12          MR. PARROTT:  Your Honor, it was my understanding

13  that there has been no hearing.  I don't even know if the

14  Court has received the evaluation from the BOP.  I think the

15  parties did receive the evaluation, but I didn't notice it on

16  the docket entry.

17          THE COURT:  But that's never been scheduled for a

18  hearing then before the Court?

19          MS. PARROTT:  No, Your Honor.

20          THE COURT:  Can you tell, Madam Clerk, if the Court

21  ordered an evaluation?

22          THE CLERK:  Yes, sir.

23          THE COURT:  But there's no report --

24          THE CLERK:  We've not received any report.

25          THE COURT:  -- filed?  All right.

1        THE CLERK:  Unless it would be changes.

2        THE COURT:  Well, what it sounds like is there's

3  not -- there's not a report.  The Court hasn't seen the

4  report, is what I'm saying to you.  Now, again, given what

5  that status is, whether you decide to go to trial or plead

6  guilty, and I understand that the competency report factors

7  into that decision, but again that's something you have to

8  talk to your lawyer about, sir, and ultimately that's you're

9  decision about whether or not to plead guilty or take it to

10  trial.

11       Well, Ms. Parrott, I've taken seriously what your

12  representation is.

13       Does the government have a position on this?

14       MS. DILLON:  No, Your Honor.

15       THE COURT:  Is he scheduled, does he have a trial,

16  docket call date?

17       MS. PARROTT:  No, Your Honor.  Basically the

18  Presentence Report, the draft has been disclosed, and I think

19  we just received it within the past week.

20       THE COURT:  And, sir, the other thing I meant to

21  tell you was when you were saying that the Presentence Report

22  would take several months, that's true in every case.  That's

23  not something that's unique to your case.  That's true in

24  every case.  That is the typical procedure.  Where after a

25  guilty plea is entered, a Presentence Report is generated and

1  that takes some time and research on the part of the Probation

2  Office.  Then it goes on to your attorney and the

3  U. S. Attorney.  Your attorney would go over it with you, make

4  any objections to it that they think were appropriate, and you

5  proceed with a sentencing.

6        So that delay between plea, preparation of

7  Presentence Report and the sentencing, that's something that's

8  normal.  There's nothing unusual about that.

9        DEFENDANT BRYANT:  I understand it now.  I have been

10  reading books by the feds, but I didn't know it could go from

11  41 to 51 months to 110 to 137.

12        THE COURT:  Well, the Guidelines are something that

13  you need to go over with your attorney, and when the probation

14  report is complete, or when the Presentence Report, rather,

15  there will be a Guideline computation in there that through

16  your attorney you may object to and bring that to the

17  attention of the district judge.

18        So you're telling me you do not want Ms. Parrott in

19  the case?

20        DEFENDANT BRYANT:  Yes, sir.

21        THE COURT:  Are you asking that I appoint another

22  lawyer?

23        DEFENDANT BRYANT:  Yes, sir.

24        THE COURT:  All right.  Well, I'll grant the motion.

25  I'll allow you to withdraw, Ms. Parrott, and, sir, the federal

1  defender will assign another attorney to your case.

2         DEFENDANT BRYANT:  Thank you, Your Honor.

3         MS. PARROTT:  Thank you, Your Honor.

4         (Hearing concluded at 10:20:27 a.m.)

5              - - - - - -

6

7  **UNITED STATES DISTRICT COURT**
   **WESTERN DISTRICT OF NORTH CAROLINA**

8

9

10              **CERTIFICATE OF REPORTER**

11         I, JOY KELLY, RPR, CRR, certify that the foregoing

12  is a true and correct transcription from the digitally

13  recorded proceedings transcribed by me to the best of my

14  ability in the above-entitled matter.

15

16

17

18  S/  JOY KELLY

19  **JOY KELLY, RPR, CRR**              Date
    **U.S. Official Court Reporter**
20  Charlotte, NC

21

22

23

24

25

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
NO. 3:11 CR 72 - MOC

UNITED STATES OF AMERICA

| | | |
|---|---|---|
| v. | : | MOTION TO WITHDRAW |
| | : | GUILTY PLEA |
| CHARLIE WAYNE BRYANT | | |

THE DEFENDANT, Charlie Wayne Bryant, by and through undersigned counsel, moves to withdraw his guilty plea entered to count one of the Bill of Indictment. Undersigned counsel has conferred with AUSA Jennifer Dillon about the relief requested and she does not consent.

This motion is made pursuant to Fed. R. Crim. P. 11(d)(2)(B) and based on the following:

*PROCEDURAL HISTORY*

1. On March 15, 2011 the defendant was charged in a one-count Bill of Indictment with assaulting and inflicting bodily injury on an officer and employee of the United States on February 8, 2011, while that officer was performing his official duties. A violation of 18 U.S.C.§§ 111(a)(1) and (b).

2. On June 2, 2011 Steven Slawinski, Esquire, of the Federal Defenders of Western North Carolina, and defendant's first attorney in this matter, filed an unopposed motion requesting a competence evaluation of the defendant (Document#14). That motion was granted by sealed Order of United States Magistrate Judge David S. Cayer filed June 3, 2011 (Document#15).

3. On August 25, 2011 a letter, with the report of examination of defendant from the Federal Detention Center, Miami, Florida, was purportedly sent to Judge Cayer. It indicates a copy was also sent to Mr. Slawinski and Jennifer Lynn Dillon, the Assistant United States Attorney assigned to this matter. That report, in summary, opines "...(the defendant) is considered to be competent to proceed with the judicial process".

4.    Mr. Slawinski left the Federal Defenders of Western North Carolina in October 2011 and the defense of this case was reassigned to Angela Parrott, Esquire, also an attorney with the Federal Defenders of Western North Caroling.

5.    On December 8, 2011 the defendant entered a "straight up" plea before United States Magistrate Judge David S. Cayer to the single charge in the Bill of Indictment (Document#23).

6.    On June 7, 2012 the Court released Ms. Parrott as counsel for the defendant (Document#28).

7.    On June 12, 2012, the psychiatric report referred to in paragraph 3, above, was first filed with this Court on its electronic filing system (Document#29).

8.    Undersigned counsel first appeared as counsel for defendant on June 14, 2012.

*ARGUMENT*

Notwithstanding Judge Cayer's finding on June 3, 2011 that: "…there is reasonable cause to believe that the Defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that the is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense…" June 3, 2011 Order (Document #15), Defendant's guilty plea was entered and accepted prior to the psychiatric report being filed with the Court as required by 18 U.S.C. §4247(c) and without the Defendant being afforded a hearing pursuant to 18 U.S.C. §4247(d).

Prior to sentencing, a defendant may withdraw a guilty plea upon showing "a fair and just reason." Fed.R.Crim.P. 11(d)(2)(B). In determining what constitutes "fair and just" the Fourth Circuit Court of Appeals generally has considered six factors identified in United States v. Moore, 931 F.2d 245 (4th Cir.1991):

We have identified six factors ("the *Moore* factors") that are useful in determining whether to permit a defendant to withdraw a guilty plea:

(1) whether the defendant has offered credible evidence that his plea was not knowing or not voluntary, (2) whether the defendant has credibly asserted his legal innocence, (3) whether there has been a delay between the entering of the plea and the filing of the motion, (4) whether defendant has had close assistance of competent counsel, (5) whether withdrawal will cause prejudice to the government, and (6) whether it will inconvenience the court and waste judicial resources.

*United States v. Sparks,* 67 F.3d 1145, 1150 (4th Cir.1995) (quoting *United States v. Moore,* 931 F.2d 245, 248 (4th Cir.1991)). The most important of these factors is the first one, which addresses the question of whether the waiver colloquy was properly conducted. *See United States v. Wilson,* 81 F.3d 1300, 1305-07 (4th Cir.1996).

United States v. Faris, 388 F.3d 452, 456-57 (4th Cir. 2004)

As confirmed by the Court in *United States v. Faris,* the most important factor is the first, which addresses whether the plea was knowingly and voluntarily entered.

The record does not indicate whether the report from the Federal Detention Facility in Miami, Florida was considered by the Court before defendant's plea was accepted; but the record is clear that no hearing was held to determine defendant's competence before acceptance of the plea. In fact, other than the questions asked of defendant in the Rule 11 plea hearing and acknowledgment of his counsel during that plea process, there was nothing in the record to indicate the defendant's mental condition had changed since Judge Cayer's earlier finding that there was reasonable cause to believe defendant might be suffering from a mental disease or defect as stated his the June 3, 2011 Order (Document #15).

The defendant also asserts his legal innocence (Moore's second factor). He contends he is not guilty of the charge contained in the Bill of Indictment; and, although undersigned counsel has not finished fully analyzing the case, there appears to be a viable insanity defense arising from the facts as well as a possible defense of self defense.

The third, fifth and sixth Moore factors are all directed toward issues of timeliness of this motion, prejudice to the government and whether allowing the motion will waste judicial resources or inconvenience the Court. Undersigned counsel first appeared in this matter less than 30 days ago and would urge this motion be considered timely filed. Whether the government would be prejudiced or the court inconvenienced are matters of which undersigned counsel does not have knowledge.

The final Moore factor is the Fourth factor – whether the defendant had close assistance of competent counsel. There is no question that Angela Parrott is an extremely competent attorney; however, the defendant contends he did not understand all the consequences of his guilty plea at the time it was entered and there was no hearing to determine the extent of his ability to understand.

WHEREFORE, based on the foregoing and in the interests of fairness and justice, defendant prays he be allowed to withdraw his guilty plea to count one of the Bill of Indictment.

This 9th day of July, 2012.

s/Richard H. Tomberlin
Richard H. Tomberlin
Attorney for Defendant
N. C. State Bar No. 8060
301 S. McDowell Street, Suite 1210
Charlotte, North Carolina 28204
Telephone: (704) 373-09779

CERTIFICATE OF SERVICE

This is to certify that I have served a copy of the foregoing through the Electronic Case

Filing system in effect for the United States District Court for the Western District of North

Carolina on:

> Jennifer Dillon
> Assistant United States Attorney
> Jennifer.dillon@usdoj.gov

This 9th day of July, 2012.

> s/Richard H. Tomberlin
> Richard H. Tomberlin

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | DOCKET NO. 3:11CR72-MOC |
| v. | UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO WITHDRAW GUILTY PLEA |
| CHARLIE WAYNE BRYANT | |

NOW COMES the United States of America, by and through Anne M. Tompkins, United States Attorney for the Western District of North Carolina, in response to the defendant's motion to withdraw his guilty plea. The defendant has failed to meet his burden to establish a fair and just reason to withdraw his guilty plea. The United States therefore requests that the defendant's motion be denied.

## FACTUAL BACKGROUND

On March 15, 2011, the federal grand jury for the Western District of North Carolina indicted Charlie Wayne Bryant ("Bryant") on one count of Assaulting, resisting, or impeding certain officers or employees in violation of Title 18, United States Code, Section 111(a) and (b). Bryant was arrested on this charge on April 18, 2011. On April 25, 2011, Bryant was arraigned on the indictment and was ordered detained. Appointed counsel Steven Slawinski represented Bryant at the arraignment. On October 17, 2011, Angela Parrott replaced Steven Slawinski as Bryant's attorney. District Judge Max O. Cogburn scheduled Bryant's trial for January 3, 2012. On December 8, 2011, Bryant entered his guilty plea straight up before Magistrate Judge David S. Cayer.

On May 15, 2012, Ms. Parrott filed a motion to withdraw as Bryant's attorney, and the court held an inquiry to status of counsel hearing on June 7, 2012. At that hearing, it came to the parties' attention that the court had not received a copy of the Federal Bureau of Prisons

competency evaluation that was addressed to Magistrate Judge Cayer and dated on August 25, 2011. The undersigned subsequently sent a copy of the report to Magistrate Judge Cayer, which was filed on June 12, 2012. On June 14, 2012, Richard Tomberlin replaced Ms. Parrott as counsel for Bryant. On June 29, 2012, District Judge Max O. Cogburn issued a sealed order. On July 9, 2012, Bryant, through Mr. Tomberlin as counsel, filed a motion to withdraw his guilty plea, asserting that it is unclear whether the court considered the competency report prior to the Rule 11 hearing. Further, Bryant asserts his legal innocence in that he is insane and possibly acted in self-defense. Finally, Bryant contends that he did not understand all the consequences of his guilty plea.

## FACTS RELATING TO BRYANT'S GUILTY PLEA

On December 8, 2011, Bryant pled guilty to assaulting, resisting, or impeding certain officers or employees. At the plea hearing, Magistrate Judge Cayer asked Bryant a series of questions to ensure that Bryant's plea was knowing and voluntary. Specifically, Judge Cayer asked Bryant, "Is your mind clear and do you understand that you are here to enter a guilty plea that cannot later be withdrawn?" Transcript of Plea Hearing at 3. Bryant responded, "Yes, sir." Id. Judge Cayer asked Bryant if he received a copy of the indictment and whether he discussed its contents with his attorney. Id. Bryant stated, "Yes, sir." Id. Later, Judge Cayer asked Bryant if he understood that he had a right to a trial. Id. at 6. Bryant indicated that he understood that right. Id. Judge Cayer also explained that by pleading guilty Bryant was waiving or giving up those trial rights, that there would be no trial, and the last hearing would be sentencing. Id. at 6-7. Judge Cayer asked Bryant if he understood that, and Bryant replied "Yes, sir." Id. at 7. Additionally, the defendant indicated that he was, in fact, guilty of the count in the bill of indictment. Id.

Judge Cayer also asked Bryant if anyone had threatened, intimidated, or forced him to enter a guilty plea. Id. Bryant replied, "No, sir." Id. Prior to accepting the defendant's guilty plea, Judge Cayer asked Bryant several key questions:

THE COURT: Has anyone made you any promises of leniency or a light sentence to induce you to plead guilty?

DEFENDANT BRYANT: No, sir.

THE COURT: Have you had enough time to **discuss with your attorney any possible defenses you may have to this charge?**

DEFENDANT BRYANT: Yes, sir.

THE COURT: Have you heard and understood all parts of this proceeding and do you still wish to plead guilty?

DEFENDANT BRYANT: Yes, sir.

Id. at 7-8 (emphasis added). Thereafter, the Court found Bryant's plea of guilty to Count One to be knowingly and voluntarily made and accepted the plea. See Plea Hearing Transcript at 8.

Seven months after the entry of his guilty plea, on July 9, 2012, Bryant filed the instant motion to withdraw his guilty plea. Doc. 35.

## ARGUMENT

Because defendants do not have an absolute right to withdraw their guilty plea, a defendant seeking to withdraw his plea "has the burden of showing a fair and just reason for withdrawal." *United States v. Ubakanma*, 215 F.3d 421, 424 (4th Cir. 2000), Fed. R. Crim. P. 11(d)(2)(B). A "fair and just" reason for withdrawing a plea challenges either the fairness of the defendant's Rule 11 proceeding or "the fulfillment of a promise or condition emanating from the proceeding." *United States v. Lambey*, 974 F.2d 389, 1394 (4th Cir. 1992). The Fourth Circuit Court of Appeals articulated a non-exhaustive list of six factors for the district court to consider in determining whether a defendant has met his burden in establishing a fair and just reason for the withdrawal of a guilty plea:

(1) whether the defendant has offered credible evidence that his plea was not knowing or not voluntary;

(2) whether the defendant has credibly asserted his legal innocence;

(3) whether there has been a delay between the entering of the plea and the filing of the motion;

(4) whether defendant has had close assistance of competent counsel;

(5) whether withdrawal will cause prejudice to the government; and

(6) whether the withdrawal of the plea will inconvenience the court and waste judicial resources.

*United States v. Moore*, 931 F.2d 245, 248 (4th Cir. 1991).

      While the Fourth Circuit has emphasized that each of these factors should be considered, "[t]he most important consideration in resolving a motion to withdraw a guilty plea is an evaluation of the Rule 11 colloquy at which the guilty plea was accepted." *United States v. Bowman*, 348 F.3d 408, 414 (4th Cir. 2003). This first factor regarding the defendant's knowing and voluntary plea hearing is essential to the analysis because whether a plea was both counseled and voluntary is ordinarily dispositive. *Id.*; *see also United States v. Wilson*, 81 F.3d 1300, 1307 (4th Cir. 1996) ("The key to a [plea withdrawal] motion is whether or not the Rule 11 proceeding was properly conducted."); *United States v. Puckett*, 61 F.3d 1092, 1099 (4th Cir. 1995) ("[A] 'fair and just' reason for withdrawing a guilty plea is one that 'essentially challenges . . . the fairness of the Rule 11 proceeding.'" (quoting *United States v. Lambey*, 974 F.2d 1389, 1394 (4th Cir. 1992) (*en banc*)). Thus, "a properly conducted Rule 11 guilty plea colloquy leaves a defendant with a very limited basis upon which to have his plea withdrawn," *Bowman*, 348 F.3d at 414, and statements of fact by a defendant during Rule 11 proceedings "may not ordinarily be repudiated," *Lambey*, 974 F2d at 1395. The emphasis on the Rule 11 colloquy accords with its purpose to protect the defendant against making an uninformed decision and to protect the public from an unjust judgment of guilty when a public trial has not been conducted: "[A]n appropriately conducted Rule 11 colloquy can only serve meaningfully if the court is entitled to rely on the defendant's statements made under oath to accept a guilty plea." *Bowman*, 348 F.3d at 417.

The district court's evaluation of these factors and the decision on whether a defendant has met his burden in establishing a justification for the withdrawal of a guilty plea is reviewed by the Court of Appeals under the abuse of discretion standard. *United States v. Wilson*, 81 F.3d 1300, 1305 (4th Cir. 1996).

With respect to the second factor concerning a claim of legal innocence, a defendant "must do more than just demonstrate that [he] had a bona fide belief that [his] actions were lawful." *United States v. Sparks*, 67 F.3d 1145, 1153 (4th Cir. 1995). Rather, a defendant must "show that such a belief would translate into a credible assertion of legal innocence." *Id.* As to the fourth factor, when a defendant alleges ineffective assistance of counsel as a basis for his plea withdrawal motion, he must show constitutionally defective performance: (1) that his counsel's performance fell below an objective standard of reasonableness; and (2) that there was a reasonable probability that, but for counsel's errors, he would not have plead guilty and would have insisted on going to trial. *See Bowman*, 348 F.3d at 416; *Ubakanma*, 215 F.3d at 425. Although the third, fifth, and sixth factors should be considered by the district court, the Fourth Circuit has recognized that the first, second, and fourth factors "speak most straightforwardly to the question whether the movant has a fair and just reason to upset settled systemic expectations by withdrawing his plea," while these remaining factors "are better understood as countervailing considerations that establish how heavily the presumption should weigh in any given case." *Sparks*, 67 F.3d at 1154.

Bryant's motion to withdraw his guilty plea suggests that because the Magistrate Court did not conduct a full competency hearing, his plea was not knowingly and voluntarily made. Doc. 35 at 3. Additionally, Bryant implies that Judge Cayer's questions at the Rule 11 hearing were not enough to determine the defendant's mental condition. Id. As to the whether the defendant asserts a credible theory of legal innocence, Bryant claims he may be legally insane or that he has a "possible defense of self defense [*sic*]." Id. Bryant asserts his motion is timely because the motion was filed 30 days after counsel appeared in the case. Id. at 4. Finally, although Bryant acknowledges that Ms. Parrott is "an extremely competent attorney," the

defendant broadly suggests that he did not have close assistance of competent counsel because "he did not understand all the consequences of his guilty plea at the time it was entered and there was no hearing to determine the extent of his ability to understand." Id. Bryant provides no credible evidence to support any of these claims. Because Bryant cannot provide a "fair and just reason" for withdrawing the properly accepted guilty plea, Bryant's motion should be denied.

### 1. Knowing and Voluntary Nature of the Plea

Bryant argues his plea was not knowing and voluntary because the record does not indicate whether the competency report was considered by the Court before defendant's plea was accepted and no hearing was held to determine defendant's competence before accepting the plea. Doc 35 at 3. However, it does not follow that in absence of a formal competency hearing, Bryant's plea was not knowing and voluntary.

On June 2, 2011, Bryant's counsel filed an unopposed motion to determine competency pursuant to 18 U.S.C. § 4241(a). Doc. 14. The Magistrate Court subsequently granted the motion. Doc. 15. Bryant was sent to a federal detention center in Miami, FL for an evaluation. On August 25, 2011, the federal detention center prepared and mailed a competency evaluation report to Judge Cayer, defense counsel, and the undersigned. Unbeknownst to the parties, the court never received its copy. After the parties reviewed the competency evaluation, Mr. Slawinski contacted the undersigned and informed her that Bryant would plead guilty straight up. Mr. Slawinski subsequently left the Federal Defender's Office for the Western District of North Carolina before Bryant's Rule 11 hearing was set. Ms. Parrott then filed an appearance on behalf of Bryant, and she later informed the undersigned that Bryant still intended to plead guilty straight up. On December 8, 2011, Bryant pled straight up before Judge Cayer. At that hearing, the parties were still unaware that the Court did not receive its copy of the competency evaluation. At the hearing, Ms. Parrott nor Bryant objected on competency grounds, nor did they ask to put on evidence as to competency. The Magistrate Court conducted the Rule 11 hearing and accepted Bryant's guilty plea.

It was not error for the Magistrate Court to accept Bryant guilty plea, despite not having received the competency evaluation, because the parties were aware that Bryant was found competent and no objections were made. Several circuits have held that the trial court has discretion to determine whether a formal competency hearing is necessary when the defendant has been found competent after a psychiatric evaluation. *United States v. Lebron*, 76 F.3d 29 (1st Cir. 1996) ("We hold that when a qualified psychiatrist examines a defendant before he enters a plea to criminal charges, and the psychiatric report and other pertinent current information reveal that the defendant is competent to stand trial, it is not reversible error for a district court to fail or refuse to conduct a formal hearing under the provisions of 18 U.S.C. § 4241(a)."); *United States v. Denkins*, 367 F.3d 537, 545-46 (6th Cir. 2004) (If it was error for the district to take defendant's plea prior to sending defendant for a competency evaluation, such error was harmless. No authority suggests that § 4241 mandates a hearing when there is no prospect of meeting the statutory standard of incompetency.); *Williams v. Woodford*, 384 F.3d 567, 605 (9th Cir. 2004) ("Because the psychiatric evaluation concluded that [the defendant] was competent to stand trial, the district court, having no reasonable cause to believe that [the defendant] was incompetent, was not required to hold a formal hearing."); *United States v. Downs*, 123 F.3d 637, 641 (7th Cir. 1997) (finding "Section 4241(b) authorizes courts to order a psychiatric examination 'prior to the date of the hearing' but we do not read that section to *require* a hearing whenever a psychiatric examination has been ordered." (emphasis in original)); *United States v. Jones*, 23 F.3d 1307, 1309 (8th Cir. 1994) (recognizing that a "trial court ha[s] the discretion to hold or to forgo an additional hearing" when "[t]he psychiatric report submitted to the court indicate[s] that [the defendant] was competent to stand trial"); *Arnold v. United States*, 432 F.2d 871, 873-874 (10th Cir. 1970) ("All reasonable suspicions of defendant's infirm mental condition were apparently put to rest with the psychiatric report;" thus, the trial court was not required to hold a competency hearing prior to accepting the defendant's plea.) Thus, a formal hearing is not required when the report finds the defendant is competent, as did the report in this case.

Neither Ms. Parrott nor Mr. Bryant asked for a full competency hearing prior to the Rule 11 hearing, and the Magistrate Court's questions during the plea colloquy and its observations of the defendant gave the court no reason to doubt Bryant's competence. *United States v. Downs*, 123 F.3d 637, 641 (7th Cir. 1997) ("The [d]istrict [c]ourt's decision not to hold a hearing was not an abuse of the court's discretion," where, "combined with the [d]istrict [c]ourt's own observations and the silence of Downs' counsel, the psychiatric report obviated the need for an evidentiary hearing.") See also *United States v. Ewing*, 494 F.3d 607, 622 (1st Cir. 2007) (citing *United States v. Downs*, 123 F.3d 637, 641 (7th Cir. 1997); *Williams*, 384 F.3d at 605; *Arnold*, 432 F.2d at 874 (After the parties received the report, "neither [the defendant] nor his counsel contended or testified that the accused was not mentally competent to knowingly and voluntarily enter a plea of guilty to the charges against him, or to aid in his defense."); *Sanchez v. United States*, 921 F. Supp. 56 (D.P.R. 1996) (court's refusal to conduct a formal hearing to determine competency was not erroneous when recent examination by a qualified physician revealed that petitioner was competent to stand trial). Thus, although the Magistrate Court did not receive its copy of the competency report in this case, no further competency hearing was required where the court closely questioned Bryant and his counsel as to Bryant's knowing and voluntariness of his plea, his medication, his mental condition, and was able to observe Bryant's demeanor first-hand. *See id.*; *United States v. Panagopoulos*, 457 Fed. Appx. 279, 281 (4th Cir. December 7, 2011); *United States v. Denkins*, 367 F.3d 537, 546-547 (6th Cir. 2004) ("We know of no authority, and Defendant has not cited any, for the proposition that § 4241 mandates a hearing even when there is no prospect of meeting the statutory standard of incompetency.").

Furthermore, once it was clear that the Magistrate Court had not received its copy of the report at the inquiry to status of counsel hearing held on June 7, 2012, the undersigned subsequently sent a copy of the report to the court. The report was filed on June 12, 2012. Subsequently, the District Court filed a sealed order on June 29, 2012, addressing the issue.

Moreover, Bryant's plea was knowing and voluntary based on the transcript of the Rule 11 hearing and his Entry and Acceptance of Plea form. See Transcript of Plea Hearing and Doc.

23. At the outset of the hearing, Bryant acknowledged that he was providing testimony under oath and that false information would subject him to prosecution for perjury. Transcript of Plea Hearing at 2. Judge Cayer asked Bryant during the plea colloquy if his mind was clear and if he understood that he could not later withdraw his guilty plea. Id. at 3. Bryant responded, "Yes, sir." Id. Bryant indicated that understood the maximum penalty. Id. at 4. Bryant stated that he spoke to his attorney about how the U.S. Sentencing Guidelines might apply in his case. Id. at 5. Judge Cayer asked Bryant if he understood that if the sentence was more severe than he expected that he would still be bound by his plea and have no right to withdraw it. Id. Bryant responded, "Yes, sir." Id. Bryant indicated that he understood his trial rights. Id. at 6. Importantly, Judge Cayer ask Bryant if he was, "in fact, guilty of the count in this bill of indictment to which you've come to court today to plead guilty?" Id. at 7. Bryant answered, "Yes, sir." Bryant did not tell Judge Cayer that he had been threatened, intimidated, or forced to enter his guilty plea. Id. Bryant also stated that he was not made any promises of leniency or a light sentence to induce him to pelad guilty. Id. Bryant said that he had enough time to discuss the charge with his attorney and was satisfied with the services of his attorney. Id. at 8. Finally, Bryant positively indicated that he heard and understood all parts of the proceeding and still wanted to plead guilty. Id. Bryant then signed the Entry and Acceptance of Plea form that indicated the answers to his questions. Doc 23.

Nevertheless, Bryant now claims that "he did not understand all the consequences of his guilty plea at the time it was entered." Doc. 35 at 4. Such last minute, bald, self-serving claims cannot undermine the integrity of the plea hearing and the acceptance of the guilty plea and do not constitute fair and just reasons for withdrawing his plea. *See Lambey*, 974 F.2d at 1395; *Wilson*, 81 F.3d at 457; *Faris*, 388 F.3d at 457 (affirming denial of motion to withdraw guilty plea where motion alleged promises of a lenient sentence but defendant "specifically averred during the plea colloquy that nobody made any promises other than those in the plea agreement"). The thorough plea hearing and the signed Entry and Acceptance of Plea form demonstrate that the plea was knowingly and voluntarily made.

## 2. Credible Assertion of Legal Innocence

Bryant has no meritorious defenses, and this issue was specifically discussed during his plea hearing. Transcript of Plea Hearing at 7-8. Bryant's assertion of legal innocence is not credible. In his motion, Bryant alleges two possible theories for legal innocence: (1) "a viable insanity defense arising from the facts;" and (2) "a possible defense of self defense [*sic*]." Doc. 35 at 3. Neither of Bryant's previous attorneys filed notices regarding these defenses. In fact, after receiving the competency evaluation from the Bureau of Prisons, the undersigned was notified that Bryant wished to plead guilty straight up. Although Bryant now, seven months later, claims that he is legally insane, such statements contradict the finding of the Bureau of Prisons, his statements to Judge Cayer at the Rule 11 hearing (Transcript dated December 8, 2011), his signed Entry and Acceptance of Guilty Plea form (Doc. 23), and the finding made by the District Court in its sealed Order (Doc. 34). Bryant specially admitted to factual guilt at his Rule 11 hearing by pleading straight up as charged to the Bill of Indictment.

Bryant also claims he has a possible theory of self-defense. Bryant's two previous defense attorneys did not pursue this defense theory for good reason. Despite the statements by Bryant at his Rule 11 hearing that he was, in fact, guilty of the offense charged, should Bryant's plea be withdrawn and his case go to trial, the United States intends to show through the testimony of multiple witnesses that Bryant because extremely disruptive at the Social Security Office in Gastonia, NC and assaulted the victim by punching him in the mouth. The altercation continued into the men's bathroom, where Bryant admittedly made several attempts to obtain the victim's firearm. After some time, with the help of other Social Security employees, Bryant was subdued and handcuffed. In an interview with Special Agent Long from the Federal Protective Service and Special Agent Littlejohn from the Social Security Administration - Office of Inspector General, Bryant admitted that he punched the victim in the face when he was asked to quiet down. Bryant also stated, "I was trying to grab his Glock, but couldn't get it out, my intentions were to kill him because he was beating me." Self-defense is unlikely a credible assertion of legal innocence. In light of Bryant's repeated admissions of guilt, both at his plea

hearing and his admissions to federal agents, Bryant cannot legitimately assert legal innocence. *See United States v. Self*, 393 Fed. Appx. 47, 50 (affirming denial of motion to withdraw guilty plea based on claim of public authority defense because defendant could not show legal innocence where he also gave extensive statements of his guilt).

### 3. Delay Between Entry of the Plea and Filing of the Motion

The Fourth Circuit previously has held that a period of six weeks was sufficient to constitute a "long delay." *Moore*, 931 F.2d at 248. Bryant entered his guilty plea on December 8, 2011. Bryant did not move withdraw his guilty plea until July 9, 2012. The delay in filing a withdrawal motion for more than seven months heavily weighs against withdrawal of Bryant's plea. *See United States v. Nicholson*, 676 F.3d 376, 384 (4th Cir. 2012) (finding delay where the defendant plead guilty on December 22, 2010, but did not approach his attorney about filing a motion until February 2011); *United States v. Craig*, 985 F.2d 175, 178 (4th Cir. 1993) (finding that an eight-week delay supports denial of motion to withdraw guilty plea).

### 4. Close Assistance of Competent Counsel

The record fails to show any complaints made by Bryant as to Mr. Slawinski or Ms. Parrott's performace until his draft Presentence Investigation Report ("PSR") was issued on June 1, 2012. Bryant's motion fails to specifically assert that Ms. Parrott's performance fell below an objective standard of reasonableness. Further, Bryant fails to claim that he would not have pled guilty and would have insisted on going to trial but for his attorney's unreasonable performance. Doc. 35 at 4. Because the parties received Bryant's competency evaluation, the parties were aware that the Federal Bureau of Prisons found Bryant competent. Ms. Parrott did not ask to be heard as to the issue of competency, and the defendant did not express willingness to present evidence regarding his competency at the Rule 11 hearing. Thus, Bryant fails to meet his burden of showing a fair and just reason for withdrawing his plea under this factor.

### 5. Prejudice to the United States

The prejudice caused to the United States is fairly typical of the prejudice caused in all cases where a plea is sought to be withdrawn, particularly seven months after it has been entered.

This factor and the factor regarding inconvenience to the court is generally considered important only if a defendant has already established a fair and just reason for the withdrawal of a guilty plea. *United States v. Sparks*, 67 F.3d at 1153.

### 6. Inconvenience to the Court and Waste of Judicial Resources

Here, withdrawal of the guilty plea would waste judicial resources because evidence of Bryant's guilt, including his own repeated admissions of guilt, are so overwhelming. *See Faris*, 388 F.3d at 460 (finding that it would be a waste of resources to test the possibility of acquittal at trial where the defendant had made credible admissions of guilt).

<div align="center">

**CONCLUSION**

</div>

A proper analysis of the *Moore* factors demonstrates that Bryant cannot meet his burden to show a fair and just reason for withdrawing his guilty plea. This Court should deny Defendant's motion to withdraw his guilty plea.

RESPECTFULLY SUBMITTED, this 19th day of July, 2012.

<div style="margin-left: 40%;">

ANNE M. TOMPKINS
UNITED STATES ATTORNEY
s/Jennifer Lynn Dillon
New Jersey Bar Number: 01502-2008
New York Bar Number: 4679957
Assistant United States Attorney
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: 704-344-6222
Fax: 704-344-6629
E-mail: jennifer.dillon@usdoj.gov

</div>

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
#### DOCKET NO. 3:11CR72-MOC-DSC

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | **ORDER** |
| CHARLIE WAYNE BRYANT, | ) | |
| | ) | |
| Defendant. | ) | |

**THIS MATTER** is before the Court on Defendant's "Motion to Withdraw Guilty Plea" (Doc. 35) filed July 9, 2012 and "United States' Response to Defendant's Motion to Withdraw Guilty Plea" (Doc. 37) filed July 19, 2012. United States District Judge Max O. Cogburn, Jr. referred this matter to the undersigned.

Having fully considered the arguments, the record, and the applicable authority, the Court finds that there is no basis for withdrawal of Defendant's guilty plea, as discussed below, and will **DENY** Defendant's Motion to Withdraw Guilty Plea.

## I. PROCEDURAL AND FACTUAL BACKGROUND

On March 15, 2011, Defendant Charlie Wayne Bryant was indicted on one count of assaulting, resisting, or impeding certain officers or employees in violation of Title 18, United States Code, Section 111(a) and (b). Defendant was arrested on this charge on April 18, 2011. On April 25, 2011, Defendant was arraigned on the indictment and ordered detained. Appointed counsel Steven Slawinski represented Defendant at the arraignment. On October 17, 2011, Angela Parrott replaced Steven Slawinski as Defendant's attorney. Judge Cogburn scheduled Defendant's trial for January 3, 2012. On December 8, 2011, Defendant entered a "straight up" guilty plea before the undersigned.

At the plea hearing, the Court engaged in the standard colloquy with Defendant to ensure that his plea was knowing and voluntary. Specifically, the Court asked Defendant, "Is your mind clear and do you understand that you are here to enter a guilty plea that cannot later be withdrawn?" Doc. 36 at 3. Defendant responded, "Yes, sir." Id. The Court asked Defendant if he received a copy of the indictment and whether he discussed its contents with his attorney. Id. Defendant stated, "Yes, sir." Id. Later, the Court asked Defendant if he understood that he had a right to a trial. Id. at 6. Defendant indicated that he understood that right. Id. The Court also explained that by pleading guilty Defendant was waiving or giving up that right, that there would be no trial, and that his next hearing would be for sentencing. Id. at 6-7. The Court asked Defendant if he understood that, and Defendant replied "Yes, sir." Id. at 7. Additionally, Defendant indicated that he was, in fact, guilty of the one count in the bill of indictment. Id.

The Court asked Defendant if anyone had threatened, intimidated, or forced him to enter a guilty plea. Id. Defendant replied, "No, sir." Id. The plea colloquy also included the following:

THE COURT: Are you now under the influence of any alcohol or drugs?

DEFENDANT: No, sir.

MS. PARROTT: Your Honor, just for the record, it doesn't affect his ability to understand today's proceedings, but he does take a thousand milligrams of Depakote

THE COURT: All right.

MS. PARROTT: —twice a day at the jail.

THE COURT: All right.

Is your mind clear and do you understand that you are here to enter a guilty plea that cannot later be withdrawn?

DEFENDANT: Yes, sir.

Id. at 3. Defendant was also asked by the Court:

THE COURT: Have you had enough time to discuss with your attorney any possible defenses you may have to this charge?

DEFENDANT: Yes, sir.

Id. at 7-8. Finally, Defendant was asked:

THE COURT: Have you heard and understood all parts of this proceeding and do you still wish to plead guilty?

DEFENDANT: Yes, sir.

Id. at 8. Thereafter, the Court found Defendant's plea of guilty to be knowingly and voluntarily made and accepted his plea. See Doc. 36 at 8.

On May 15, 2012, Ms. Parrott filed a motion to withdraw as counsel. The Court held an inquiry into status of counsel hearing on June 7, 2012. Ms. Parrott was allowed to withdraw as counsel. At that hearing, it came to the parties' attention that the Court had not received a copy of the Federal Bureau of Prisons competency evaluation addressed to the undersigned and dated August 25, 2011. Assistant United States Attorney Jennifer Dillon subsequently sent a copy of the report to the undersigned, which was filed on June 12, 2012. On June 14, 2012, Richard Tomberlin replaced Ms. Parrott as counsel for Defendant. On June 29, 2012, Judge Cogburn entered a sealed Order finding Defendant competent to proceed.

On July 9, 2012, seven months after the entry of his guilty plea, Defendant filed the instant Motion. Doc. 35. Defendant asserts that it is unclear whether the Court considered the competency report prior to the Rule 11 hearing. Defendant suggests that because the Court did not conduct a full competency hearing, his plea was not knowingly and voluntarily made. Doc. 35 at 3. Defendant also suggests that the Court's questions at the Rule 11 hearing were not sufficient to determine the Defendant's mental condition. Id. Further, Defendant asserts his legal innocence and raises issues of insanity and self defense. He asserts his Motion is timely because it was filed thirty days after his present counsel appeared in the case. Id. at 4. Finally, although Defendant acknowledges that Ms. Parrott is "an extremely competent attorney," he suggests that he did not have close assistance

3

of competent counsel because "he did not understand all the consequences of his guilty plea at the time it was entered and there was no hearing to determine the extent of his ability to understand." Id.

## II. DISCUSSION OF CLAIMS

Rule 11(d) of the Federal Rules of Criminal Procedure places the burden on Defendant to show a "fair and just reason for requesting the withdrawal" of his plea. Fed. R. Crim. Pro. 11(d). In determining whether a defendant has met this burden, the Fourth Circuit has set forth six non-exclusive factors for district courts to consider:

(1) the existence of credible evidence that the plea was not knowing and voluntary;

(2) credible assertions by the defendant of his legal innocence;

(3) any delay between the entry of the plea and the motion to withdraw;

(4) the assistance of competent counsel in connection with the plea;

(5) whether the withdrawal would cause prejudice to the government; and

(6) whether withdrawal would inconvenience the Court and waste judicial resources.

United States v. Moore, 931 F.2d 245, 248 (4th Cir. 1991).

While each of the Moore factors should be considered, "[t]he most important consideration in resolving a motion to withdraw a guilty plea is an evaluation of the Rule 11 colloquy at which the guilty plea was accepted," because whether a plea was both counseled and voluntary is ordinarily dispositive. United States v. Bowman, 348 F.3d 408, 414 (4th Cir. 2003). Once a guilty plea is entered, there is "a strong presumption that the plea is final and binding." United States v. Lambey, 974 F.2d 1389, 1394 (4th Cir. 1992).

The Court finds that Defendant has not provided credible evidence that his plea was not knowing and voluntary. Defendant argues his plea was not knowing and voluntary because the record does not indicate whether the competency report was considered by the Court before his plea was accepted. He also points to the fact that no hearing was held to determine his competency

4

before the plea. Doc 35 at 3. The Court finds that the failure to conduct a formal competency hearing does not make Defendant's plea unknowing or involuntary.

Several circuits have held that the district court has discretion to determine whether a formal competency hearing is necessary when the defendant has been found competent after a psychiatric evaluation. United States v. Lazo-Romero, 233 F. App'x 739 (9th Cir. 2007)("Because the psychiatric evaluation concluded that [the defendant] was competent to stand trial, the district court, having no reasonable cause to believe that [the defendant] was incompetent, was not required to hold a formal hearing."); United States v. Denkins, 367 F.3d 537, 545-46 (6th Cir. 2004) (If it was error for the district court to take defendant's plea prior to sending defendant for a competency evaluation, such error was harmless. No authority suggests that § 4241 mandates a hearing when there is no prospect of meeting the statutory standard of incompetency.); United States v. Downs, 123 F.3d 637, 641 (7th Cir. 1997) (finding "Section 4241(b) authorizes courts to order a psychiatric examination 'prior to the date of the hearing' but we do not read that section to *require* a hearing whenever a psychiatric examination has been ordered." (emphasis in original)); United States v. Lebron, 76 F.3d 29, 33 (1st Cir. 1996) ("We hold that when a qualified psychiatrist examines a defendant before he enters a plea to criminal charges, and the psychiatric report and other pertinent current information reveal that the defendant is competent to stand trial, it is not reversible error for a district court to fail or refuse to conduct a formal hearing under the provisions of 18 U.S.C. § 4241(a)."); United States v. Jones, 23 F.3d 1307, 1309 (8th Cir. 1994) (recognizing that a "trial court ha[s] the discretion to hold or to forgo an additional hearing" when "[t]he psychiatric report submitted to the court indicate[s] that [the defendant] was competent to stand trial"); Arnold v. United States, 432 F.2d 871, 873-874 (10th Cir. 1970) ("All reasonable suspicions of defendant's infirm mental condition were apparently put to rest with the psychiatric report;" thus, the trial court was not required to hold a competency hearing prior to accepting the defendant's plea.). Based on these precedents, the Court finds that a formal hearing was not required since the report found that Defendant was competent.

5

The Court is entitled to rely heavily on the representations made by the Defendant during the Rule 11 hearing about the voluntariness of his plea. See Blackledge v. Allison, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity."). Ms. Parrott did not request a competency hearing prior to the Rule 11 hearing, and Defendant's answers during the plea colloquy and the Court's observations of him gave no reason to doubt his competency. See Downs, 123 F.3d at 641 ("The [d]istrict [c]ourt's decision not to hold a hearing was not an abuse of the court's discretion," where, "combined with the [d]istrict [c]ourt's own observations and the silence of Downs' counsel, the psychiatric report obviated the need for an evidentiary hearing."). See also United States v. Ewing, 494 F.3d 607, 622 (1st Cir. 2007) (citing United States v. Downs, 123 F.3d 637, 641 (7th Cir. 1997)); Williams v. Woodford, 384 F.3d 567, 605 (9th Cir. 2004); Arnold, 432 F.2d at 874 (After the parties received the report, "neither [the defendant] nor his counsel contended or testified that the accused was not mentally competent to knowingly and voluntarily enter a plea of guilty to the charges against him, or to aid in his defense."); Sanchez v. United States, 921 F. Supp. 56, 60 (D.P.R. 1996) (court's refusal to conduct a formal hearing to determine competency was not erroneous when recent examination by a qualified physician revealed that petitioner was competent to stand trial). Although the Court did not receive a copy of the competency report prior to the Rule 11 hearing, a competency hearing was not mandated. The Court questioned Defendant and his counsel as to his plea, his medication, his mental condition, and was able to observe Defendant's demeanor first hand. See United States v. Panagopoulos, 457 F. App'x. 279, 281 (4th Cir. 2011); United States v. Denkins, 367 F.3d 537, 546-547 (6th Cir. 2004) ("We know of no authority, and Defendant has not cited any, for the proposition that § 4241 mandates a hearing even when there is no prospect of meeting the statutory standard of incompetency.").

With respect to the second factor concerning a claim of legal innocence, Defendant has no meritorious defenses, and this issue was specifically addressed during the plea hearing. Doc. 36 at 7-8. In his Motion, Defendant alleges two possible theories of legal innocence: (1) "a viable insanity defense arising from the facts;" and (2) "a possible defense of self defense [sic]." Doc. 35 at 3.

6

Neither of Defendant's previous attorneys filed notice of these defenses. Although Defendant now claims that he is legally insane, this contradicts the finding of the Bureau of Prisons, his statements to the Court at the Rule 11 hearing (Doc. 36), his signed Entry and Acceptance of Guilty Plea form (Doc. 23), and the finding made by the District Judge in his sealed Order (Doc. 34). Defendant admitted to factual guilt at his Rule 11 hearing by pleading "straight up" as charged to the Bill of Indictment.

Defendant also claims that he has a possible theory of self-defense. However, in its response the Government represents that it has eyewitness testimony that Defendant became extremely disruptive at the Social Security office and assaulted the victim by punching him in the mouth. The altercation continued into the men's bathroom, where Defendant admittedly made several attempts to gain control of the victim's firearm. With the help of other Social Security employees, Defendant was subdued and handcuffed. In an interview with Special Agent Long from the Federal Protective Service and Special Agent Littlejohn from the Social Security Administration - Office of Inspector General, Defendant admitted that he punched the victim in the face when he was asked to quiet down. Defendant also stated, "I was trying to grab his Glock, but couldn't get it out, my intentions were to kill him because he was beating me." In light of his repeated admissions of guilt, both at his plea hearing and his admissions to federal agents, Defendant cannot legitimately assert legal innocence. See United States v. Self, 393 F. App'x. 47, 50 (affirming denial of motion to withdraw guilty plea based on claim of public authority defense because defendant could not show legal innocence where he also gave extensive statements of his guilt). Defendant's previous counsel did not pursue this theory. Therefore, the Court finds there is no credible assertion of legal innocence.

With respect to the third factor concerning the delay between the entry of the plea and this Motion, Defendant entered his plea on December 8, 2011 and filed this Motion on July 9, 2012- more than seven (7) months after the entry of his guilty plea. The Court finds that this delay is substantial. See United States v. Wells, No. 94-5666, 1996 WL 174631, at *5 (4th Cir. April 12,

7

1996) (holding that "a delay of over fifteen weeks" between entry of a guilty plea and a motion to withdraw the plea was "a substantial delay" supporting denial of the motion).

With respect to the fourth factor concerning the assistance of competent counsel in connection with the plea, the record fails to show any complaints made by Defendant about his counsel's performace until his draft Presentence Investigation Report ("PSR") was submitted on June 1, 2012. Defendant's Motion fails to assert that Ms. Parrott's performance fell below an objective standard of reasonableness. Further, Defendant fails to allege that he would not have pled guilty and would have insisted on going to trial but for his attorney's deficient performance. Doc. 35 at 4. A defendant must demonstrate that his attorneys' performance fell below an objective standard of reasonableness and that he was prejudiced to the degree that there is a reasonable probability that, but for counsel's error, he would not have pleaded guilty and would have insisted on going to trial. See United States v. Lambey, 974 F.2d at 1394-95. The Court finds that Defendant has failed to make the required showing. He does not assert how his plea decision was affected or cite any case law to support his argument.

Furthermore, Defendant was asked during his Rule 11 hearing if he was satisfied with the services of his attorney in this case. Defendant's sworn answer was in the affirmative. When given an opportunity to voice any concerns about satisfaction with his attorney's representation, Defendant expressed none. Doc. 36 at 8.

With regard to the fifth and six factors concerning prejudice to the Government, inconvenience to the Court and wasting judicial resources, withdrawal of Defendant's guilty plea would prejudice the Government due to the lapse of seven months since the plea was entered, and would inconvenience the Court and waste judicial resources because the presentence report has been completed and filed.

Based on the above analysis, the Court finds that there is no basis for withdrawal of Defendant's guilty plea. **IT IS, THEREFORE, ORDERED** that Defendant's "Motion to Withdraw Guilty Plea" (Doc. 35) filed July 9, 2012 is **DENIED**.

8

The Clerk is directed to send copies of this Order to counsel for the parties; <u>and to the Honorable Max O. Cogburn, Jr.</u>

**SO ORDERED.**

Signed: July 27, 2012

David S. Cayer
United States Magistrate Judge

UNITED STATES OF AMERICA

        v.               :

                     :

CHARLIE WAYNE BRYANT

                                MOTION FOR LEAVE TO FILE
                                OBJECTIONS AND REQUEST
                           REVIEW OF MAGISTRATE'S ORDER
                                  OUT OF TIME

THE DEFENDANT, Charlie Wayne Bryant, by and through undersigned counsel, moves the Court, in its discretion, to allow the filing of objections pursuant to Federal Rule of Criminal Procedure Rule 59(a) to the order entered July 27, 2012 by The Honorable David S. Cayer, United States Magistrate (Document 38), out of time. In support of this motion counsel shows as follows:

Counsel filed defendant's motion to withdraw his guilty plea on July 9, 2012 (Document 35) and the motion was referred to Magistrate Cayer by The Honorable Max O. Cogburn, Jr., District Judge, on July 23, 2012.

Magistrate Cayer entered his order denying the defendant's motion on July 27, 2012 and, through inadvertence, undersigned counsel failed to timely object to that order and request review by the District Court. Undersigned counsel has conferred with Jennifer Dillon, the Assistant United States Attorney assigned to this matter, and she consents to this motion.

This 22nd day of August, 2012.

                              s/Richard H. Tomberlin
                              Richard H. Tomberlin
                              Attorney for Defendant
                              N. C. State Bar No. 8060
                              301 S. McDowell Street, Suite 1210
                              Charlotte, North Carolina 28204
                              Telephone: (704) 373-09779

CERTIFICATE OF SERVICE

This is to certify that I have served a copy of the foregoing through the Electronic Case Filing system in effect for the United States District Court for the Western District of North Carolina on:

Jennifer Dillon
Assistant United States Attorney
Jennifer.dillon@usdoj.gov

This 22nd day of August, 2012.

s/Richard H. Tomberlin
Richard H. Tomberlin

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
#### 3:11cr72

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| Vs. | ) | ORDER |
| | ) | |
| CHARLIE WAYNE BRYANT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**THIS MATTER** is before the court on defendant's Motion for Leave to File Objections and Request Review of Magistrate's Order Out of Time (#41) and Objection to Magistrate's Order and Motion for Review by District Court (#42). Upon review of the docket in this matter, Judge Cayer previously issued an Order (#38) denying defendant's Motion to Withdraw Guilty Plea. Defendant now seeks a review of Judge Cayer's findings. Although defendant files his Objection out of time, based on Fed.R.Civ.Pr. 59(a), he indicates that the government consents to the filing. For the reasons set forth below, the court GRANTS defendant's Motion for Leave to File and Request Review of Magistrate's Order Out of Time but DENIES his Objection to Magistrate's Order and Motion for Review.

Federal Rule of Criminal Procedure 59(a) allows a district judge to refer to a magistrate court judge for determination of any matter that does not dispose of a charge or defense. When a party objects to a magistrate judge's order on a nondispositive matter, a district judge must determine whether the order is contrary to law or clearly erroneous. Id. The issues raised by defendant, specifically, whether Judge Cayer was required to hold a hearing or "otherwise enter an order finding the defendant was competent to proceed prior to accepting his guilty plea" are nondispositive under Rule 59 because their resolutions do

-1-

not terminate a charge or defense.

The court has considered defendant's objections and the materials submitted regarding the defendant's guilty plea and finds that the Order is consistent with law and not clearly erroneous. Accordingly, the court affirms Judge Cayer's Order as the final decision of this court.

## ORDER

**IT IS, THEREFORE, ORDERED** that defendant's Motion for Leave to File Objections and Request Review of Magistrate's Order Out of Time (#41) is **GRANTED**. It is further ordered that defendant's Objection to Magistrate's Order and Motion for Review by District Court (#42) is **DENIED**.

Signed: September 5, 2012

Max O. Cogburn Jr.
United States District Judge

–2–

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


UNITED STATES OF AMERICA,    )
    )
         Plaintiff,    )  3:11CR72
    )  OCTOBER 26, 2012
    vs    )
    )
CHARLIE WAYNE BRYANT,    )
    )
         Defendant.    )
_____/

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE MAX O. COGBURN, JR.
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE UNITED STATES:    JENNIFER DILLON
    U. S. Attorney's Office
    227 W. Trade Street
    Suite 1700
    Charlotte, NC 28202


FOR THE DEFENDANT:    RICHARD H. TOMBERLIN
    301 S. McDowell Street
    Charlotte, NC 28204



Proceedings reported and transcript prepared by:


JOY KELLY, RPR, CRR
U. S. Official Court Reporter
Charlotte, North Carolina
704-350-7495

# I N D E X

**WITNESS**                                                    **PAGE**


AMY SILVER

   Direct Examination By Ms. Dillon .............14
   Cross Examination By Mr. Tomberlin ..........21
   Redirect Examination By Ms. Dillon ..........28
   Recross Examination By Mr. Tomberlin .........30
   Further Redirect Examination By Ms. Dillon ...34


HUBERT DAVIDSON

   Direct Examination By Ms. Dillon .............35
   Cross Examination By Mr. Tomberlin  ..........41
   Redirect Examination By Ms. Dillon ..........46
   Recross Examination By Mr. Tomberlin .........46


BRANDON VALLIER

   Direct Examination By Ms. Dillon .............47
   Cross Examination By Mr. Tomberlin ..........52


EDDIE SEIGLE

   Direct Examination By Ms. Dillon .............55
   Cross Examination By Mr. Tomberlin ..........65
   Redirect Examination By Ms. Dillon ..........73


ERIC LONG

   Direct Examination By Ms. Dillon .............73
   Cross Examination By Mr. Tomberlin ..........82
   Redirect Examination By Ms. Dillon ..........84
   Recross Examination By Mr. Tomberlin .........85

I N D E X (CONTINUED)

WITNESS                                         PAGE

CHARLIE BRYANT

  Direct Examination By Mr. Tomberlin  ........87
  Cross Examination By Ms. Dillon ..............92


CERTIFICATE OF REPORTER ......................114

```
 1              P R O C E E D I N G S
 2    FRIDAY, OCTOBER 26, 2012
 3              (Court called to order at 9:50 a.m.)
 4              THE COURT:  The next one is the United States v.
 5    Charlie Wayne Bryant.
 6              (Defendant is not present in courtroom.)
 7              Before the defendant gets here, as a matter of how
 8    we're going to proceed, it appears to me that the defense is
 9    saying there's not a factual basis for this plea.
10              MR. TOMBERLIN:  For the enhanced part of the plea,
11    (b).
12              MS. DILLON:  And, Your Honor, just to be clear, I
13    had some confusion reading the filing last night with the
14    discussion about the dangerous weapon.  If you look at the
15    indictment, it is charged as a bodily injury, and under
16    111B(b), the government is allowed to charge whether they use
17    a dangerous weapon or if the victim receives a bodily injury,
18    and we did go forward on the theory that he did receive a
19    bodily injury.
20              THE COURT:  What was the bodily injury?
21              MS. DILLON:  He received a laceration to his lip
22    which required a stitch to his lip.
23              THE COURT:  Here's what the Court, and this is
24    why -- I don't know what all we may do today -- it would seem
25    to me that if the facts are that the injured party chased the
```

1  defendant, who pretty clearly has a history of assaultive

2  behavior and all sorts of things that are not good, this is

3  not any kind of model citizen, if this entire incident is by

4  him -- actually if a witness testified he's actually tackled

5  and a struggle goes on after that, I don't think that the

6  statute -- I don't know that that's an assault. I mean he may

7  be trying to resist, but, I mean, you put yourself in

8  situations and do that. I have actually -- we all see things

9  in our lives, and I can remember an officer in Asheville,

10  North Carolina, by the name of Rice, and I don't mind using

11  his name, who had brought a vagrant defendant into court,

12  district court, charging him with assault on an officer,

13  damage to the officer's property, to wit: his watch, resisting

14  arrest, on and on and on.

15         The facts of that case, as given by the person that

16  called, the furniture store owner, who also got charged with

17  interfering with the officer when he tried to stop the

18  officer's assault on the vagrant, was that the officer went to

19  the drunk defendant who was laying in the alley and started

20  kicking and hitting him, and broke his watch while he was

21  backhanding him and then charged him. I mean you can put

22  yourself in situations where something happens if you go and

23  initiated the contact.

24         MS. DILLON: Well, Your Honor, we have witnesses

25  here today and you'll be able to hear that testimony --

1    THE COURT:  Do you have witnesses available now or

2  is this just the defendant's version?

3    MR. TOMBERLIN:  Your Honor, I've got the statements

4  that were provided in discovery that have been filed.

5    THE COURT:  This is the whole thing about it.  I

6  mean this is a huge sentence that this guy gets for a busted

7  lip.  Now, albeit, he is -- he has really shown himself in the

8  past and during this incident, and is apparently a dangerous

9  person.  So I've got to then try to be fair to a dangerous

10  person who probably deserves a lot of this but I don't know if

11  he deserves all of this enhancement.  I don't know what

12  happened to him.

13    MS. DILLON:  Well, Your Honor, we ask that you

14  reserve judgment until you hear --

15    THE COURT:  I will.  I will.  But I'm going to find

16  out.  So we'll be ready to hear that today then.

17    MS. DILLON:  Yes, Your Honor.

18    THE COURT:  I'll reserve it but I want to know how

19  the whole thing happened.  I understand that he did -- did he

20  suffer -- did he suffer it from the swing with the fist or did

21  he suffer it when he was hitting him with the baton in the

22  bathroom, when the officer was hitting the defendant with the

23  baton in the bathroom?

24    MS. DILLON:  Your Honor, the foreshadowing of the

25  testimony is this incident happened so fast, I don't know if

1  anyone can say exactly when his lip was busted because it was

2  a continuous fight all the way through, into the bathroom and

3  it continued from there, and other employees had to assist him

4  to get this defendant to calm down. So I don't know if that's

5  going to be able to specifically be ascertained by the Court

6  which specific punch actually caused the laceration. I don't

7  know that we're going to know that.

8          THE COURT: All right. Where are the witnesses?

9          MS. DILLON: They are in the witness room at this

10 time, Your Honor.

11         THE COURT: All right.

12         MR. TOMBERLIN: Your Honor, I'm hoping to be able to

13 play a bit of the video of this. Technologically, I'm not all

14 that great. Do you intend to do any of that?

15         MS. DILLON: I do not, Your Honor. As the agent

16 will testify, that video has a delay. It's a one-second delay

17 and then a two-second delay, and then it takes frames. It's

18 not a continuous video. So for evidentiary purposes, we don't

19 feel that it's very useful because there's a lot of things

20 that you don't see, so we didn't plan on playing it.

21         THE COURT: I'll allow you to play it.

22         MR. TOMBERLIN: Thank you, Your Honor.

23         THE COURT: We'll have to help you get it played. I

24 don't know how we're going to do it. We'll have to figure it

25 out. Madam Clerk will have to help him.

1          THE CLERK:  I only need a few minutes.

2          (Judge speaks with the clerk.)

3          THE COURT:  Let's go ahead.  You've got your laptop

4    there to play it?

5          MR. TOMBERLIN:  I do have my laptop, Your Honor.

6          THE COURT:  Let's go ahead and get that ready to go

7    so once we start the evidence we can start it.  The Court will

8    be in recess while we do that.

9          (Recess taken.)

10          (Defendant present in courtroom.)

11          THE COURT:  Okay.  Now, as I understand it, the

12   defendant is continuing with his guilty plea.  Is it the

13   enhancement that he's talking about or what's the story here?

14   I need to know that.  Because if we're not having a guilty

15   plea, I need to know that.  It's going to be on important

16   thing.

17          MR. TOMBERLIN:  Your Honor, his objection is to the

18   factual basis on the enhancement, not on the assault charge,

19   so this is under 111(a) and (b), and it is (b), the

20   enhancement part, that he says there's no factual basis for.

21          MS. DILLON:  Your Honor, that might be the argument

22   today but the defendant did attempt to withdraw his guilty

23   plea prior to sentencing after the PSR came out.

24          Those motions, the government responded to.  That

25   motion was referred to Judge Cayer, and Judge Cayer found that

1  there was no basis to withdraw the guilty plea, so the

2  defendant has tried to attempt to withdraw the guilty plea as

3  to all of the charges, (a) and (b), not just the enhancement.

4  　　　　MR. TOMBERLIN:  That is correct, that did occur.  We

5  did ask that that be set aside, and it was denied.  Appealed.

6  Your Honor upheld Judge Cayer.

7  　　　　THE COURT:  Okay.  I call the case of United States

8  v. Charlie Wayne Bryant.

9  　　　　Mr. Bryant, if you would, please stand.

10  　　　　Do you recall appearing before a United States

11  magistrate judge for the purpose of entering a plea of guilty

12  in this case?

13  　　　　DEFENDANT BRYANT:  Yes, sir.

14  　　　　THE COURT:  Do you remember being placed under oath

15  at that time?

16  　　　　DEFENDANT BRYANT:  Yes, sir.

17  　　　　THE COURT:  Do you remember answering the questions

18  the judge asked you?

19  　　　　DEFENDANT BRYANT:  Yes, sir.

20  　　　　THE COURT:  Do you remember signing a plea

21  transcript form indicating your answers were true and correct

22  at the time they were given?

23  　　　　DEFENDANT BRYANT:  Yes, Your Honor.

24  　　　　THE COURT:  Were your answers true and correct when

25  you answered the magistrate judge's questions?

1        DEFENDANT BRYANT:  Yes, sir.

2        THE COURT:  If I asked you the same questions today,

3   would your answers be the same?

4        DEFENDANT BRYANT:  Yes, sir.

5        THE COURT:  All right.  Counsel, were you there at

6   the original Rule 11?

7        MR. TOMBERLIN:  No, Your Honor, I was not.  Angela

8   Parrott represented Mr. Bryant at that original Rule 11

9   hearing.  The issues were prior to that he had been sent off

10  for an evaluation.  There was not a hearing held as to his

11  competency after the report came back.  It was my

12  understanding there was a Presentence Report entered.

13  Ms. Parrott made a motion to withdraw.  That motion was

14  allowed by the Court, and then I was appointed thereafter.

15       THE COURT:  Okay.  Then there's no point in me

16  asking you about -- did you ask her about whether he

17  understood what was going on at the hearing?  If you didn't,

18  that's fine.  But I want to ask you that question.

19       MR. TOMBERLIN:  Your Honor, I cannot answer that

20  question directly.  I mean I just can't.

21       THE COURT:  All right.  Mr. Bryant, I'm going to ask

22  you the next question, and I recognize that we're dealing with

23  a degree here of whether or not 111(b) applies or not.  But

24  did you answer the questions the way you did, and are you

25  going to go forward with your plea today because you did --

1  you did do the actions which you are charged with in the Bill

2  of Indictment absent the enhancement aspect of it.

3        DEFENDANT BRYANT:  No, sir, Your Honor.  I

4  actually -- could I plead guilty without taking the

5  responsibility, and she said, I was reading -- she said I

6  couldn't do it that way.  She said if I didn't answer the

7  questions the way she told me to, they wouldn't take it in a

8  Rule 11.

9        As to the letter I sent you about, she said that my

10  Guidelines would be 41 to 51 months, and she didn't think

11  aggravated assault gave to the case -- that I would be

12  impeding and obstructing the officer, that 37 months -- she

13  said she had -- the time I done give me -- she give me time

14  served, would be 24 months.  Then she just -- I don't know,

15  she didn't go to discovery.  I thought it was inefficient

16  counsel.

17        I sent Mr. Tomberlin a letter trying to get the

18  Moore's fourth factor when I tried to withdraw my guilty plea.

19  I might be guilty of simple assault, but there was no weapon

20  involved, no serious bodily injury or no intent to commit a

21  felony, so I don't see how they got me for an aggravated

22  assault.

23        She told me if I went to trial and lost, they would

24  probably agree with Mr. Seigle because he's in law

25  enforcement, then I would get two more offense levels for

1  obstruction of justice and go from 41 to 51 months to 71 to

2  87.  So I was looking at 46 more months just for taking it to

3  trial.  So I just pled guilty like I have been doing all my

4  life with the public defenders.

5         THE COURT:  Well, a lot of this was rehashed, I

6  guess, during the hearing in front of Judge Cayer, who ended

7  up with a finding in there.  And I realize he may be -- there

8  may be a -- I've got to make a finding today as to whether he

9  understood the consequences and all.  Let me see my prior

10 order and Judge Cayer's.  Has anybody got a copy of it?

11        MR. TOMBERLIN:  Judge Cayer's prior order?

12        THE COURT:  My order.  Judge Cayer's order and my

13 order together.

14        MR. TOMBERLIN:  Your Honor, may I say one thing to

15 the Court.  There was not a hearing in front of Judge Cayer to

16 determine what -- I believe that is correct --

17        MS. DILLON:  The Court ruled on the papers, Your

18 Honor.

19        MR. TOMBERLIN:  The Court ruled on the documents.

20        THE COURT:  The Rule 11 was originally in front of

21 him.

22        MR. TOMBERLIN:  The Rule 11 was originally in front

23 of Judge Cayer.

24        MS. DILLON:  I believe that's correct, Your Honor.

25        MR. TOMBERLIN:  He referenced in his order what

1  occurred during the Rule 11 hearing.

2           MS. DILLON:  I believe Judge Cayer's order is

3  Document 38.

4           MR. TOMBERLIN:  That is correct.

5           THE CLERK:  I'm printing it out now for you.

6           MR. TOMBERLIN:  If Your Honor please, I've got a

7  paper copy of Judge Cayer's order.

8           THE COURT:  I've got one printing out right now.

9           MR. TOMBERLIN:  Okay.  (Pause)

10          THE COURT:  All right.  The Court has reviewed the

11  the entry and acceptance of the plea from the Rule 11 hearing.

12  The Court also has a copy of Judge Cayer's well-reasoned order

13  regarding the entry of the plea and the defendant's desire to

14  withdraw the plea at a date substantially later than when all

15  of that occurred, from the guilty plea and all the reasons

16  that are in there, and this Court's affirmance of that ruling

17  was it was -- the order was consistent with the law and not

18  clearly erroneous.

19          And so based on that, and having reviewed what went

20  on in the Rule 11 hearing, and having Judge Cayer's order

21  after he reviewed what went on at the hearing, then based upon

22  the answers given by the defendant at the Rule 11 hearing

23  before the magistrate judge, and for the reasons stated in

24  Judge Cayer's order denying the defendant's motion to withdraw

25  his plea, the Court finds that the defendant's plea was

1   knowingly and voluntarily made.  The Court affirms the

2   magistrate judge's finding that the defendant understood the

3   charges, potential penalties and the consequences of his plea,

4   and accordingly, the Court affirms the magistrate judge's

5   acceptance of the defendant's plea of guilty at the Rule 11

6   hearing.

7         Let's go ahead and have a factual basis from these

8   gentlemen as quickly as we can.  No point in --

9         MS. DILLON:  Thank you, Your Honor.  The United

10  States calls Amy Silver.

11        THE COURT:  All right.  Let's remember the Rules of

12  Evidence, that she can testify, but I don't mind her

13  testifying to some narrative form and then subject to being

14  for proper cross-examination, which I will allow the defense

15  to do without any limitations with regard to that.  But I want

16  to get into this testimony.  There's no point in -- we don't

17  have a jury here that we're playing to.

18        MR. TOMBERLIN:  Yes, Your Honor.

19        THE COURT:  The question is what are the facts.

20  That's what I want to know.

21                   **AMY SILVER**

22  being duly sworn, was examined and testified as follows:

23              **DIRECT EXAMINATION**

24  BY MS. DILLON:

25  Q   Good afternoon.

1   A    Good afternoon.

2   Q    Can you please state your name and spell your last name

3   for the recrod.

4   A    Amy Silver.  S-I-L-V-E-R.

5   Q    And where do you work, Ms. Silver?

6   A    Social Security Administration.

7   Q    And where is that located?

8   A    Gastonia, North Carolina.

9        MR. TOMBERLIN:  Your Honor, we would stipulate that

10  she was working for the Social Security Administration; was

11  present at work at February 8, 2011; and was there at the time

12  that Officer Seigle and Mr. Bryant were there in that

13  building.

14       THE COURT:  Thank you, sir.  With that stipulation,

15  you may move on to the facts that occurred on that day.

16       MS. DILLON:  Thank you, Your Honor.

17  BY MS. DILLON:

18  Q    Ms. Silver, can you please tell us, describe the Social

19  Security office for us?

20  A    Let's see, the front door would be to my left if I'm

21  sitting at the first window.  The security officer's desk

22  would be right in front of me.  Then there are interviewing

23  windows to the right of those, to the security officer's desk,

24  and then there's other interviewing windows on to my right.

25  Q    Is there a restroom in that area?

1    A    Yes, the restroom would be to my right in front of me.

2    Q    Okay.  And you can see the Social Security officers's

3    desk you stated?

4    A    Yes.

5    Q    And can you see the windows behind his area?

6    A    Yes.  The first two or three.

7    Q    And what are those windows for?

8    A    I'm sorry?

9    Q    Who sits at those windows?

10   A    Claims representatives.

11   Q    And what do you do?

12   A    I'm a service representative.

13   Q    So service representatives are on one side of the office.

14   On the opposite end is the claim representative?

15   A    Yes.

16   Q    Okay.  Ms. Silver, are you familiar with Mr. Bryant?

17   A    Yes.

18   Q    Have you seen him before February 8, 2011?

19   A    Yes.

20   Q    Have you ever assisted him?

21   A    I don't think so.

22   Q    Okay.  Do you see Mr. Bryant in the courtroom today?

23   A    Yes, I do.

24   Q    Can you please describe something he's wearing.

25         MR. TOMBERLIN:  We'll stipulate this is Charlie

1    Bryant, the defendant, next to me, Your Honor.

2              THE COURT:  All right.

3    Q    When you saw -- did you see Mr. Bryant enter the room on

4    February 8, 2011?

5    A    Yes.

6    Q    I ask that you describe what you saw.

7    A    He came in and checked in like any other customer that

8    comes into the office, and he was called up to another

9    interviewing window.

10   Q    Do you know whose interviewing window that was?

11   A    Yes.  It was Mr. Eric Craig.

12   Q    And where was Mr. Craig sitting in relation to you?

13   A    I don't remember, but he would have been to my right.

14   Q    Okay.  Could you see Mr. Craig from where you were?

15   A    I don't remember.

16   Q    Okay.  Did you hear any of the conversation between

17   Mr. Craig and Mr. Bryant?

18   A    No.

19   Q    What did you see next?

20   A    I remember seeing him talking to Ms. Stowe, who was

21   sitting in the interviewing window across the room from me.

22   Q    So she was in the claims representative area?

23   A    Yes.

24   Q    Okay.  And what do you recall seeing at that time?

25   A    She was conducting an interview.  And Mr. Bryant started

1   to get loud.  And Mr. Seigle, our security officer, approached

2   him and was asking him to calm it down.

3   Q    Do you recall any of the things that he was saying?

4   A    No.

5   Q    Okay.  What happened next, if you recall?

6   A    Mr. Seigle bent over to ask him to calm down, and

7   Mr. Bryant stood up and swung at Mr. Seigle.

8   Q    How many times if you recall did he approach Mr. Bryant

9   to ask him to quiet down?

10  A    I only remember one time.

11  Q    Okay.  And you said that Mr. Bryant stood up and swung at

12  Mr. Seigle?

13  A    Yes.

14  Q    Did Mr. Seigle, did he appear to touch Mr. Bryant first?

15  A    No.

16  Q    Did you ever see Mr. Seigle hit Mr. Bryant first?

17  A    No.

18  Q    Okay.  What occurred after you saw Mr. Bryant hit

19  Mr. Seigle?

20         MR. TOMBERLIN:  Objection as to misstatements.

21  Swung at him.

22         THE COURT:  So far it's "swung at."  Was contact

23  made?

24         THE WITNESS:  I don't remember if contact was made.

25  BY MS. DILLON:

1  Q    So what did you see after you saw Mr. Bryant swing at

2  Mr. Seigle?

3  A    Mr. Seigle restraining him and pushing him into the one

4  of the bathrooms.

5  Q    Okay.  And how far away is that bathroom from where

6  Mr. Seigle and Mr. Bryant was, if you can approximate?

7  A    Probably five or ten feet.

8  Q    And then what happened at that point?

9  A    There was an altercation in the bathroom, and we cleared

10  the lobby of all the customers that were in the lobby.

11  Q    How many people were in the lobby at that time?

12        MR. TOMBERLIN:  Objection as to relevance.

13        THE COURT:  Overruled.

14  A    I don't remember.

15  Q    Do you recall if there were a lot of people?

16  A    There were a lot of people in the lobby.

17  Q    Okay.  So what did you guys do at that point?

18  A    At that point we cleared the lobby.  There was an

19  individual at my window in front of me and I told him to

20  leave.

21  Q    Did everyone exit the building?

22  A    Everybody in the lobby did exit the building, yes.

23  Q    Did police come at some point?

24  A    Yes.

25  Q    Did you get to witness when police arrived?

1   A    Yes.

2   Q    Were you inside or outside the building?

3   A    I was inside the building.

4   Q    Okay.  Can you tell us what happened?

5   A    The police came into the building and went into the

6  restroom where Mr. Seigle and -- was with Mr. Bryant.  And

7  they -- the next thing I saw was the police officers bringing

8  out Mr. Bryant.

9   Q    Were you able to hear anything while they were in the

10  restaurant?

11  A    No.

12  Q    Okay.  Did you hear Mr. Bryant say anything when he came

13  out of the restroom?

14  A    Yes.  When Mr. Bryant was leaving the building he said

15  "I'll catch you on the street."

16  Q    Do you recall whether an ambulance came to the scene?

17  A    Yes.

18  Q    At any time during this altercation, Ms. Silver, did you

19  see Mr. Seigle grab Mr. Bryant from behind?

20  A    No.

21  Q    From what you observed, based on your opinion on what you

22  observed that day, who was the aggressor?

23        MR. TOMBERLIN:  Objection.

24        THE COURT:  Overruled.  It's a sentencing hearing.

25  A    Mr. Bryant.

1  Q    Thank you.

2           MS. DILLON:  No further questions, Your Honor.

3           THE COURT:  Before cross-examination, there was a

4  swing by this defendant at the security officer?

5           THE WITNESS:  Yes.

6           THE COURT:  Was the security officer knocked down,

7  knocked back or anything at this point?

8           THE WITNESS:  Was not knocked down, no.

9           THE COURT:  What reaction did you see from the

10 security officer following the swing?

11          THE WITNESS:  I just remember the security officer

12 grabbing him.

13          THE COURT:  Okay.  So following the swing, the

14 security officer grabbed him and pushed him toward the

15 bathroom?

16          THE WITNESS:  Yes.

17          THE COURT:  They went in the bathroom?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  So.  The contact from the original

20 assault into the bathroom is all one action.

21          THE WITNESS:  Yes.

22          THE COURT:  All right.  Thank you.  You may cross

23 examines.

24          MR. TOMBERLIN:  Thank you, Your Honor.

25                    **CROSS EXAMINATION**

1   BY MR. TOMBERLIN:

2   Q    Where were you sitting?

3   A    At Window One.

4   Q    And does that look down that hallway?

5   A    It looks directly to the window he was sitting at.

6   Q    Now, the window he was sitting out, would his back have

7   been to the hallway that went to the bathroom?

8   A    His back was to the lobby.

9   Q    And was the bathroom off the hallway to the lobby?

10  A    No.  The bathroom is in the lobby.

11  Q    Could you see into the lobby from your window?

12  A    Yes.

13  Q    And let me show you a picture.  Let me first show you a

14  copy of your statement.  You gave a statement, did you not?

15  A    Yes.

16          MS. DILLON:  It's okay.  We can see it.

17          MR. TOMBERLIN:  Okay.  You can see it.

18  BY MR. TOMBERLIN:

19  Q    Is that the statement that you gave?

20  A    There's nothing here.

21          THE COURT:  I've got it.  She doesn't.

22          THE CLERK:  She has it now.

23          THE COURT:  So we know right now for this, the

24  darkened spaces on here are --

25          MR. TOMBERLIN:  Redacted.

1          MS. DILLON:  Redactions, Your Honor, pursuant to our

2   policy redacting victim's names.

3          THE COURT:  But in this case everybody knows who

4   this is.

5          MS. DILLON:  Absolutely.

6          THE COURT:  Okay.  Where you see the dark marks is

7   Mr. Seigle.  So we're clear who this is.

8          MR. TOMBERLIN:  Thank you, Your Honor.

9   BY MR. TOMBERLIN:

10  Q    Ms. Silver, in front of you there's a document on your

11  screen.  Is that correct?

12  A    Yes.

13  Q    And do you recognize the signature on that?

14  A    Yes.

15  Q    Who signed that?

16  A    I did.

17  Q    Is that what you told someone on February 8th of 2011?

18  A    Yes.

19  Q    And that's when you saw Mr. Bryant, you said, swing at

20  Mr. -- and the blacked-out name would have been "Seigle."

21  A    Yes.

22  Q    Is that right?

23  A    Yes.

24  Q    That would be Officer Seigle.  Is that correct?

25  A    Yes.

1    Q    Okay. And then a fight started you said after that?

2    A    Yes.

3    MR. TOMBERLIN:  If I get this one more time, does it

4    go off for a minute?

5    THE CLERK:  It will.  It's off.

6    Q    And I'm going to show you a couple of pictures and ask

7    you if you can help me with where these pictures are located.

8    Do you see a picture on there?

9    A    Yes.

10    Q    You've got to kind of turn your head a little bit

11    sideways.  Do you recognize where that picture is?

12    A    Yes.

13    Q    And where is that?

14    A    That is the hallway in our Social Security office.

15    Q    And who you do you see in the left hand or the top side

16    of that picture?

17    A    Mr. Seigle.

18    Q    And behind Mr. Seigle would be what?

19    A    The lobby.

20    Q    And behind that lobby, is that a hallway or is that just

21    an open area?

22    A    Behind the wall?

23    Q    Behind his back.

24    A    Behind his back is an open lobby area.

25    Q    And then how far from that open lobby area to the

1    bathroom?

2    A    Probably five, ten feet.

3    Q    Is it across the lobby or is it to left or the right of

4    lobby as --

5    A    If I'm looking at it, it would be to the right.

6    Q    So if you were standing where Mr. Seigle was standing,

7    but instead of looking the direction he was looking you were

8    looking directly the opposite direction, the bathroom would be

9    some five feet down on the right?

10   A    Yes.

11   Q    Now let me show you the next photograph and tell me if

12   you can identify this.

13   A    Yes.

14   Q    Did you have an angle that day that allowed you to see

15   this action?

16   A    Yes.

17   Q    And was this the action that you saw take place?

18   A    No.

19   Q    Do you know who that picture depicts?

20   A    Yeah.  It's Mr. Bryant and Mr. Seigle.

21   Q    Okay.  And do you see a time on that?

22   A    12:59.

23        MS. DILLON:  Go to the document.

24        THE WITNESS:  Oh, the document.  I'm confused.  I'm

25   sorry.

1       MR. TOMBERLIN:  Your Honor, may it please the Court,

2  if you'll give me a second.

3       THE COURT:  Why don't you lead her on it.  Point to

4  it.  Let's move -- let's get the facts in.

5       MR. TOMBERLIN:  Okay.

6       THE COURT:  It's cross, so you've got a lot --

7  really in these sentencings hearings, there's a lot of leeway

8  with the Rules of Evidence.

9       MR. TOMBERLIN:  Yes, sir.  What I was trying to do

10  is I was trying to get this thing --

11       THE COURT:  To rotate around.

12       MR. TOMBERLIN:  To rotate around, and I wanted to do

13  that if I could but I don't know that I can rotate pages.

14       MS. DILLON:  You want counterclockwise.

15       THE COURT:  Counterclockwise.

16       MR. TOMBERLIN:  Okay.

17       THE COURT:  There you go.

18       MR. TOMBERLIN:  Okay.  That's better.

19       THE COURT:  12:59:59.  The Court sees the time.

20  BY MR. TOMBERLIN:

21  Q    12:59:59 on February 8, 2011, that's the camera shot from

22  your office down there pointing toward Mr. Seigle and

23  Mr. Bryant when the altercation started, isn't it?

24  A    Yes.

25  Q    And then as the altercation continued, Mr. Seigle told

1    Mr. Bryant to leave and pointed to him to go out -- to get,

2    didn't he?

3    A    Yes.

4    Q    And that's what that picture was, wasn't it?

5    A    Yes.

6    Q    And that was part of that same sequence, wasn't it?

7    A    Yes.

8    Q    And then the next thing that occurred after that was a

9    struggle between Mr. Bryant and Mr. Seigle, and that's what

10   you saw.  Is that right?

11   A    Yes.

12   Q    And that's a picture of that that occurred at 1:00.  Is

13   that correct?

14   A    Yes.

15   Q    And then the next thing that happened after that is

16   Mr. Bryant had taken off out into the lobby and Mr. Seigle

17   took off after him.  Isn't that right?

18   A    No.  I remember Mr. Seigle shoving Mr. Bryant into the

19   bathroom.

20   Q    Okay.  If you would take a look at this picture, did you

21   see this occur?

22   A    Yes.

23   Q    Ma'am?

24   A    Yes.

25            THE COURT:  She said "yes."

1   Q   Okay.  Now, the bathroom that you're talking about is

2   about five to ten feet forward of where this picture is, is

3   that right?

4   A   Yes.

5   Q   And then when you saw Mr. Seigle shove Mr. Bryant into

6   the bathroom, did he tackle him?

7   A   All I remember is him shoving him into the bathroom.

8   Q   Did you hear anything when that occurred?

9   A   Just heard a lot of commotion.  I didn't know what it

10  was.

11  Q   Okay.  And that's what you know about this, is that

12  right?

13  A   Yes.

14  Q   You said that you saw Mr. Bryant being taken by the

15  police out of the building?

16  A   Yes.

17  Q   Is that correct?  Was he handcuffed?

18  A   I don't remember.

19  Q   And did he have officers there near him?

20  A   Yes.

21  Q   Okay.

22          MR. TOMBERLIN:  Thank you, Your Honor.  That's all

23  I've got with this witness.

24          THE COURT:  Any redirect?

25          MS. DILLON:  Yes, Your Honor.  If we could show page

1  3.

2  **REDIRECT EXAMINATION**

3  BY MS. DILLON:

4  Q    Ms. Silver, this is not the angle that you're seeing when

5  you were there?

6  A    No.

7  Q    Okay.  What is this view?

8  A    This is coming down the hallway.

9  Q    Okay.  And where are you in relation to this?

10  A    I'm directly across the office.

11  Q    So you can see into that doorway that they are standing

12  in?

13  A    Yes.

14  Q    Okay.  And the time here is 12:59:59?

15  A    Yes.

16  Q    Okay.  If we can go to the next picture.  Okay.  Now,

17  again, you didn't see this angle of picture 4, right?

18  A    Correct.

19  Q    You saw it from the other side of the room?

20  A    Yes.

21  Q    Through the doorway?

22  A    Yes.

23  Q    This is at -- a second later.  Correct?

24  A    Yes.

25  Q    Things happened in between the last second and this

1  second that's not depicted in these photographs?

2          MR. TOMBERLIN:  Objection.  If she knows.

3          THE COURT:  Do you know?  Do you know what -- do you

4  know that something happened between the other photograph and

5  this photograph, do you know that something happened?

6          THE WITNESS:  I don't know.

7  BY MS. DILLON:

8  Q    Did you see what happened during this altercation?

9  A    Yes.

10 Q    So these are just snapshots in time, right?

11 A    Yes.

12 Q    So you're not seeing everything in this picture that you

13 saw?

14 A    Correct.

15 Q    Okay.  Picture 5, please.  And this is another second

16 later?

17 A    Yes.

18 Q    And you're recollection that you stated was that there

19 was a continuous -- a continuous struggle into the bathroom?

20 A    Yes.

21         MS. DILLON:  Thank you.  No further questios.

22              **RECROSS EXAMINATION**

23 BY MR. TOMBERLIN:

24 Q    How far away were you?

25         MR. TOMBERLIN:  May I, Your Honor?

1    THE COURT:  Yeah, you may.

2  Q    How far away were you from that opening there where

3  Mr. Seigle is standing?

4  A    25 -- 20 to 25 feet.

5  Q    So you were all the way across the lobby?

6  A    I'm across the lobby.

7  Q    And you said the lobby was full of people?

8  A    There were people in there, yes.

9  Q    And you were sitting down?

10  A    Yes.

11  Q    And were there chairs with people between you and this

12  doorway?

13  A    Yes.

14  Q    And so your vision would have had to be past or through

15  people sitting or empty chairs in the lobby to be able to see

16  the doorway?

17  A    Yes.

18  Q    Ma'am?

19  A    Yes.

20  Q    And how about to see the bathroom?

21  A    You can't see the doors of the bathroom from where I was

22  sitting at, no.

23  Q    So did you get up?  I mean how did you see them get into

24  the bathroom if you can't see the doors of the bathroom from

25  where you sit?

1   A    Because the bathroom with the doors kind of sit back.

2   And I saw him shove him into the bathroom.  The way the

3   bathrooms are set, you can't see the actual doors from where I

4   sit.

5   Q    Okay.  So you could not see the door to the bathroom, all

6   you saw is Officer Seigle shove him?

7   A    Yes.

8   Q    Is that correct?

9   A    Yes.

10  Q    And was Mr. Bryant heading toward the bathroom at that

11  time or was he heading to the lobby, was he heading out of the

12  building, where was he going?

13  A    He do not look like he was heading out of the building,

14  no.

15  Q    Did it look like he was heading into the bathroom?

16  A    No.

17  Q    Let me show you a series --

18         MR. TOMBERLIN:  Is that up on that screen?

19         THE COURT:  Yes.

20  BY MR. TOMBERLIN:

21  Q    I'm going to play a series and tell me whether or not you

22  could see this and if this was consistent with what you saw

23  that day.  Strike that question.

24      My understanding is you you could not see down this

25  hallway.  Is that right?

1  A    Correct.

2  Q    So if I play a picture that shows what occurred in that

3  hallway, you would not be able to see it from the angle I'm

4  showing it?

5  A    I couldn't see down the hallway but I can see into the

6  door.

7  Q    Okay.  So you could see --

8            THE COURT:  Clearly the Court knows she can see

9  what's in front of her.  Whatever occurs in front of her she

10  can see.

11  Q    Let me show you, and tell me whether or not this is

12  consistent with what you saw.  (Shows silent video.)

13        Was that consistent with what you saw?

14  A    Yes, but there was another time where Mr. Seigle walked

15  up to Mr. Bryant who you bent down and told him to calm down

16  or to leave.

17  Q    And were there any swings or anything at that time?

18  A    At that time, no.

19  Q    Okay.  Now, see that that window in front of where

20  Mr. Bryant got up, there's a glass window there that's a --

21  where another representative for the Social Security

22  Administration sits.  Is that correct?

23  A    I'm sorry?

24            THE COURT:  Somebody else sits there?

25            THE WITNESS:  At that window?

1    THE COURT:  At that window, a representative of the

2  Social Security Administration.

3    THE WITNESS:  There was that day, yes.

4  Q    Okay.  And Ms. Stowe would have been the one at that

5  cubical?

6  A    Yes.

7    MR. TOMBERLIN:    That's all I've got.

8    THE COURT:  Okay.

9    **FURTHER REDIRECT EXAMINATION**

10  BY MS. DILLON:

11  Q    Ms. Silver, does that -- what you just saw, that series

12  of pictures that were played in front of you, did that depict

13  the punch or the swing that you saw?

14  A    I don't remember.

15  Q    If we could play it one more time.

16    THE COURT:  The Court has heard her testimony and

17  can see what the picture shows.  Go ahead play it one more

18  time.

19    MR. TOMBERLIN:  I'm going to play it backwards to

20  get it there.

21    (Silent video played.)  Replay it forward.

22    MS. DILLON:  Thank you.

23  BY MS. DILLON:

24  Q    Ms. Silver, did you see a punch there in that video?

25  A    Yes.

SILVER - RECROSS

1 Q    You saw a punch?

2 A    Or I saw a swing, yes.

3 Q    Can you tell us when that was?  If we can play it again.

4      (Silent Video played again.)

5          MR. TOMBERLIN:  Is that far enough back?

6          MS. DILLON:  Yes.  Thank you.

7          MR. TOMBERLIN:  Do you want me to stop it on it?

8          (Silent video played.)

9 A    Right there.  (Indicating)

10 Q    That's the punch that you saw, or the swing?

11 A    Yes.

12 Q    All right.

13          MS. DILLON:  Thank you.  No further questions.

14          MR. TOMBERLIN:  No further questions.

15          THE COURT:  Thank you, ma'am.  You may come down.

16 Call your next witness.

17          MS. DILLON:  The United States calls Mr. Hubert

18 Davidson.

19                  **HUBERT DAVIDSON**

20 being duly sworn, was examined and testified as follows:

21                  **DIRECT EXAMINATION**

22 BY MS. DILLON:

23 Q    Good morning.

24 A    Good morning.

25 Q    Can you please state your name and spell your last name

1    for the record.

2    A    Yes, it's Hubert Davidson.  D-A-V-I-D-S-O-N.

3    Q    And if you push that screen back, it will come down and

4    we can see you more easily.  Thank you.

5         Mr. Tomberlin, would you stipulate to the same

6    stipulation?

7              MR. TOMBERLIN:  Sure.  Yes, I would.

8              MS. DILLON:  Thank you.

9    Q    Mr. Davidson, you work at the Social Security office?

10   A    I do.

11   Q    And what is your job there?

12   A    I'm a claims representative.

13   Q    Okay.  And you were working the date Mr. Bryant came in

14   and had an altercation with Mr. Seigle?

15   A    Yes, I was.

16   Q    Where were you located at that time?

17   A    I was seated next to Ms. Stowe.

18   Q    And were you able to see and observe what was going on?

19   A    Yes, I was.

20   Q    Okay.  And can you please describe to us what you

21   observed when Mr. Bryant came to her window?

22   A    Okay.  As I stated, I was seated beside Mr. Stowe, and I

23   just completed my interview.  And I was wrapping up my claim

24   and I heard Mr. Bryant's voice get real, real loud.  So

25   normally in a situation like that what I do is just stand up

1   and walk by, try to make my presence known that there's a male

2   around and hopefully it would calm him down.  So I sat back

3   down.

4   Q     I'm sorry?

5   A     I walked past Ms. Stowe's desk and walked back and sat

6   down.

7   Q     You did that for what purpose?

8   A     Hopefully to calm him down some, because his voice was

9   extremely loud.

10  Q     Do you recall what he was saying?

11  A     Not verbatim, no.

12  Q     Did you know what he was upset about?

13  A     No, I don't.

14  Q     Okay.  After you had walked past and sat back down, what

15  did you do next?

16  A     I continued with wrapping up my claim, and he had gotten

17  loud again.

18  Q     So what, if anything, did you do at that point?

19  A     I stood up again and walked by, walked over to the

20  printer and walked by Mr. Stowe's desk and put some paper

21  beside her and sat down.

22  Q     Did that seem to calm Mr. Bryant in any way?

23  A     No, it didn't.

24  Q     Is it usual for people to get loud in the Social Security

25  office?

1    A    It is. And normally that tactic works.

2    Q    What happened next?

3    A    The next thing I know I heard a rumbling and scuffling

4    going on so I ran out the side door. After I entered into the

5    lobby where Officer Seigle and Mr. Bryant was, they were

6    standing in front of the bathroom door. As I approached them,

7    they had fell into the bathroom door.

8    Q    So what did you see when you saw them in front of the

9    bathroom door?

10    A    Officer Siegel's back was -- well, I take that back.

11    Mr. Bryant's back was towards the door and Officer Seigle was

12    kind of in front of him, and they just fell through the door.

13    Q    They fell through the door?

14    A    Uh-huh.

15    Q    Okay. And how close is the bathroom from where Ms.

16    Stowe's window is?

17    A    No more than two or three feet.

18    Q    It's close?

19    A    It's real close.

20    Q    Okay. And what do you remember happening next?

21    A    Well, after running up on them and going into the

22    bathroom, Mr. Bryant was laying on the floor, and Officer

23    Seigle was actually on top of him, but I entered into the

24    bathroom, so I went over to my left, Mr. Bryant's right, and

25    at that point I made eye contact with Mr. Bryant.

1    Q    Okay.  So what happened after you made eye contact?

2    A    He was wailing.  He was throwing his arms and legs

3    everywhere.  He struck me in the chest, and I had his foot.  I

4    kind of tightened up to his foot hoping to calm him down.

5    Q    Okay.  So you were struck during this incident?

6    A    I was.

7    Q    Okay.  And before you were struck, had you done anything

8    to Mr. Bryant?

9    A    No.

10   Q    Okay.  Was Mr. Bryant saying anything at this time if you

11   recall?

12   A    Not that I recall.

13   Q    Can you tell us what happened next?

14   A    At that point, as I stated before, they were struggling.

15   He was wailing away.  Arms, legs flying.  Officer Seigle was

16   trying to reach and grab his baton out of his back but he

17   couldn't get to it, so I got his baton and I attempted to open

18   his baton.  Anyone who has ever used one knows that it just

19   pops open.  And at that point Mr. Vallier was behind me.  So

20   Mr. Vallier had took the baton and he popped it open and gave

21   it to Mr. Seigle, Officer Seigle.

22   Q    Did you see the defendant reaching for anything during

23   that time?

24   A    He was reaching for his sidearm.

25   Q    For whose sidearm?

1    A    For Officer Seigle's sidearm.

2    Q    By "sidearm" you mean a firearm?

3    A    Firearm.  Correct.

4    Q    And how do you know he was reaching for it?

5    A    I mean it's -- it's -- it's on the side and he was

6    reaching for it is the best I can tell you.  And that's, you

7    know, that's what I witnessed.

8    Q    Can you see how many times he reached for it, if you

9    recall?

10   A    I can't recall.

11   Q    Okay.  What happened once Mr. Vallier was able to open

12   that baton?

13   A    Well, what happened was Officer Seigle struck him maybe

14   once or twice and that kind of calmed him down.  And at that

15   point I think the officers had arrived at that point.

16   Q    To your knowledge did it appear Mr. Seigle received any

17   injuries?

18   A    I didn't witness -- I didn't witness him get struck, but

19   his mouth was bleeding.

20   Q    Okay.  At any time during this altercation, Mr. Davidson,

21   did you see Mr. Seigle grab Mr. Bryant from behind?

22   A    No, I didn't.

23   Q    From your observation, based on your opinion -- your

24   opinion based on your observation, who was the aggressor?

25   A    Mr. Bryant was.

1　Q　　Thank you.

2　　　　　　MS. DILLON:  No further questions.

3　　　　　　THE COURT:  Cross.

4　　　　　　MR. TOMBERLIN:  Thank you, Your Honor.

5　　　　　　　　　**CROSS EXAMINATION**

6　BY MR. TOMBERLIN:

7　Q　　You saw the altercation happen in the hallway.  Is that

8　right?

9　A　　After entering the lobby is where I began to see --

10　　　　　THE COURT:  He said he came in and they were at the

11　bathroom door.

12　Q　　Okay.  So you saw nothing in the hallway.  I thought you

13　said you went and stood next to Ms. Stowe at one point?

14　　　　　THE COURT:  What he saw was there was a loud thing

15　going on, then he went out of the place while the loud talking

16　was going on, and as far as the struggle is concerned, he saw

17　him in the bathroom door.

18　　　　　THE WITNESS:  That was it.

19　Q　　Who pushed who into the bathroom?

20　A　　Mr. Seigle actually pushed him in the bathroom.

21　Q　　And when he pushed him in the bathroom, did he land on

22　top of him, Mr. Bryant?

23　A　　Yes.

24　Q　　And then you walked into the bathroom.  Is that correct?

25　A　　That's correct.

1   Q    And when you walked into the bathroom, did you hit

2   Mr. Bryant a couple times?

3   A    After -- I didn't hit Mr. Bryant, but I grabbed -- he

4   kicked me in the chest and I grabbed his foot.  It was like a

5   kick and a grab.

6   Q    You gave a statement, right?

7   A    I did.

8   Q    You gave a statement that you signed.  There it is.

9        Do you recognize that, it has been mark as Exhibit 4.

10  A    Barely legible.

11       THE COURT:  Can you make it just a little bit

12  bigger?

13       MR. TOMBERLIN:  Yes, sir.

14       THE COURT:  Right there.  Yeah.  That's good enough.

15       THE WITNESS:  Okay.

16  BY MR. TOMBERLIN:

17  Q    Do you recognize that?

18  A    I do.

19  Q    "In an attempt to get Mr. Bryant under control, I grabbed

20  his leg and struck him twice with my right elbow."

21  A    Correct.

22  Q    So you did hit him a couple times?

23  A    Correct.  And pulled back on his foot.

24  Q    Sir?

25  A    And pulled back on his foot.

1  Q    Okay.  And at that time the situation was Mr. Bryant was

2  flailing his arms and his legs, and you were grabbing his

3  legs.  Mr. Seigle was fairly heavy at that time, was he not?

4  A    Yes.

5  Q    And considerably larger than Mr. Bryant?

6  A    Weightwise?  Yes.

7  Q    And he was on top of Mr. Bryant.  Wasn't splayed out or

8  was he sitting on him?  How was he on top of Mr. Bryant?

9  A    Kind of laid out on him.

10  Q    Did he have his hands kind of pinned or not?

11  A    I don't recall.

12  Q    Okay.  But you saw Mr. Bryant waving his hands around and

13  kicking his feet?

14  A    I did.

15  Q    Did you see him grabbing at the left side and grabbing at

16  the right side of Officer Seigle?

17  A    He was actually grabbing both sides.  I mean he was

18  wailing so his arms were going and his hands --

19  Q    So he was grabbing with Officer Seigle all over the

20  place?

21  A    Correct.

22  Q    Did it appear as though he was trying to get Officer

23  Seigle off of him?

24  A    You could say that.

25  Q    Now, when you say he was reaching for the gun, was he

1  reaching for the gun or did you see him reaching for the side

2  where the gun was?

3  A    Correct.  Reaching for the side where the gun was.

4  Q    Okay.  And the gun was in a holster, wasn't it?

5  A    It was.

6  Q    And was it the holster that had the flap over it?

7  A    I don't recall.

8  Q    Okay.  But what you saw was him reaching over the side

9  where the holster was?

10  A    Correct.

11  Q    And you saw him reaching over to the other side of

12  Mr. Bryant.  Is that correct?

13  A    Correct.

14  Q    And your concern at that point was that he might try and

15  take the gun?

16  A    Correct.

17  Q    Did he ever say "I'm going to take your gun"?

18  A    Of course not.

19  Q    Okay.  And you never saw him with the gun --

20  A    No.

21  Q    -- Mr. Bryant?  And then you were there when Mr. Vallier

22  came in?

23  A    Correct.

24  Q    And Mr. Bryant let Mr. Vallier handcuff him?

25  A    Not that I recall.

1    Q    Okay.  But you saw Mr. Vallier open up the baton?

2    A    Correct.  I actually -- I actually had it, and I was

3    trying to open it myself, but Mr. Vallier has a little more

4    experience with opening them so he actually did.

5    Q    It was an asp, is that right?  Or do you know what it

6    was?

7    A    I guess it was an asp.  Baton.

8    Q    It's an expandable baton that's used to hit with.

9    A    Correct.

10   Q    And that was used to hit Mr. Bryant a couple of times?

11   A    Correct.  And that calmed him down.

12   Q    Just to be clear, when you first saw Mr. Bryant and

13   Mr. Seigle together, they were intertwined with each other at

14   the bathroom door?

15   A    Correct.

16   Q    You didn't see who got there first or how they got there?

17   A    I didn't.

18        MR. TOMBERLIN:  May I have just a second, Your

19   Honor?

20        THE COURT:  Yes, sir.

21   Q    Now, where you said in this statement -- if you look up

22   about 1, 2, 3, 4, 5, 6, 7 lines from bottom of your statement

23   where it says, "Mr. Bryant at that point started reaching for

24   officer -- "  I think you said "Eddie's gun.  He reached for

25   it several times when Brandon yelled."  That is what you were

1    talking about the flailing was where he was grabbing the one

2    side and then the other.  Is that right?

3    A    Correct.

4    Q    So you don't know whether he was reaching for the gun or

5    not, you just knew that he was reaching one side of Officer

6    Seigle then the other side trying to get this man off of him.

7    A    That's my opinion that he was reaching for the gun.

8         MR. TOMBERLIN:  Thank you.

9                    **REDIRECT EXAMINATION**

10   BY MS. DILLON:

11   Q    To be clear, Mr. Davidson, because this is getting

12   confusing, do you believe that Mr. Bryant, from your

13   observation was reaching for a firearm or just throwing his

14   hands from one side to another?

15   A    He began reaching for his firearm.

16   Q    Okay.  Thank you.

17        MS. DILLON:  No further questions.

18                    **RECROSS EXAMINATION**

19   BY MR. TOMBERLIN:

20   Q    Do you believe that he was trying to get Officer Seigle

21   off him and that's why he was reaching around both sides and

22   pushing at Officer Seigle, or do you believe he was reaching

23   to try and take the firearm from the holster?

24   A    I would say both.  If you're in a confrontation with

25   someone, of course one of your main goals is to get him off of

1    you, but from what I observed, it appeared he was reaching for

2    his gun.

3              THE COURT:  All right.  You may come down.  Thank

4    you.  Any more witnesses?

5              MS. DILLON:  Yes, Your Honor.  Your Honor, the

6    United States calls Mr. Brandon Vallier.

7              THE COURT:  Then we are going to get to Officer

8    Seigle next.

9              MS. DILLON:  Yes, Your Honor.  He's actually next.

10             THE COURT:  All right.  Let's move this stuff along,

11   please, on the government's side of this.

12                         **BRANDON VALLIER**

13   being duly sworn, was examined and testified as follows:

14                       **DIRECT EXAMINATION**

15   BY MS. DILLON:

16   Q    Good morning.

17   A    Good morning.

18   Q    Can you please state your name and spell your last name

19   for the record.

20   A    Brandon Vallier.  V-A-L-L-I-E-R.

21             MS. DILLON:  And does the defense make the same

22   stipulation?

23             MR. TOMBERLIN:  We will stipulate he's an employee

24   of the Social Security Administration, was working that day.

25   The same stipulation we made previously.

1          MS. DILLON:  Thank you.

2          THE COURT:  As to what he saw.

3    BY MS. DILLON:

4    Q    Mr. Vallier, what do you do at the Secret Service --

5    Social Security.  I'm sorry.

6    A    I'm a service representative.

7    Q    And were you able to see Mr. Bryant on February 8th,

8    2011?

9    A    Yes, ma'am.

10   Q    Okay.  And you were in the lobby that day?

11   A    Yes, ma'am.

12   Q    Okay.  What were you doing that day when you first saw

13   Mr. Bryant?

14   A    I was answering telephones.

15   Q    Okay.  Did you see Mr. Bryant come in?

16   A    Yes, I did.

17   Q    Can you tell us what you saw?

18   A    He came in and spoke with a service representative and he

19   got referred to a claims representative, Mr. Stowe, to be seen

20   on a matter in regards to his benefits.

21   Q    Did he see Ms. Stowe?

22   A    Yes.

23   Q    Okay.  What did you see next?

24   A    I didn't see anything next.  I heard some people talking

25   in the lobby and then heard glass break, so I immediately ran

1   to the front and heard a male voice yell "gun" and then ran

2   out into the lobby.

3   Q    Okay.  What happened next?

4   A    I stood next to another claims representative that was in

5   the lobby, Mr. Cooper, and we had asked all the claimants in

6   the lobby to go ahead and step outside for their safety.

7   Q    What did you do next?

8   A    I asked where Officer Seigle was.  Walked over to the

9   restroom where another claims representative, Mr. Davidson,

10  was standing, and walked in and witnessed Mr. Seigle up

11  against the wall, and then Mr. Bryant laying on the ground

12  facing up, swinging at Mr. Seigle.

13  Q    Okay.  Where was this?

14  A    This was in the men's bathroom, restroom.

15  Q    Can you describe was anyone speaking, was anything said?

16  What did you see?

17  A    Mr. Seigle was asking Mr. Bryant to calm down and

18  Mr. Bryant had said, "I'm going to fuck you up."

19  Q    Okay.  Did Mr. Bryant say anything else?

20  A    Not at that moment.  He had passed that point stated that

21  Mr. Seigle was not going to place him in cuffs, handcuffs.

22  Q    Did you ever see Mr. Bryant reach for Mr. Siegel's

23  firearm?

24  A    Yes.

25  Q    Do you recall how many times you witnessed that?

1    A    At least twice.

2    Q    Did you appear -- was there a time when Mr. Seigle got

3    his baton?

4    A    He was handed his baton.  He tried to grab it.  Every

5    time he tried to grab it, Mr. Bryant would swing or kick at

6    him.  That was one of instances when Mr. Bryant had grabbed on

7    to Officer Seigle's holster.

8    Q    So how did Mr. Seigle get his asp?

9    A    Mr. Davidson had grabbed it out.  Tried to extend it.  He

10   was unable to.  I've used an asp before from previous

11   training, so I was able to extend that for him and hand it to

12   Officer Seigle.

13   Q    Can you tell us what happened next?

14   A    I handed it to Officer Seigle.  Officer Seigle just held

15   it in front of him.  Mr. Bryant again tried swinging at

16   Officer Seigle, so Officer Seigle responded with hitting

17   Mr. Bryant's arms away and legs away.

18   Q    At any time did Mr. Bryant grab the asp?

19   A    Yes, ma'am.

20   Q    Can you describe that for us?

21   A    Mr. Bryant grabbed it with one hand and then he placed

22   his other hand on it and tried yanking it away from Officer

23   Seigle.  I then stated to Officer Seigle that if Mr. Bryant

24   were to take that asp, he may have to use his firearm.

25   Q    And why did you say that?

1    A    Because of the continuum of force.  He has the ability

2    to, you know, hurt or endanger or kill Officer Seigle with

3    that baton.  It's a weapon.

4    Q    Did Mr. Bryant do anything when he heard you say that to

5    Mr. Seigle?

6    A    He immediately looked at me and kind of stopped what he

7    was doing.

8    Q    Okay.  What happened at that point?

9    A    I had told Mr. Bryant that we were going to place him in

10   handcuffs.  That's when Officer Seigle -- or that's when

11   Mr. Bryant stated that Officer Seigle was not going to put him

12   in handcuffs.

13   Q    So Mr. Bryant stated that Mr. Seigle was not going to put

14   him in handcuffs?

15   A    Correct.

16   Q    So then what happened?

17   A    I asked him if he wanted me to and he said, yes.

18   Q    So did you put Mr. Bryant into cuffs?

19   A    Yes, ma'am.

20   Q    Can you tell us what happened next?

21   A    After I got him in cuffs, myself and Officer Seigle

22   helped pick Mr. Bryant up, and then one of the Gaston County

23   police officers had showed up into the room.

24   Q    What happened when the police officers got there?

25   A    Mr. Bryant stated, "Oh, no, sarge, not you."  I don't

1    know what that was in regards to.  Then he started to struggle

2    with the officer that had came in.  I stepped back out and

3    waved another officer and stating that Mr. Bryant was trying

4    to fight the officer.

5    Q    Did more officers come to the bathroom?

6    A    Yes, ma'am.

7    Q    During the time you were witnessing the fight in the

8    bathroom, did it appear that Mr. Bryant was simply trying to

9    get Mr. Seigle off of him?

10   A    They just seemed -- he just seemed to be fighting at him.

11   Q    So he was -- he was punching and kicking at Mr. Seigle?

12   A    Yes, ma'am.  Mr. Seigle was against the wall.

13   Q    And Mr. Seigle was kind of on top of Mr. Bryant?

14   A    I wouldn't say on top of him.  He was backed away.

15   Q    Okay.  And did you see whether Mr. Seigle had any

16   injuries?

17   A    He was bleeding from the mouth.

18   Q    Okay.  Based on what you observed, Mr. Vallier, do you

19   have an opinion as to who was the aggressor?

20   A    Mr. Bryant.

21        MS. DILLON:  No further questions, Your Honor.

22        THE COURT:  Any cross?

23        MR. TOMBERLIN:  Yes, sir.

24                    CROSS EXAMINATION

25   BY MR. TOMBERLIN:

1  Q    Did you see them go in the bathroom?

2  A    No, sir.

3  Q    And when you first got there I believe you gave a

4  statement that said that Mr. Davis was standing there holding

5  the door open?

6  A    Yes, sir.

7  Q    And let me understand, describe for me, if you would,

8  where Mr. Bryant was and where Mr. Seigle was and the distance

9  between them and any contact that they were making at that

10 point?

11 A    Officer Seigle was standing, slouched against the wall,

12 his back against the wall.  Mr. Bryant was on his -- the lower

13 portion of his back.  Probably his feet were about a foot away

14 from Officer Seigle as he was bending them up to kick towards

15 him.

16 Q    Did you see Officer Seigle go toward Mr. Bryant or did

17 you see Mr. Bryant go toward Officer Seigle?

18 A    Mr. Bryant go toward Officer Seigle.

19 Q    And he was laying on his back?

20 A    Yes.

21 Q    Pushing?

22 A    Pushing and curling up.

23 Q    Did Officer Seigle have a place he could back up to?

24 A    He was backed up against the wall.  There was nowhere he

25 could go.

1  Q    Okay.  Let me show you what is marked as No. 6 and ask if

2  this is your statement.

3  A    Yes.

4  Q    And let me take you on down toward the bottom, if I may.

5       You say in there, about halfway down the page, "I then

6  informed Officer Seigle that if Mr. Bryant takes away the asp,

7  he will have to draw his firearm to comply with the continuum

8  of force."  I believe that's what you testified to just a

9  minute ago.

10 A    Yes, sir.

11 Q    At any time did you see Mr. Bryant with control over the

12 firearm?

13 A    No, sir.

14 Q    At any time did you see Mr. Bryant with control over the

15 asp?

16 A    Yes, sir.

17 Q    And did he have control where he could use that asp to

18 hurt anybody?

19 A    Yes, sir.

20 Q    And did he use that asp to hurt anybody?

21 A    No, sir.

22       MR. TOMBERLIN:  Okay.  That's all I've got.

23       THE COURT:  All right.  Anything else?

24       MS. DILLON:  No, Your Honor.  That's all.

25       THE COURT:  Thank you.  You may come down.  Call

| | |
|---|---|
| 1 | your next witness. |
| 2 | MS. DILLON: United States calls Mr. Seigle. |
| 3 | **EDDIE SEIGLE** |
| 4 | being duly sworn, was examined and testified as follows: |
| 5 | **DIRECT EXAMINATION** |
| 6 | BY MS. DILLON: |
| 7 | Q   Good morning. |
| 8 | A   Good morning. |
| 9 | Q   Can you please state your name and spell your last name |
| 10 | for the record. |
| 11 | A   Eddie Seigle.  S-E-I-G-L-E |
| 12 | Q   Mr. Seigle, are you retired? |
| 13 | A   I am. |
| 14 | Q   When did you retire? |
| 15 | A   About a year and a half ago, February. |
| 16 | Q   Okay.  And have you recently been diagnosed with |
| 17 | something? |
| 18 | A   Yes. |
| 19 | Q   Can you tell us what that is? |
| 20 | A   Well, I have post-traumatic stress and dementia. |
| 21 | Q   Okay.  And when did you last work? |
| 22 | A   About a year and a half ago. |
| 23 | Q   Okay.  Was that at the Social Security office? |
| 24 | A   Yes. |
| 25 | Q   And you were a security officer there? |

SEIGLE - DIRECT

```
 1    A     Yes.

 2    Q     And that's at the Gastonia Social Security office?

 3    A     Yes.

 4    Q     And how long did you work there as an officer?

 5    A     All together?

 6    Q     At the Social Security office?

 7    A     About six years.

 8    Q     Okay.  And are you familiar with Mr. Bryant?

 9    A     Yes.

10    Q     Have you seen him at the Social Security office before?

11    A     Yes, ma'am.  Several occasions.

12    Q     And you have had interactions in the past with him?

13    A     Yes.  It was a few cases whenever he come into the office

14    he would be mumbling and talking to hisself, and that put me

15    on alert as to what was taking place.  He would come in, pull

16    a ticket.  He'd have seat.  Then he would go there, he would

17    start talking amongst the people.  And so that just had me be

18    alert that, you know, just I observed him.  And that would be

19    for anyone that come in that I had to do an alert for -- maybe

20    for like being, you know, maybe going to be out of order or

21    something.

22          THE COURT:  Let's move on and let's get to the

23    incident.

24          MS. DILLON:  Yes, Your Honor.

25    BY MS. DILLON:
```

1  Q    And you saw him enter the office on February 8th, 2011?

2  A    Yes.

3  Q    Did he say anything to you when he came into the office

4  that day?

5  A    He came in.  He came up to the desk because he knew my

6  name because I had my name badge.  He said good morning.  I

7  said good morning.  And he said, "I put my knife out there in

8  the bushes."

9  Q    Okay.

10 A    Then he pulled a ticket and he had a seat.

11 Q    Have you had any instances before where Mr. Bryant talked

12 about a knife?

13 A    Yes.  One evening -- well, there was two or three

14 occasions.  One case was that it was around about 4:30,

15 getting off from work, the supervisor waited on him because he

16 was the last person to leave the building.  And the supervisor

17 was going to wait on him.  And I asked him would he be okay to

18 supervise him.  He said he thought he would be okay.  So I

19 left.  That was my time for getting off work.

20     So the next morning I came in, you know back to work, the

21 supervisor came up to me and said that he had been threatened

22 by Mr. Bryant.  And I said in what way?  And he said that

23 Mr. Bryant had a little pocketknife and pulled it out and he

24 was cleaning his nails.  And as the supervisor was encoding

25 into the computer what was taking place, Mr. Bryant said, told

1   the supervisor, "You're going to put what I want you to in

2   that computer."  And the supervisor got a little bit uptight

3   about it because he didn't know where he was going with this.

4       That's what was told to me that morning when I came into

5   work.

6       And on a couple of occasions he came in, you know, he

7   would get -- people like, you know, he be talking, he would

8   get people to strike --

9           MR. TOMBERLIN:  I'm going to object.

10          THE COURT:  Let's get to the day.  Let's get to the

11  day this happened and what happened.

12          MS. DILLON:  Yes, Your Honor.

13          THE WITNESS:  Okay.

14  BY MS. DILLON:

15  Q   So after Mr. Bryant came in he took a ticket?

16  A   Yes.

17  Q   What did you observe next?

18  A   Okay.  He went and sat down and maybe about 30 minutes,

19  you know, for his ticket to be called, he went up to the first

20  window to be assisted.  And he was at that window probably for

21  maybe about 15, 20 minutes because someone else was going to

22  see him.  So he had a seat back into the lobby back out there.

23  Q   When he was at that first window, did you hear him say

24  anything?

25  A   He raised -- he raised his voice maybe a couple of times,

1   sort of, you know, and I had to go over there, you know, sort

2   of like let him know to calm down.

3   Q    You asked him to calm down while he was at that first

4   window?

5   A    Yeah.  Uh-huh.

6   Q    Did you have any altercations with him --

7   A    Not at that point, no, ma'am.

8   Q    Okay.  And then he had to sit back down and wait for

9   someone else?

10  A    Right.  He sat down maybe about 20 minutes, and behind my

11  desk a lady by the name of Ms. Stowe, she called him back.

12  That's right behind my desk like where he's sitting, the

13  judge.  So I heard, I just about pretty much heard everything

14  that was said.

15  Q    So what do you overhear?

16  A    Okay.  It started off, from what I overheard it, it

17  started off pretty good.  And then later on down the line he

18  said a couple of things.  It wasn't a curse word at that time

19  but he raised his voice, you know.  I told him he would have

20  to lower his voice.

21  Q    So you went and told him he had to lower his voice?

22  A    Yes.

23  Q    What happened?

24  A    I went back to my desk and I sat down.

25       So I'm assuming the lady was continuing to work on his

1  case.  And after -- after she continued to work on that, it

2  was -- it was again that he got a little uproarious.  He

3  cursed.

4  Q    Do you remember what he said?

5  A    I think he said "dam," or something like that.  So I went

6  back to him again and I said, "Mr. Bryant," I said, "we're not

7  going to have this now," I said.  "You're going to have to

8  lower your voice and use no profanity."  So at this point I

9  went back and I sat down again.

10  Q    Okay.  What happened then?

11  A    Okay.  CR continued to continue on with what she was

12  doing.  Okay.  This time it sort of like -- well, it did, it

13  got pretty much at the point now that it was boiling.

14  Q    What do you mean by "boiling"?

15  A    He used double words this time.

16  Q    Excuse me?

17  A    He used double words.

18  Q    Double words?

19  A    Yes.

20       THE COURT:  He was cursing.

21       THE WITNESS:  Yeah.  Cursing.

22       THE COURT:  Move on.

23  A    So I went toward him.  This time I said, "Mr. Bryant,

24  I've warned you.  This is my third time warning you that there

25  will be no profanity in this building."  I said, "You need to

1 | lower your voice where the CR can assist you and help you."

2 | So he stood up, and as he stood up, he shoulder bumped me

3 | like that. (Indicating) I didn't know what was his intention

4 | was, so I got him off of me. And that's when he came back at

5 | me, swung at me and hit me across the head. I went back and

6 | hit him and bushed him into the bathroom.

7 | Q Why did you push him into the bathroom?

8 | A Well, there was a group of people in the lobby, and just

9 | on my instinct, me thinking the way I was thinking, I knew I

10 | had to get him out of the crowd of the people so that's why I

11 | pushed him through the bathroom door.

12 | Q Was the lobby full that day?

13 | A Yes.

14 | Q What happened once you guys got into the bathroom?

15 | A Well, before that happened, before he -- I was pushing

16 | him. When he came back and hit me the second time that's when

17 | he busted my lip and that's when I downed him after pushing

18 | him through the door.

19 | Q So he busted your lip while you were still in the lobby?

20 | A Yes. And then after I got him through the lobby and

21 | pushed him down, then I had him down. And he was, you know,

22 | he was pretty stout at that time. But I was doing my best to

23 | try to do him and get him cuffed.

24 | Q Okay. And why were you trying to cuff him?

25 | A Because he had done lost it. He was out of order.

1   Q    Okay.  So once you're in the bathroom, can you tell us

2   what happened?

3   A    At that point in time once again I was trying to cuff

4   him.

5   Q    When you first get into the bathroom where is Mr. Bryant?

6   A    Okay.  When he was pushed he was pushed through the door

7   against a wall.

8   Q    Okay.

9   A    And that's when I had him down at that point.  And I was

10  trying to subdue him and tell him quit resisting so I could

11  cuff him.  And at that time he just kept on bucking and going

12  on and kicking.  Just all this stuff.

13  Q    Was he yelling?

14  A    He was yelling too.

15  Q    Do you remember anything he said to you?

16           THE COURT:  If you do.

17  A    No, I don't.

18  Q    At any time did you feel that he reached for your

19  firearm?

20  A    Okay.  This went on for about maybe three, four minutes

21  continuously.  At that point when I had him down, he came up

22  under me and at the bottom of my holster, he started up at the

23  bottom of my holster, he got to the top of my -- my gun in my

24  holster, and that's when I had put more pressure on him

25  because he was after my weapon and I wasn't going to let him

 1    get my weapon.

 2    Q    Were you concerned at that point, sir?

 3    A    I was.  So it continued on.  And Vallier, a gentlemen

 4    working for the Social Security office named Vallier, he came

 5    over to assist me.  And also Mr. Davidson, he came over to

 6    assist me.  Because this guy, I mean, he was -- I mean -- I

 7    mean, I weigh about 300 pounds but he was just strong.  And he

 8    was out of it.  So it took all I could to hold him down.

 9    Q    At some point did you get ahold of your asp?

10    A    My what?

11    Q    Your baton?

12    A    Yes.  Okay.  At this point in time, when I had him down,

13    Vallier pulled out my baton and he popped it out and he gave

14    it to me.

15    Q    What did you do then?

16    A    That's when I started to use it.

17    Q    Okay.  Did Mr. Bryant grab hold of it at any point?

18    A    Of the baton?  He tried to at one point, yes.

19    Q    Were you able to subdue him with that baton?

20    A    Well, at this time he was continuing on.  Myself,

21    Vallier, and Mr. Davidson, we was still continuing, try to

22    subdue him.  So we had the Gastonia City Police, they came in.

23    They came in.  They was, you know, they was lock and load.

24    And as I had him down, somebody hit me on the arm and it was

25    the Gastonia Police.  I guess he was letting you know that he

1  was assisting.

2       So finally after -- we were still scuffling at that time.

3  And then we finally got the cuffs on him.  And then another

4  Gastonia policeman came in and they jacked him up and they

5  took him to the car.

6  Q    And were you injured, Mr. Seigle?

7  A    Yes.

8  Q    How were you injured?

9  A    I had got a busted lip.  Just some, you know, little bit

10 of a bruise and --

11 Q    Did you go to the hospital?

12 A    Yes.

13 Q    Did they take you by ambulance?

14 A    Yes.

15 Q    And did you receive any treatment at the hospital?

16 A    Yes.

17 Q    What did they do for you?

18 A    They took x-rays of my head, and also they stitched my

19 lip up.

20 Q    Okay.

21 A    And it caused me some problems as well.

22 Q    Sorry?

23 A    It caused me some problems.  It caused me problems.

24 Q    Who caused you problems?

25 A    When this took place.

1    THE COURT:  Part of his retirement is PTDS.

2    THE WITNESS:  Thank you, sir.  Post-traumatic

3    stress, my dementia, it all kicked in.  It was like I was

4    trying to protect the people and myself like I was going back

5    to the war zone.  I had to do what I could to subdue him.  It

6    affected me and it caused me stressors.

7    Q    Mr. Seigle, did you ever grab Mr. Bryant from behind

8    while he was sitting there talking to Ms. Stowe?

9    A    Behind?

10   Q    Yeah.  Did you ever grab him while he was sitting there?

11   A    No, I didn't put my hand on him.

12   Q    Did you swing at him first by any chance?

13   A    No.

14   Q    Who hit first?

15   A    He did.

16   MS. DILLON:  No further questions, Your Honor.

17   THE COURT:  All right.  Cross.

18                    **CROSS EXAMINATION**

19   BY MR. TOMBERLIN:

20   Q    When she asked you whether or not he grabbed your baton

21   you said he tried to.  Did he grab your baton?

22   A    No.

23   Q    Did he grab your gun?

24   A    Yes.  He tried to.

25   Q    Did he touch your gun?

1   A     Yes.

2   Q     Did your gun --

3   A     The shoulder.  The holster, as it went up my holster, he

4   had his hand on the top of the shoulder holster.

5   Q     He had his hand on the top of the shoulder holster?

6   A     Holster, trying to get my gun.

7   Q     And were you on top of him or were you standing back from

8   him?

9   A     I was on top of him.

10  Q     Were you against the wall standing up or were you

11  actually physically laying on top of him?

12  A     I was on top of him.

13  Q     Physically laying on top of him?

14  A     Not laying.  I was on top -- my knee.  I had my knee down

15  on him and I was on top of him.

16  Q     Using your weight to hold him down?

17  A     Yes.

18  Q     And did you have your hands on his arms?

19  A     Yes.

20  Q     And were you holding his arms down?

21  A     Yes.  I was trying to do all I could to hold him down,

22  his arm and his body.

23  Q     Let me show you a statement that will be marked as

24  Exhibit 3 and ask you if -- is that up?

25          MS. DILLON:  Uh-huh.

1   Q   Is that a copy of the statement that you gave to someone

2   regarding this incident? Eric Long?

3   A   Yes. That's correct.

4   Q   And you say down about the middle of the second

5   paragraph, "Based on my training and experience, I felt

6   threatened and pushed Bryant back to create space. Bryant

7   then swung his arm with a clenched fist striking me in the

8   mouth. I then grabbed ahold of Bryant and a fight ensued."

9   Do you see that?

10   A   Yes.

11   Q   Was that at the bathroom or was that in the hallway?

12   A   That was in the lobby, hall.

13   Q   Let me show you a little video.

14   A   Uh-huh.

15   Q   Do you recognize that photograph?

16   A   Yes, I do.

17   Q   Let me go back to the first photograph in this chain.

18   This is part of Exhibit 1 the first photograph, 1A?

19   A   Okay.

20   Q   Do you recognize that as being you?

21   A   I do.

22   Q   And is that the hallway there within that building that's

23   the Social Security Administration?

24   A   Yes.

25   Q   And what are you looking at?

SEIGLE - CROSS

```
 1   A    Okay.  At this time, if this is correct, a picture of it
 2   is me, correct, I may be observing the window at this
 3   particular time.
 4   Q    Okay.  Let me flip to the second photograph which is 2A.
 5   A    Okay.
 6   Q    Does that help you identify --
 7   A    Yes.  Yes.  Yes.
 8   Q    And where is that?
 9   A    This is in the hallway.
10   Q    And is that Mr. Bryant?
11   A    Yes.
12   Q    Can you tell where that -- was that what happened in
13   front of that window that Ms. Stowe was at?
14   A    Yes.
15   Q    And let me show you 1C.  Do you recognize that?
16   A    I do recognize it.  I do recognize it.
17   Q    What was going on then, if you recall?
18   A    At this time that was when Mr. Bryant had got up and I
19   was letting him know -- that was when he had shoulder bumped
20   me and that's when I told him he had to leave.
21   Q    Okay.
22   A    That's when we got into it after his shoulder bumped me,
23   that's when I pushed him off of me.
24   Q    Okay.  Let me go to Exhibit 1D.
25   A    Okay.
```

1   Q    What is that?

2   A    Yeah.  That's us.  That's me and him.

3   Q    Is that when you pushed him off of you?

4   A    No.  It was when I was standing in the lobby.  That was

5   when I was behind him in the lobby there that -- that's when

6   he stood up, and I don't see that part there.

7   Q    Okay.

8   A    I don't see that part there because when I was standing

9   the first exhibit you showed me was when I was letting him

10  know again, and that's when I was observing the window.  But

11  the other part, there should have been another part when I

12  went up to him again and that's when he got up from his seat,

13  and once he got up that's when he shoulder bumped me, chest

14  bumped me.

15  Q    Are you saying that this was a different incident?

16  A    No.  It's the same.  It's the same picture.

17       This was when we had got into it.  This was when he had

18  swung at me and that's when I went back at him after he

19  shoulder bumped me.

20  Q    You say you went back to him after he shoulder bumped

21  you.

22       MS. DILLON:  At him.

23  Q    At him.  Let me show you the next photograph.

24  A    Okay.  This right here was after he had swung at me and

25  then I swung back at him.  Then that's when I pushed him in

1   the bathroom door right there.  I remember that.

2   Q    That's when you pushed him into the bathroom?

3   A    Yeah.

4   Q    And went in after him?

5   A    Say it again.

6   Q    And went in after him and jumped on top of him?

7   A    Well, no.  He had swung at me, and that's when I pushed

8   him back and he swung back at me, and that's when I pushed him

9   in the bathroom.

10  Q    Yes, sir.  Let me see if I can show you a video.  Can you

11  see that video?

12  A    Yes, I do.

13  Q    Now that's you standing in the hallway.  Is that right?

14  A    That's right.

15  Q    Let me see if you can kind of review this and tell me

16  what happened, particularly where the shoulder bump came in?

17  A    The shoulder bump came in as I'm walking up, because he

18  had done started using profanity.  That's when I came up

19  behind him.  Okay, that right there is when he got up.

20  Q    Okay.

21  A    That's when he got up and he got into attack mode and

22  came at me.

23  Q    Let me see if I can go back again --

24           THE COURT:  You're never going to get all of this in

25  the hallway.  You can keep going back over it all you want to.

1    I'll let you go over it for three hours if you want to sit

2    here and go through that thing for three hours.

3              MR. TOMBERLIN:  No, sir, I don't want to sit here

4    and go through.

5              THE COURT:  Let's get to what you think he's lying

6    about.

7              MR. TOMBERLIN:  That would be fine.

8    BY MR. TOMBERLIN:

9    Q    Tell me how you got -- strike that.

10        Isn't it true that what you did is push Mr. Bryant into

11   the bathroom after that tussle that occurred in the hallway?

12   A    Okay, sir.  Once again --

13             THE COURT:  Did Mr. Bryant try to leave and you

14   tried following him and then shoved him in the bathroom?

15             THE WITNESS:  No.  No.  No.  Uh-huh.  No.

16             This is when all the rumpus took place.  That's when

17   me and him had got into it.  And the pictures I'm seeing now,

18   my desk is right there behind me to your right there, and when

19   he came, after we came past my desk, the bathroom is right

20   here to your left, shortly right there to your left; just

21   about maybe three, four feet.  It's not that far.  That right

22   there was on the inside is when we were doing our hits and

23   stuff.

24   BY MR. TOMBERLIN:

25   Q    And if you would have let him go, he would have left just

1  like you told him to, wouldn't he?

2  A    Say what now?

3  Q    If you would have just stayed where you were, he would

4  left the building like you had told him to, wouldn't he?

5  A    In all turns --

6           MS. DILLON:  Objection.  Speculation.

7           THE COURT:  Overruled.  Overruled.  Go ahead and

8  say.  Answer the question.

9           THE WITNESS:  Yes.  If he had left the building like

10  I told him to, yes.

11  BY MR. TOMBERLIN:

12  Q    If you would have stayed right there in that hallway

13  after he went by you in this photograph, he would have gone

14  ahead and left the building, wouldn't he?

15  A    Yeah, but that wasn't his intention.

16  Q    But you decided instead you pushed him into the bathroom?

17  A    Yeah.  That was during the time we done got into the

18  scuffle part.

19  Q    Did you ever tell him that you were detaining him?

20  A    Yes, because when I had him down on the floor, the

21  bathroom floor, I told him to quit resisting.

22  Q    Did you ever tell him that he was under arrest?

23  A    Well, I don't have the arrest power.

24  Q    Did you ever tell him to stop?

25  A    Yes.  Many a time.  Many a time.  I told him to quit.  To

1  give up.  Quit resisting.

2  Q    How about before you got into the bathroom?

3  A    Before?  Before was when we was in the altercation.

4         MR. TOMBERLIN:  That's all I've got.

5         THE COURT:  Any redirect at all?

6         MS. DILLON:  Very short, Your Honor.

7                **REDIRECT EXAMINATION**

8  BY MS. DILLON:

9  Q    Mr. Seigle, did Mr. Bryant leave?

10 A    Did he leave?

11 Q    When you asked him to leave, did he leave?

12 A    No.

13 Q    When you first got into that altercation when he stood

14 up, did that continue or did it stop and he walked away from

15 you?

16 A    That continued.

17 Q    Okay.  And was it Mr. Bryant's intention to leave at that

18 point from what you saw?

19 A    No.

20        MS. DILLON:  Thank you.  No further questions.

21        MR. TOMBERLIN:  No further questions.

22        THE COURT:  Thank you, sir.  You may come down.

23        THE WITNESS:  Thank you, sir.

24        MS. DILLON:  The United States calls Eric Long.

25             - - - -

1          **ERIC LONG**

2    being duly sworn, was examined and testified as follows:

3                    **DIRECT EXAMINATION**

4    BY MS. DILLON:

5    Q    Good morning.

6    A    Good afternoon.

7    Q    Can you please state your name and spell your last name

8    for the record.

9    A    Eric Long.  L-O-N-G.

10   Q    And where do you work?

11   A    Federal Protective Service.

12   Q    And how long have you worked there?

13   A    Three years.

14   Q    What did you do there?

15   A    I'm a special agent.

16   Q    What are your duties?

17   A    I conduct investigations into matters concerning or

18   pertaining to federal facilities and federal employees.

19            MR. TOMBERLIN:  We'll stipulate to that.

20   BY MS. DILLON:

21   Q    Did you become involved in an investigation of

22   Mr. Bryant?

23   A    Yes, I did.

24   Q    And is Mr. Bryant in the courtroom today?

25   A    Yes.

1      MR. TOMBERLIN:  We'll stipulate he's right here next

2   to me.

3   BY MS. DILLON:

4   Q    How did you become involved in that investigation?

5   A    I was notified by the Battle Creek Mega Center, it's a

6   dispatch from my region, that a guard was assaulted at the

7   Gastonia Social Security Office.

8   Q    And if you could just pull that microphone toward you.

9          THE COURT:  I heard him.  He was called -- he was

10  called in because he heard that a guard was assaulted at the

11  Social Security place there.

12  Q    And did you receive a surveillance tape from that

13  incident?

14  A    Yes.

15  Q    Does that show a continuous course of action or is it a

16  series of photographs?

17  A    No.  What it is, is it's like a frame shot.  Almost takes

18  picutres.  So it shows like one second here --

19          MR. TOMBERLIN:  Objection.

20          THE COURT:  He can give his opinion but it's one

21  second to one second.

22          MS. DILLON:  How many seconds is --

23          THE WITNESS:  Well, it's actually one second, it's

24  actually two seconds in some parts of it.  That's from the

25  individual in management, I think his name is Dennis Mosley or

1   Mobley, he's the assistant officer there at the Social

2   Security facility.

3   BY MS. DILLON:

4   Q    Now you conducted an investigation of this incident?

5   A    Yes.  Myself and Agent Littlejohn who is sitting there

6   next to you.

7   Q    Okay.  And that included interviewing witnesses?

8   A    It included interviewing witnesses, interviewing the

9   subject, Mr. Bryant; interviewing the victim, Mr. Seigle.

10  Q    Okay.  And was there a time where you interviewed the

11  defendant?

12  A    Yes.  Myself and Agent Littlejohn interviewed him.

13  Q    When was that?

14  A    February 11th at approximately 2:00 at the Gaston County

15  Detention facility.

16  Q    And did you read the defendant his *Miranda* rights?

17  A    Yes, I did, and it was also witnessed by Kevin

18  Littlejohn.

19  Q    Did he sign a *Miranda* waiver form?

20  A    Yes.  He agreed to speak with me.

21  Q    When you got to the jail, were you handed anything?

22  A    Yes.  When I got there I was actually walking in.

23  Mr. Bryant was sitting down like in a -- it's almost like a

24  library for inmates, he was sitting down behind a table in an

25  orange jumpsuit, and a guard walked up to me and handed me a

1    piece of paper.  I briefly had a chance to look at it, and on

2    the piece of paper it says "Barack Obama must die."

3    Q    Then what did you do next once you received that paper?

4    A    Well, as I didn't -- it was pretty much as I was walking

5    in.  So I opened the door, put it in my case file, walked in,

6    pulled up my credentials, identify myself as a federal agent

7    with Homeland Security.  Agent Littlejohn identified himself

8    as a agent with SSA/OIG.  And the first thing Bryant said to

9    me was, "Are you here with the letter I wrote about President

10   Obama?"  I then stated to him, "We'll get to that in a minute.

11   I'm actually here about the incident that occurred at the

12   Gastonia Social Security Office."

13   Q    Did he make statements to you about what occurred at the

14   Social Security Office?

15   A    Yes.

16   Q    What did he tell you?

17   A    Well, he said that he was there to inquire about some

18   checks he believed he was owed dating back to 2005.

19   Q    What else did he say?

20   A    Said he met with a black guy, later identified as service

21   representative Eric Craig.  And that during his meeting with

22   Eric Craig, Mr. Craig had told him that his checks -- that he

23   was inquiring -- or inquiring about had previously been issued

24   and that a trace had been put on them from the Treasury

25   Department, and that they were waiting for the checks to come

1  to the Social Security Office to prove that Mr. Bryant had

2  received them.

3  Q    Did he tell you anything about a knife in the bushes?

4  A    Yeah.  He said prior to entering the facility he had left

5  his knife out in the bushes.

6  Q    When he was talking about -- speaking with Mr. Craig, did

7  he admit to using profane language and raising his voice?

8  A    Yes.  He admitted to using profane language and getting

9  loud.

10  Q    Okay.  What did he tell you what happened while he was

11  sitting there?

12  A    He said that a guard had to walk up to him and tell him,

13  you know, I guess to calm down.  Then he said after that he

14  went back to the lobby and waited for 15 minutes.

15  Q    Okay.  What happened then?

16  A    Said he was seen by a claims representative Heather

17  Stowe, and Heather Stowe reinstated his SSI benefits.

18  Q    And then what happened?

19  A    Heather Stowe also told him that the checks had

20  previously been issued.  That's when Mr. Bryant told me and

21  Agent Littlejohn sitting right there that -- he stood up and

22  said, "What does it take -- "

23        Your Honor, may I use profanity in your courtroom?

24        THE COURT:  Of course.  You're telling the facts.

25  A    Okay, sir.  He stood up and said, "What does it take, a

1  fucking act of Congress?"  He said that PSO Littlejohn -- I'm

2  sorry, PSO Seigle was standing behind him and had touched him

3  on his elbow, and that's when he said, "Keep your fucking

4  hands off of me," and then admitted to punching PSO Seigle in

5  the face first.

6  Q    And what did he tell you happened after he punched Mr.

7  Seigle?

8  A    Well, according to Bryant, Seigle then pushed him in the

9  bathroom and jumped on top of him.  That's Mr. Bryant's side

10  of it.

11      He said there was a fight that occurred between both of

12  them.  And he said during the fight, he admitted to me again

13  that he was reaching for his weapon.  I think the quote -- and

14  I don't want to misquote it, but if you have my statement

15  there it says, "I was trying to grab his Glock.  My intentions

16  were to kill him because he was beating me."

17  Q    Okay.  And did Mr. Bryant hear anything -- did

18  Mr. Bryant --

19  A    Mr. Bryant said he heard that Mr. Vallier state the fact

20  that you're going to have to shoot him or you're going to have

21  to take some type of action.  I don't really recall the exact

22  frame.  And that's when he agreed to be cuffed up.

23      After he was cuffed, that's when Mr. Bryant admitted to

24  me that he may have made a statement, he wasn't exactly sure

25  of the statement he made, but it was something to the effect

1   of "I should shoot your ass."

2   Q   He said that on the way out of the bathroom?

3   A   That's what Mr. Bryant admitted to me. I wasn't there so

4   I don't know the exact specifics of what occurred in that, so

5   I'm just basing it off my interview with Mr. Bryant.

6   Q   Okay. Now, I'm going to show you what has been

7   previously marked as Government's Exhibit 2.

8   A   I can't see anything. No, ma'am. I can actually see

9   right here looking at hers.

10   Q   Can you see it now?

11   A   Yes.

12   Q   What is that document?

13   A   It appears to be a copy of the piece of paper I was

14   handed by an correctional officer at the Gaston County

15   Detention facility.

16   Q   Okay. And does it say anything about security guards?

17   A   Yeah, if you look here at the line towards the bottom it

18   says -- his handwriting is not that great -- I'm trying to

19   make sure I read it out correctly -- "Don't forgot to kill a

20   couple of security guards."

21   Q   Okay.

22   A   Before and underneath that it says -- I'm not sure if

23   that's "Hefner," but it says, "Before he sends home in body

24   bag."

25   Q   Okay. And on the top of this it says, "Barack Obama must

1  die."

2  A    Yes, it says, "Barack Obama must die."

3  Q    And this was handed to you when you got to the jail?

4  A    Yes.  And it also has his name up top, Charlie Bryant.

5  Q    Did you speak to Mr. Bryant about this letter?

6  A    Yes, I did.

7  Q    What did he tell you?

8  A    Well, first of all, he admitted to writing the letter to

9  me and to Agent Littlejohn.  He said that he wished President

10 Barack Obama no ill will, but that he thought he was a dumb

11 ass.  He also admitted to me that he had previously been

12 visited by Secret Service agents for making a previous threat

13 towards President Clinton, but that he had lied to those

14 agents and said he meant no ill will or no harm towards

15 President Clinton.

16     I talked to him further.  That's when he asked about his

17 lawyer.  I said are you asking for your legal counsel?  He

18 said yes.  That's when the interview was immediately

19 terminated.

20 Q    Okay.

21 A    Then I would like to say after the --

22          MR. TOMBERLIN:  Objection as to what he would like

23 to say.

24          THE COURT:  Sustained.  Sustained.

25          THE WITNESS:  Yes, sir.

BY THE COURT:

Q    Was there any conversation after Mr. Bryant invoked his right to counsel?

A    Yes.  He became very hostile towards me and one of his comments towards me was to go suck a floppy donkey dick.

Q    What was his demeanor during the formal interview?

A    It was -- I don't want to speculate but it was almost like he was very aggressive towards me.  His demeanor completely changed on a dime.  Very aggressive.  Very argumentative.  Trying to make smart comments towards me.

Q    Was he argumentive during the entire interview?

A    No.  During the entire interview he was actually very lucid and very agreeable, and actually made several, you know, he was a very good witness as far as being able to recall facts.  And he actually bragged about specific parts of his memory.  He said he had a photographic memory.

        MS. DILLON:  No further questions, Your Honor.

        THE COURT:  Any cross?

        MR. TOMBERLIN:  One or two.

                    **CROSS EXAMINATION**

BY MR. TOMBERLIN:

Q    Did you interview Heather Stowe?

A    Yes, sir.

Q    And the lady sitting there at the window talking to Mr. Bryant?

1    A    Yes, sir.

2    Q    Let me show you what is being marked as Exhibit No. 2,

3    assuming it comes up.  There it is.  Can you see that?

4    A    It's very small print.

5    Q    I'm going to make it bigger right now.

6    A    Okay.  I can only see half it.

7    Q    Look at the first half.  Do you recognize that as a

8    statement that you took from Ms. Stowe?

9    A    There's two statements I provided from Mr. Stowe.  I'm

10   not sure if this is the one I took from her or not.

11   Q    Well, if you would, please read that and tell whether or

12   not that's consistent with what she told you.

13   A    (Witness complies.)

14   Q    And tell me when you want me to move it down.

15            THE COURT:  Is this his version --

16            MS. DILLON:  It is not, Your Honor.

17   BY MR. TOMBERLIN:

18   Q    Do you need me to move it down?

19   A    I'm almost there.  I'm just trying to be sure I read

20   everything.  Can you move it up?

21        (Statement moved up on video.)

22        Okay.  Part 2.  Okay.

23   Q    Is that the statement that you took from Ms. Stowe?

24   A    Yes.

25   Q    Okay.  Is that what she told you?

1    A    During the interview?

2    Q    Yes.

3    A    It varied somewhat.  I mean it wasn't an exact thing.

4    People write statements.  It's not always exactly the

5    statement they write.

6    Q    Okay.

7                MR. TOMBERLIN:  That's all I've got.

8                        **REDIRECT EXAMINATION**

9    BY MS. DILLON:

10   Q    Mr. Long, you prepared your own report.  Correct?

11   A    Yes.

12   Q    And your own report contains what statements people

13   provided you?

14   A    Yes.

15   Q    And if we can scroll up, please, this states -- oh,

16   allright.

17               MR. TOMBERLIN:  Where do you want to go?

18               MS. DILLON:  Just to the top of any page.

19   Q    See where it says "Social Security Administration" at the

20   top?

21   A    Yes.

22   Q    And it states "Understanding that this statement is for

23   the use of the Social Security Administration, I hereby

24   certify that."

25   A    Yes.

1  Q    Ms. Stowe did not prepare this statement for you,

2  correct?  She provided this to the Social Security?

3  A    Like I said, there's two statements that she provided me.

4  I'd have to have both of them in front of me, but I mean there

5  are two different statements she provided me.

6         THE COURT:  A statement is a statement.  People tell

7  the truth and they don't; they are consistent, they're

8  inconsistent.  The Court is not going to consider where it

9  came from, and I'm really not sure of the relevance.

10        THE WITNESS:  I understand, Your Honor.

11        THE COURT:  I'm really not sure of the relevance.

12        MS. DILLON:  That's the only point, Your Honor.

13  Thank you.  No further questions.

14              **RECROSS EXAMINATION**

15  BY MR. TOMBERLIN:

16  Q    Well, did Ms. Stowe not tell you Mr. Bryant swung at the

17  guard but did not strike him and he swung with an open hand?

18        THE COURT:  Is that what she said in this statement?

19  Not to you.

20        THE WITNESS:  But I can look at it again?  It's a

21  pretty long statement.

22        THE COURT:  Is that what's in this statement?

23        MR. TOMBERLIN:  Yeah.  I want to find out whether or

24  not that's what she said to him.

25        THE COURT:  She said that in this statement.  Did

1  she make that statement to you?  You can -- you have got a

2  copy of the statement.  He can look at it before he makes an

3  answer.

4  A    Just so I'm clear, what is of the question again?

5  Q    Did she, Ms. Stowe, tell you that Mr. Bryant swung at

6  Officer Seigle with an open hand, not with a fist, and that

7  she did not hit him.  She was not successful -- or he was not

8  successful.

9  A    No, it says to me it did not appear.  She did not say

10  that she did not -- that he did not have a closed fist.  Said

11  it did not appear.

12  Q    Okay.

13       THE COURT:  All right.  Come down thank you.

14  Anything further from the government?

15       MS. DILLON:  Just a final witness, Your Honor, is

16  Ms. Jan Baucom.

17       THE COURT:  And what's this testimony going to be

18  about?

19       MS. DILLON:  She's a custodian from the Gastonia

20  Memorial Hospital with records of Mr. Seigel's injury.

21       MR. TOMBERLIN:  We'll stipulate to those medical

22  records.

23       THE COURT:  You'll stipulate that he, as a result of

24  this altercation, that at some point he received a injury to

25  his lip for which he had to have a stitch to his lip.

1         MR. TOMBERLIN:  At some point in this process when

2 he left that building that afternoon he had to go to the

3 hospital to have a stitch put in his lip.

4         THE COURT:  The Court will accept the medical

5 records in.

6         MS. DILLON:  Thank you, Your Honor.

7         THE COURT:  Any further evidence from the

8 government?

9         MS. DILLON:  That is all, Your Honor.

10         THE COURT:  All right.  Is there any evidence from

11 the defense?

12         MR. TOMBERLIN:  Your Honor, I'd like to put

13 Mr. Bryant up at this time.

14         THE COURT:  All right.  Put him up.

15                 **CHARLIE BRYANT**

16 being duly affirmed, was examined and testified as follows:

17               **DIRECT EXAMINATION**

18 BY MR. TOMBERLIN:

19 Q    What is your name, please?

20 A    Charlie Bryant.

21 Q    Mr. Bryant, you are the defendant in this case.  Is that

22 correct?

23 A    Yes, sir.

24 Q    You've heard the testimony about Social Security Office

25 on February 8th of 2011.  Is that right?

1  A    Yes, sir.

2  Q    That morning, had you gone early that morning to Kings

3  Mountain Hospital?

4  A    Yes, sir.

5  Q    Why?

6  A    To try to get my medication because I was on a manic

7  high, and I tried to get committed to the psych ward.

8  Q    And do you have mental problems?  You're bipolar, is that

9  correct?

10  A    Yes, sir.

11  Q    And when you went to the hospital, they did not keep you

12  but they put you back out without any medication.  Is that

13  correct?

14  A    Yes, sir.  About 4:30 in the morning.

15  Q    And Depakote is the medication that you ordinarily take?

16  A    Yes, sir.

17  Q    When you went to the Social Security Office, I want to

18  get right to the hallway, you've seen the pictures of the

19  hallway where you were talking --

20       THE COURT:  He does better on Seroquel.  Seroquel,

21  if he can get it, it helps him better than Depakote.  They

22  won't give it to him at the jail because it's too expensive.

23       THE WITNESS:  Klonopin is better than that.

24       THE COURT:  There'll never have it in this country

25  under the current -- with the way medical care is.  People

1  that have money can afford to buy the right medication.

2         MR. TOMBERLIN:  The right ones.

3         THE WITNESS:  Amen.

4  BY MR. TOMBERLIN:

5  Q    Mr. Bryant, I want you to go to the Social Security

6  Office in your mind that day, February 8th of 2011.  You've

7  seen the pictures that were shown where you were sitting

8  talking with Ms. Heather Stowe and you got out of the chair.

9  Have you seen that this morning?

10 A    Yes, sir.

11 Q    Tell the Court what you recall about what happened in

12 that hallway, if anything.

13 A    Really, not nothing really.  After -- well, I was talking

14 to Ms. Stowe about some checks that my deceased wife tore up

15 in 2005.

16        That Friday I had talked to the assistant manager.  I sit

17 there from 2:30 until after 5:00.

18 Q    Charlie, I don't want to stop you for the length, I want

19 to go right directly to the window when you and Officer Seigle

20 got into the -- whatever it was, tell the Court what happened.

21 A    Well, after we got in a scuffle, I was back near the

22 water fountain.  The next thing I know that he comes tackling

23 me into the bathroom.  And if he would have just asked me to

24 leave to start with, I wouldn't have even had to cussed him to

25 start with.  Because like he said, anytime he asked me to do

1   something -- he tell me to leave my knife in the bushes, I put

2   my knife in the bushes.  If he would have asked me to leave on

3   the 28th when they said I was disruptive because I got loud, I

4   would have left and come back another day.

5   Q    And what happened on this date, February 8th?

6   A    He grabbed me and shoved me back.  And then I was trying

7   to leave.  And then the next thing I know he's tackling me

8   into the bathroom.

9   Q    Once you were tackled into the bathroom, were you on your

10  back?  Was he on top of you?

11  A    Yeah, I was on my back.

12  Q    And what was he doing?

13  A    He was trying to hold me down.  And then I was trying to

14  lift him up.  I couldn't lift him up, so I got my foot in

15  between to try to lift him up, and that's when Mr. Davidson

16  come in and started twisting my foot and beating on me with

17  his elbow.

18       I put my hand on his holster and tried to scare him to

19  get off of me.  I ain't going to lie to the judge.  But I

20  never tried to take his gun like Mr. Long said; that I punched

21  him in the mouth and my intention was to kill him because they

22  was beating me with this asp.  Because when I put my hand on

23  his holster, he didn't even have his asp out.  That's when

24  Mr. Davidson told him to get his asp out.  And then he got is

25  asp out, but then Mr. Vallier, he come in to give him his asp.

1  I didn't know what was going on.  I thought they was going to

2  kill me because he had been talking about he should shoot me

3  before anybody come in the bathroom.

4      Then Mr. Vallier, he said, "Well, quit fighting and the

5  let them handcuff you."  I said, "Well, you let them quit

6  beating me and I will."  That's when I rolled over and let him

7  handcuff me.

8  Q    And once Mr. Vallier came in and said, "Quit struggling,

9  let them them handcuff you," what --

10  A    He said quit fighting and let him handcuff you.  That's

11  when I told him to let them quit beating on me.

12  Q    Do you ever touch the gun?

13  A    No, sir, I touched his holster.

14  Q    Did you ever try and grab his gun?

15  A    No, sir.

16  Q    Did you ever grab ahold of the asp?

17  A    Yes, sir.

18  Q    Is the asp that metal baton?

19  A    Uh-huh.

20  Q    Did you ever have control of that?

21  A    No, sir.

22  Q    Did you ever swing that at anybody?

23  A    No, sir.

24  Q    And if you had not been tackled there at the bathroom,

25  where were you going from that hallway?

1   A    Back to the Salvation Army.

2   Q    Was it a continual fight from the hallway all the way

3   into the bathroom, or were you on your way out after you

4   passed by Officer Seigle?

5   A    Yeah.  I passed him.  We was seven foot apart from when

6   they tackled me into the bathroom.

7   Q    You were how far apart?

8   A    About seven-foot.  And the bathroom is on the left side,

9   not the right side.

10          MR. TOMBERLIN:  That's all I've got.

11          THE COURT:  Any cross?

12          MS. DILLON:  Mr. Bryant --

13          THE COURT:  With the jury you go for a long time,

14   but try to be as surgical as you can and move along.

15          MS. DILLON:  Yes, Your Honor.

16                    **CROSS EXAMINATION**

17   BY MS. DILLON:

18   Q    Mr. Bryant, you said you put your hand on Mr. Siegel's

19   holster?

20   A    Yes, ma'am.

21   Q    And you said you tried -- you did that to try and scare

22   him?

23   A    Yes, ma'am.

24   Q    And you said -- so you're saying you never told

25   Agent Long that you were trying to get his Glock to try and

1  kill him?

2  A    No, ma'am, I never did.

3  Q    You're saying you never said that.

4  A    Yes, ma'am.

5  Q    Did you ever lie to Secret Service?

6  A    Yeah.  I called up the White House and told them I was

7  going to blow it up February 24th.  About February 18th they

8  sent two special agents, Secret Service down there, and they

9  actually -- did I like Bill Clinton?  I said I love

10  Bill Clinton.

11  Q    Why did you say that?

12  A    I didn't want the Secret Service getting me.  I don't

13  know.

14  Q    So you lied to Secret Service agents?

15  A    Yeah.

16  Q    Okay.

17        MS. DILLON:  Thank you.  No further questions.

18        MR. TOMBERLIN:  That's all.

19        THE COURT:  Sir, you may come down.

20        Any other evidence for the defense other than what

21  is in the Presentence Report and things like that?

22        MR. TOMBERLIN:  Nothing other than what's in the

23  Presentence Report, and, Your Honor, the exhibits that were

24  attached to our memorandum.

25        THE COURT:  Right.  I'll accept all of those and

1   consider all of those exhibits. And I'll hear a brief

2   argument about it from you, about -- apparently there are two

3   issues that I want to argue. Number one is the issue on the

4   (b) section, and then the other is acceptance of

5   responsibility. Those are both things that are of some

6   interest to the Court.

7           MR. TOMBERLIN: Thank you, Your Honor.

8           Your Honor, the question on the (b) section is

9   pretty much the Court's call; whether or not there is a

10  factual basis for the (b) section.

11          Mr. Bryant, as he tells the Court, there was seven

12  feet between him and the officer. He was on his way out. Mr.

13  Bryant was on his way out. You've seen the pictures that came

14  out of the hallway. You don't see the pictures of the library

15  because they are simply not there.

16          You did have testimony from Ms. Silver with respect

17  to where she was located, looking 25 feet or whatever it was.

18          Mr. Bryant said he's on his way out. The officer

19  never said you're detained, you're arrested, stop, or anything

20  of that nature. The photograph appears clear that Mr. Bryant

21  was gone, at least out of that frame in the photo, when the

22  officer was taking off after him. Everybody agrees that they

23  ended up somehow in the bathroom. Mr. Vallier puts Officer

24  Seigle standing up. Everybody else puts from Seigle on top of

25  Mr. Bryant. But one thing that's pretty clear, Mr. Bryant

1    didn't have a weapon.  He wasn't brandishing a weapon.  He

2    wasn't doing anything of that nature.  We say he never had a

3    deadly or dangerous weapon in there.

4         In terms of the incident with the lip, I would

5    contend to the Court from the video that that occurred

6    somewhere in the fight after my client was chased down by

7    Officer Seigle.  Officer Seigle said the swing occurred, that

8    he was hit in the top of the head.  And then he said there was

9    a punch at some point.  That's when the Court --

10        THE COURT:  Let me hear on the acceptance of the

11   responsibility.

12        MR. TOMBERLIN:  Acceptance of the responsibility,

13   Your Honor, is this:  My client felt like there was a

14   procedural issue with regard to not having had a hearing.  For

15   that reason, he asked to have his guilty plea withdrawn.  We

16   did that.  It was not withdrawn.

17        He has said to the Court that he does not contest

18   the 111(a) portion.  He accepts full responsibility for that.

19   He doesn't accept responsibility for the (b) portion because

20   what he says he was trying to do was get this fellow off of

21   him.  He'd 300-pound man on top of him, who had an asp in his

22   hand ultimately, and there were two other people in the room

23   and he was the one that was being beat.  So he doesn't accept

24   spoken as to (b).  And if that means he has to lose

25   responsibility points, then he's willing and he accepts that.

But that acceptance of responsibility is only with respect to
the (b) portion, which as I understand it is an enhancement
under the statute.

THE COURT: What I'm going to find is that there's
ample evidence that this was all one, one incident, a hoorah
that got started and continued on.

And I've listened to both sides. And it's fine that
both sides argue and you're entitled to argue, and I do not
fault you for that, but I will -- I do think there's a factual
basis to show that the defendant did forcibly assault --
impede, intimidate and interfere with the officer while he was
carrying out his duty, and there was some bodily injury,
although not much, a busted lip that required stitches enough
to do that.

But it's an awfully huge sentence for a mentally ill
man, and he's meantly ill. Maybe not mentally ill, but it's
clear from the record, in the Presentence Report that he has
been evaluated in this case and according to the report, and
he has extensive history of the mental health treatment
beginning at age 20. Diagnosed with bipolar, prescribed
lithium when he was 20. Numerous hospitalizations. Numerous
psychiatric medications. Dr. Jorge Luis completed the report
and opined that he met the criteria for multiple
classifications under the current system of diagnosis,
diagnostic, psychiatric disorders, including cannabis and

1  cocaine dependence.  Bipolar disorder.  Personality disorder.

2  Antisocial feature.  Clearly, I mean all those things show up

3  in this -- his whole relationship over there at the Social

4  Security.

5        Dr. Luis also indicated the defendant should

6  continue with psychiatric treatment to assist him in

7  maintinaly a relatively stable mental status.  He can benefit

8  from mandated intensive substance abuse treatment.  And his

9  prognosis is mixed, indicating that the psychiatric prognosis

10  is favorable but with the other aspects of it, it puts him at

11  a high risk.

12        He has been found certainly he can go to trial, and

13  is not legally insane in any way, shape or form.  However,

14  it's pretty clear we're dealing with a defendant who is,

15  whenever faced with an difficult situation like that -- we do

16  a terrible job of dealing with the insane in this country and

17  the mentally ill.  We do a terrible job.  We put them out on

18  the street and we only deal with them when they commit crimes.

19  I don't know what we're going to do because nobody wants to

20  spend any money.  Everybody wants to go to church and talk

21  about taking care of them but nobody wants to spend any money

22  to take care of anybody.  So then we get them when they come

23  in here and he has committed this crime.

24        Now, on acceptance of responsibility, I'll hear from

25  Ms. Dillon if you want to make any argument.  I know the

1  government gets to get one point.

2        MS. DILLON:  Yes, Your Honor, and the government is

3  choosing not to make that point.

4        THE COURT:  And normally the Court could say that

5  it's too late for that if he's going to go forward, but in

6  fairness the government has been put to a lot of extra work,

7  and the whole of that one point is there to keep from having

8  to do work and I think they probably had to do at least as

9  much work as if they had to try this case, so the Court is

10  going to allow the government to withdraw that.

11        MS. DILLON:  Thank you.

12        THE COURT:  The Court will give the two points for

13  acceptance of responsibility because acceptance of the

14  responsibility in the general sense is not agreeing to every

15  single thing the government says happened.

16        In other words, the government's version of what

17  happened, the government's ideas of what happened is not

18  acceptance of responsibility.  Acceptance of the

19  responsibiliyt is pleading guilty and taking the hit.

20        I think his argument ultimately came back to

21  acceptance of responsibility when he was willing to plead

22  guilty to the (a) part and argue the (b) part.  I don't fault

23  him in that.  But he may remember it that way; with his mental

24  condition he may see it a certain way, but it didn't happen --

25  he's guilty of that.

1    So therefore what the Court is going to find is that

2  all of the -- all of the findings in the Presentence Report

3  are accepted by the Court with the exception of taking away of

4  the acceptance of the responsibility.

5    MS. DILLON:  And Your Honor, for the record, the

6  United States objects to your finding that acceptance of

7  responsibility is appropriate in this circumstance given the

8  fact that in Document 35 the defense stated that he asserts

9  his legal innocence; that he contents that he's not guilty of

10  the charge contained in the Bill of Indictment, and although

11  he's not fully finished analyzing this case, counsel appears

12  that there's a viable insanity defense and may possibly be a

13  self-defense argument.  So for those reasons --

14    THE COURT:  That's a lawyer talking, and the

15  defendant came in subsequent to that and pled guilty.

16    MS. DILLON:  Well, it's great that he got to change

17  his argument so that he could get his points today, Your

18  Honor, but we are making that objection for the record.

19    THE COURT:  I understand.  You can object to that.

20    The Court is going to find that the proper level for

21  the defendant then is level 26, Criminal History Category VI,

22  120 to 151 months.  Okay.  Noting that there are murderers who

23  get less sentences than this.  And I'm going to sentence at

24  that Guideline.  I will not vary from that Guideline, but I

25  would, if the Guideline had been a level 28 with a 140 to 175,

1   the Court would have, with the nature and circumstances of the

2   defendant, considering his mental health, looking at the

3   18 United States Code, Section 3553 factors, and the nature of

4   the offense, type of offense that it was, with no weapon

5   involved by the defendant, and apparently it's unclear exactly

6   what all actions happened in the bathroom during that

7   particular period of time.  But this was, once it got into

8   there, you have a mentally unstable defendant who is resisting

9   arrest.

10          The Court would have taken all those factors into

11  consideration, and the fact that the injury that occurred in

12  this was an injured lip, which required one stitch, would have

13  varied to level 26 and sentenced within that Guideline range.

14  The Court's not going to need to do that because the Court is

15  going to sentence within what it believes is the proper

16  Guideline range in this case.  The sentence would be the same

17  whether the Court did it under -- whether the Court -- whether

18  the acceptance of the responsibility was given or not.  In

19  this case, the sentence would be exactly the same as the Court

20  is going to pronounce in a moment.

21          MR. TOMBERLIN:  Your Honor, may I just insert

22  something for second?

23          THE COURT:  Yes.

24          MR. TOMBERLIN:  My client has asked that I object to

25  the Category VI criminal history category.

1    THE COURT:  Overruled.  I've looked at it.

2  Overruled.  I've looked at his criminal history.  It's due a

3  lot to all of these problems that are in here.  Like I said,

4  we do not deal with the mentally ill in this country until

5  they commit crimes.

6    MR. TOMBERLIN:  No, sir.  And may I say on his

7  behalf before Your Honor does sentence him, I understand what

8  the Court's saying, and I appreciate the situation that we

9  find ourselves in as a country, we find ourselves in

10  particularly with respect to medical care and other things.

11  However, I don't believe the Court should be the final

12  depository for people who otherwise we, as a society, don't

13  know how to deal with or don't want to have to deal with.

14    THE COURT:  I understand what you argue, but the

15  problem we run into in this is that he has been found to be

16  legally competent to stand trial, and as such he is

17  responsible for that.

18    I've taken into consideration what effect his mental

19  condition had on the responsibility issue.  But we can't, we

20  can't -- we can't let people go out -- one way or another,

21  folks are going to have to be taken care of if they have a

22  mental problem.  We can't just allow them to run to the terror

23  of the public and assault folks and injure folks out there.

24  There's got to be a way to do it.  And I'm afraid that we

25  haven't dealt properly for a long time with his mental

1   condition and he's come to this; that he committed a serious

2   offense and the Guidelines are there.  And the Court is

3   sentencing him on what it believes is an appropriate sentence.

4           I will hear from you again if you wish to say

5   something, add something to your testimony, Mr. Bryant.

6           DEFENDANT BRYANT:  Yes, sir.

7           4A12 says if the sentence is imposed on the same

8   day, it should be one sentence.  Well, 54 and 55 consolidated,

9   and I pleaded guilty and I got 8 points instead of 3, so that

10  give me 14, but if you took the 8 from the 14 would be a 6,

11  and added 3 it would be 9, would be a Category IV.

12          THE COURT:  What happens is if you get arrested and

13  then you don't get sentenced yet, and then you get arrested

14  again for another event that occurs after that event --

15          DEFENDANT BRYANT:  I didn't get arrested.  I sat in

16  the jail for 15 months.

17          THE COURT:  They are separate.

18          DEFENDANT BRYANT:  Sir?

19          THE COURT:  They are separate.  They are counted

20  separate.  I believe probation has correctly done that.  And

21  you certainly -- I'm going to give you the right to appeal

22  this sentence, and you can appeal every bit of that.

23          DEFENDANT BRYANT:  All right.  I'd like to say I'm

24  sorry if I caused Mr. Seigle any -- he's talking about that

25  post-traumatic syndrome, because he come at me like he was in

```
 1  Viet Nam.  I just plead mercy to the Court.
 2             THE COURT:  I understand, and the Court has tried to
 3  give you every consideration that I can.  I have a healthy
 4  skepticism when I hear these cases anyway.  The government has
 5  proved its case.
 6             MR. TOMBERLIN:  Your Honor, the only other thing I
 7  would like to say on his behalf for the record is part of our
 8  request for a variance to the Court in this matter on the
 9  sentencing issue goes back and strikes right at the heart of
10  this concern about people not being able to somehow be
11  controlled through society.
12             Mr. Bryant did recognize this bipolar event coming
13  on.  He did do what he should have done.  He went to the
14  doctor; went to the hospital, and did not receive treatment at
15  that time.
16             THE COURT:  Right.
17             MR. TOMBERLIN:  So I would say to the Court --
18             THE COURT:  If he had one of those big ol' medical
19  policies that he was paying a pile of money for, they would
20  have seen him in a heartbeat.
21             MR. TOMBERLIN:  And he would have had a room in
22  there.
23             THE COURT:  I know.  I can't deal with the ills of
24  the world.  Folks that are supposed to try to deal with that
25  haven't gotten it done yet.
```

1    This is a serious offense. Okay. I've taken

2  everything into consideration. I have in no way considered

3  something that he said about President Obama or about

4  President Clinton. That has absolutely nothing to do with

5  this sentence. I have looked at the incident that occurred

6  and I have taken his mental health, which is well-known,

7  should be well-known to the medical folks, and sounds like it

8  was well-known to Social Security. They knew they were

9  dealing with guy that was unstable when he came in there.

10  I've taken all of that into consideration. This is a serious

11  crime. I'm going to sentence him to what I believe is the

12  appropriate sentence under the circumstances, and giving him

13  all consideration that I can give him for the reduced

14  situation that he was in.

15    I don't know what the answer to it is. I'm afraid

16  he's going to serve this sentence and then be released back on

17  society and nobody will take care of him until and unless

18  something else happens. And I find that to be a great failing

19  of our country with regard to these folks. We've got just --

20    DEFENDANT BRYANT: Could I say one more thing?

21    THE COURT: We need to take care of the folks that

22  are actually living and breathing and as much as we take care

23  of everything else. This is a very sad situation as to the

24  mentally ill in this country.

25    MR. TOMBERLIN: I would ask that he be assigned to a

1  mental health facility.

2      THE COURT:  Well, I'm going to ask the Bureau of

3  Prisons to take all this into consideration.  I'm not sending

4  him to a mental health facility.  I'm sending him to the

5  Bureau of Prisons.

6      MS. DILLON:  Wit all due respect, I haven't had a

7  opportunity to argue as to a sentence.

8      THE COURT:  I'm going to let you argue.  Go ahead

9  and argue.  I know you want a big sentence, somewhere between

10  140 and 170 months.

11      MS. DILLON:  We're asking for the high end of

12  Guideline as you have found them, Your Honor.  We do believe

13  that this was a serious offense.  It was assault on an officer

14  acting -- aiding a federal agency.  We do think that this was

15  a very dangerous situation in which there was a crowded Social

16  Security Office.  We believe that the violence was unnecessary

17  that day.  All Mr. Bryant was asked to do was to quiet down

18  and he could simply not do that.

19      His criminal history, Your Honor, is quite violent.

20  I see his first assault on a officer dating back to 1986; that

21  was his first conviction.  He has multiple convictions for

22  simple assualt; communicating threats; assault with deadly

23  weapons.  It goes on and one.  Malicious conduct by prisoner.

24  Possession of a weapon by a prisoner.  Attempted second degree

25  arson, Your Honor, in which he tried to burn down the house of

1    a woman who was in the home at the time.

2            THE COURT:  Ms. Dillon, do you recognize that he's

3    mentally ill?

4            MS. DILLON:  Your Honor, I believe that Mr. Bryant

5    has several issues, and I understand that the defense now

6    filed last night a document stating he had tried to go to the

7    doctor that day --

8            THE COURT:  That's not a big deal for the Court.

9    There's a record that this man is mentally ill and has

10   antisocial and all of these issues that are out there.

11           What this results in, though, is probably an

12   unemployable individual who is wandering the streets.  How are

13   we going to get him medication to get him medicated if he's

14   out there homeless and wandering streets and not doing things.

15   And so all we do is we bring him in here and we say, well,

16   he's not medicated, and so he's going -- he does all these

17   crimes.  I don't know how to deal exactly with it, Ms. Dillon.

18   I can warehouse him in the United States prison system, but it

19   doesn't seem to me to be the right thing over what turned out

20   to be a busted lip.

21           MS. DILLON:  Your Honor, we are luckily it was only

22   a busted lip.

23           THE COURT:  He didn't bring a weapon in.  He didn't

24   bring a firearm in.  He didn't bring a knife in.  And it

25   started out as shoulder thing with a push, any there was a

1  swing, and then it all got going into the bathroom.  And he's

2  made a lot of comments about things, but he's going to shoot

3  his mouth off a lot.  He says -- about President Obama,

4  President Clinton.  The man is mentally ill, and I'm going to

5  give him a long sentence, a long sentence --

6          MS. DILLON:  Well, Your Honor --

7          THE COURT:  I'm not giving him a lifetime sentence

8  over somebody not being shot at, stabbed or what I can be

9  satisfied was attempted murder.  I don't know what would have

10  happened with regard to the firearm.

11          MS. DILLON:  Well, Your Honor, the government

12  believes that we're lucky that that firearm was not taken

13  today.  We don't know what the circumstances would have been

14  had it been taken.  And we do believe that Mr. Bryant has not

15  been detered by his multiple periods of incarceration for this

16  type of behavior in the past, and that he is a recidivist, and

17  a long sentence is necessary to deter this defendant and

18  others from this kind of behavior.

19          THE COURT:  I don't know if he can be deterred,

20  Mr. Dillon.  He's mentally ill.

21          MS. DILLON:  Well, then, Your Honor, we suggest that

22  he be given a long sentence; protect the needs of the public,

23  which we do believe, and I think the Court has recognized, is

24  a important factor in this analysis.

25          So we do ask that the Court sentence him to a time

1    of 150 months to ensure the safety of the public in this

2    instance; to show the seriousness of this offense; and to

3    provide just punishment for this defense, Your Honor, but most

4    importantly to protect the public from this defendant.

5           THE COURT:  I think you would be right, it would

6    normally be a high end of the Guideline range if there wasn't

7    the mental history that's here in this particular case.  But I

8    don't think that it's -- I don't think it's the high end of

9    the Guideline range in this case.

10          I'll hear from you if you want to say anything else?

11   If he wants to add something, let him add it.

12          DEFENDANT BRYANT:  You said you wasn't going to give

13   a variance or downward departure.  Well --

14          THE COURT:  I'm -- I would give a variance -- I

15   would give a variance if this -- if the Guideline range had

16   been 140 to 170 months.

17          DEFENDANT BRYANT:  It was Mr. Seigle's actions that

18   caused the bodily injury.  I was trying to defend myself.

19          MS. DILLON:  That's a sign, Your Honor, that he

20   still does not accept responsibility.

21          THE COURT:  Yeah.  And he's also mentally ill,

22   Ms. Dillon.

23          DEFENDANT BRYANT:  Thank you, Your Honor.

24          THE COURT:  He's also mentally ill.  You have to

25   look at all of it.  You can't just, you can't -- you don't

1  have to look at all of it.  I've got to look at all of it.

2  You don't have to.

3         MR. TOMBERLIN:  I believe he said he was finished,

4  Your Honor.  Is that correct?

5         DEFENDANT BRYANT:  Yes, sir.

6         THE COURT:  All right.  Pursuant to the Sentencing

7  Reform Act of 1984 and *United States v. Booker*, it is the

8  judgment of the Court having considered the factors noted in

9  18 United States Code, Section 3553(a), that the defendant,

10  Charlie Wayne Bryant, is hereby committed to the custody of

11  the United States Bureau of Prisons to be imprisoned for a

12  term of 130 months.

13         The Court calls to the attention of the custodial

14  authorities that the defendant has a history of mental health

15  issues and recommends that the defendant be allowed to

16  participate in any available mental health treatment programs

17  while incarcerated.  And in addition, that the defendant's

18  issues are so serious that the Bureau of Prisons look to send

19  him somewhere where these problems and these issues can be

20  addressed properly.  Not just a regular mental health deal.

21  This man is mentally ill.

22         The Court calls to the attention of the custodial

23  authority that the defendant has a history of substance abuse

24  and recommends the defendant be allowed to participate in any

25  available substance abuse treatment programs while

1  incarcerated, and if eligible receive the benefit of the 18

2  United States Code, Section 3621(e)(2).

3       The Court further recommends the defendant be

4  allowed to participate in any educational and vocational

5  opportunities while incarcerated.  I don't know whether the

6  circumstances of this kind of assault allows 3621(e)(2) but it

7  might.

8       Upon release from imprisonment the defendant shall

9  be placed on supervised release for a term of three years.

10  Within 72 hours of release from the custody of the Bureau of

11  Prisons, the defendant shall report in person to the probation

12  office in the district in which the defendant is released.

13       While on supervised release the defendant shall not

14  commit another federal, state or local crime, shall comply

15  with the standard conditions that have been adopted by the

16  Court in the Western District of North Carolina, and shall

17  comply with the following additional conditions:  The

18  defendant shall submit to mental health evaluation and

19  treatment program under the guidance and supervision of the

20  United States Probation Office.  The defendant shall remain in

21  treatment and maintain any prescribed medications until

22  satisfactorily discharged by the program and/or with the

23  approval of the U. S. Probation Office.

24       The defendant shall have no direct or indirect

25  contact with any victim or effected parties in this matter

unless provided with specifically an authorization to do so in advance by the United States Probation officer.

It is further ordered that the defendant shall pay to the United States a special assessment $100.

The Court finds the defendant does not have the ability to pay a fine or interest, and the Court having considered the factors noted in 18 United States Code, Section 3572(a), will waive payment of a fine and interest in this case. The criminal monetary penality shall be due and payable immediately.

The Court has considered the financial and other information contained in the Presentence Report and finds the following is feasible: If for any reason the defendant is unable to pay the monetary penalty immediately, during the period of imprisonment, payment shall be made through the Federal Bureau of Prisons Inmate Financial Responsibility Program.

Upon release from imprisonment, any remaining balance of the $100, if not fully paid, although I don't know how it can't be, shall be paid in monthly installments of no less than $50 to commence within 60 days after release until paid in full.

Once again, the Court states, if it's not been clear, that had the acceptance of responsibility not been granted, the nature and circumstances of the offense and the

1    history of the characteristics of the defendant, most notably

2    his long-term mental health problems, which are clearly not

3    being adequately treated out in the private sector,

4    considering all of those factors together, the Court believes

5    that the sentence of 130 months would reflect the seriousness

6    of the offense, promote a respect for the law and provide a

7    just punishment and adequate deterrence not only to the

8    defendant but also to the other individuals who might consider

9    doing this kind of crime.

10            It will also allow the defendant with needed

11   educational/vocational training, medical care and treatment in

12   the most effective manner.

13            The Court finds that 130 months under all the 3553

14   factors is the appropriate circumstances, hearing everything

15   about the case, the defendant's mental health and all of those

16   things, and had the Guideline range been higher, the Court

17   would have varied to 130 months.  So I want that to be clear

18   on the record.  Anything further from the defense?

19            MR. TOMBERLIN:  No, Your Honor.

20            THE COURT:  Now, anything further from the

21   government?

22            MS. DILLON:  No, Your Honor.

23            THE COURT:  Okay.  Now, Mr. Bryant, you may have a

24   right to appeal your conviction and this sentence to the

25   Fourth Circuit Court of Appeals.  Any Notice of Appeal must be

```
 1   filed within 14 days from the entry of the judgment in this
 2   case.  If you're unable to pay for the cost of an appeal, you
 3   may apply for leave to appeal at no cost to you.  If you so
 4   request, the clerk of court will prepare and file a Notice of
 5   Appeal on your behalf, and you can get court-appointed counsel
 6   to represent you during this appeal.  I would recommend you
 7   speak to your lawyer about whether you want to exercise these
 8   appellate rights.  I just need to know you understand your
 9   right to appeal.
10            DEFENDANT BRYANT:  Yes, sir.
11            THE COURT:  Okay.  Mr. Bryant, good luck to you.  I
12   hope somewhere down the line you get the kind of long-term
13   mental health and medication that you need to stay out of
14   these problems.  You've really got some antisocial behavior
15   problems.  I think you recognize that and the record clearly
16   shows it.
17            DEFENDANT BRYANT:  All right.  Thank you.
18            Do I get time on the 626 days I have been
19   incarcerated?
20            THE COURT:  You get all the time -- time-served goes
21   against all of that.
22            DEFENDANT BRYANT:  All right.  Thank you.
23            THE COURT:  You do, yes, sir.
24            Anything further from the defense?
25            MR. TOMBERLIN:  No, Your Honor.
```

1          THE COURT:  Anything further from the government?

2          MS. DILLON:  No, Your Honor.

3          THE COURT:  Thank you.  This matter is concluded.

4    This will be a Guideline sentence.

5          (Hearing concluded at 12:35 a.m.)

6                    - - - - -

7

8    UNITED STATES DISTRICT COURT
     WESTERN DISTRICT OF NORTH CAROLINA

9

10

11              CERTIFICATE OF REPORTER

12          I, JOY KELLY, RPR, CRR, certify that the foregoing

13   is a correct transcript from the record of proceedings in the

14   above-entitled matter.

15

16

17   S/JOY KELLY

18   JOY KELLY, RPR, CRR                Date _____
     U.S. Official Court Reporter
19   Charlotte, North Carolina

20

21

22

23

24

25

The Honorable Max O. Cogburn Jr.   10529912

Sir,

I don't know what y'all discussed before I entered your courtroom. But Mr. Tomberlin flip, he objected in PSI to Aggravated Assult, said should been minor assult. Then told me we would argue Factual bases. But soon has I entered said we will agree to part A but object part B about gun. But I told him Thursday B applied because of injury he said would act like didn't know. But you sure did, would have been better off sticking with Ms. Panto she said guidelines should be Impeding or Obstructing which is correct. Because Definitions - For purposes of this guideli "Aggravated assult" means A felonious assult that involved A) a dangerous weapon with inten to cause bodily injury (i.e. not merely to frighter with that weapon; B) serious bodily injury" or an intent to commit another felony. Sir there was no Factual bases. You done me wrong, with 2A2.4 would have been less offense levels 16 range 46-57 mont instead of 130 months. Then you

talk about going to church. Mt chp. 5
34-37 says not to swear, agent Long swore
on Holy Bible then lied under oath. Then
only witness was right Mr. Davidson. Why
you think didn't have Ms. Stone there?
When Tomberlin asked agent Long was that
Ms. Stones statement to him. She said
I went at him with hands open, he put his
hands up told not to come any closer. Then
I swung but missed, he then hit me to
protect his self. So who really assulted
who? If you look at picture 4 & 5 is no
way all that could have happen like Mr.
Seigle testified in one second. Then in 5
his in his stance to charge and tackle
me. "If" I did hit him then, his action
provoked harm done by me, which should
warrant down departure. Also want my
statement to agent Long stricken was of
medicine until about March of 2014. You
see how crazy was talking about
President. But my word I didn't tell
him that, so I want to appeal.
Also just because I have mental illness do
nt mean I can't remember. God Bless U

Charlie Bryant 287912
P.O. Box 34429
Charlotte, N.C. 28234

Mailed From Mecklenburg

County Jail Central

28202161960

CHARLOTTE NC 282
30 OCT 2012 PM 4 L

c/o
MR. Frank G. Johns
United States District Court
Office of The Clerk
401 West Trade St. Room 210
Charlotte, N.C. 28202

FOREVER

Charlie Bryant 287912
P.O. Box 34429
Charlotte, N.C. 28234

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA
     Plaintiff,

        VS.             Case No. 3:11-CR-72

Charlie W. Bryant
     Defendant         NOTICE OF APPEAL

    Comes Now the Defendant, Charlie W. Bryant, pro se, and hereby gives notice of appeal from the judgment and sentence imposed by the Court on the 26th day of October 2012.

    Respectfully submitted this 30th day of October 2012.

I also ask the Court to appoint me an appeal attorney.

              Sincerely, C Bry
              Charlie W. Bryant
              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

United States of
America
Plaintiff,

vs.                                    Case No. 3:11-CR-72
Charlie W. Bryant
Defendant

Certificate of Service

The undersigned hereby certifies that
copies of my Notice of Appeal was sent
by US postal mail. This 30th day of
October 2012 to the following parties:

Frank G. Johns
Clerk of Court

Jennifer L. Dillon
Assistant U.S. Attorney

Richard H. Tomberlin
Defendants Attorney

Charlie Bryant 287912
P.O. Box 34429
Charlotte, N.C. 28234

Mailed From Mecklenburg

County Jail Cental

282021281960

C/o
MR. Frank G. Johns
United States District Court
Office of The Clerk
401 West Trade Street, Room 210
Charlotte, N.C. 28202

CHARLOTTE NC 282

30 OCT 2012 PM 4 L



# United States District Court
## For The Western District of North Carolina

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| V. | (For Offenses Committed On or After November 1, 1987) |
| Charlie Wayne Bryant | Case Number: DNCW311CR000072-001 |
| | USM Number: 26367-058 |
| | Richard H. Tomberlin |
| | Defendant's Attorney |

**THE DEFENDANT:**

X    Pleaded guilty to count(s) 1.

—    Pleaded nolo contendere to count(s) which was accepted by the court.

—    Was found guilty on count(s) after a plea of not guilty.

**ACCORDINGLY,** the court has adjudicated that the defendant is guilty of the following offense(s):

| Title and Section | Nature of Offense | Date Offense Concluded | Counts |
|---|---|---|---|
| 18: 111(a)(1) and (b) | Forcibly Assault, Resist, Oppose, Impede, Intimidate and Interfere with an Officer of the United States by Use of a Deadly Weapon | 2/8/2011 | 1 |

    The defendant is sentenced as provided in pages 2 through 5 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984, <u>United States v. Booker</u>, 125 S.Ct. 738 (2005), and 18 U.S.C. § 3553(a).

—    The defendant has been found not guilty on count(s) .

—    Count(s) (is)(are) dismissed on the motion of the United States.

    **IT IS ORDERED** that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay monetary penalties, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

Date of Imposition of Sentence: 10/26/2012

Max O. Cogburn Jr.
United States District Judge

Date:      November 13, 2012

Case 3:11-cr-00072-MOC    Document 52    Filed 11/13/12    Page 1 of 6

Defendant: Charlie Wayne Bryant
Case Number: DNCW311CR000072-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of <u>ONE HUNDRED THIRTY (130) MONTHS.</u>.

<u>X</u>    The Court makes the following recommendations to the Bureau of Prisons:

- Participate in any available mental health treatment programs available.  The defendant should be designated at a BOP facility where his mental issues can be addressed properly.
- Participate in any available substance abuse treatment programs while incarcerated and if eligible receive benefit of 18: 3621(e)(2).
- Participate in any educational and vocational opportunities.
- Participate in the Inmate Financial Responsibility Program.

<u>X</u>    The Defendant is remanded to the custody of the United States Marshal.

___    The Defendant shall surrender to the United States Marshal for this District:

    ___    As notified by the United States Marshal.

    ___    At___a.m. / p.m. on ___.

___    The Defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ___    As notified by the United States Marshal.

    ___    Before 2 p.m. on ___.

    ___    As notified by the Probation Office.

## RETURN

I have executed this Judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____ at
_____, with a certified copy of this Judgment.


_____
    United States Marshal


                                    By: _____
                                            Deputy Marshal

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of <u>THREE (3) YEARS.</u>.

___ The condition for mandatory drug testing is suspended based on the court's determination that the defendant poses a low risk of future substance abuse.

### STANDARD CONDITIONS OF SUPERVISION

The defendant shall comply with the standard conditions that have been adopted by this court and any additional conditions ordered.

1. The defendant shall not commit another federal, state, or local crime.
2. The defendant shall refrain from possessing a firearm, destructive device, or other dangerous weapon.
3. The defendant shall pay any financial obligation imposed by this judgment remaining unpaid as of the commencement of the sentence of probation or the term of supervised release on a schedule to be established by the Court.
4. The defendant shall provide access to any personal or business financial information as requested by the probation officer.
5. The defendant shall not acquire any new lines of credit unless authorized to do so in advance by the probation officer.
6. The defendant shall not leave the Western District of North Carolina without the permission of the Court or probation officer.
7. The defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer.
8. A defendant on supervised release shall report in person to the probation officer in the district to which he or she is released within 72 hours of release from custody of the Bureau of Prisons.
9. The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.
10. The defendant shall support his or her dependents and meet other family responsibilities.
11. The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other activities authorized by the probation officer.
12. The defendant shall notify the probation officer within 72 hours of any change in residence or employment.
13. The defendant shall refrain from excessive use of alcohol and shall not unlawfully purchase, possess, use, distribute or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as duly prescribed by a licensed physician.
14. The defendant shall participate in a program of testing and treatment or both for substance abuse if directed to do so by the probation officer, until such time as the defendant is released from the program by the probation officer; provided, however, that defendant shall submit to a drug test within 15 days of release on probation or supervised release and at least two periodic drug tests thereafter for use of any controlled substance, subject to the provisions of 18:3563(a)(5) or 18:3583(d), respectively; The defendant shall refrain from obstructing or attempting to obstruct or tamper, in any fashion, with the efficiency and accuracy of any prohibited substance testing or monitoring which is (are) required as a condition of supervision.
15. The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered.
16. The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer.
17. The defendant shall submit his person, residence, office, vehicle and/or any computer system including computer data storage media, or any electronic device capable of storing, retrieving, and/or accessing data to which they have access or control, to a search, from time to time, conducted by any U.S. Probation Officer and such other law enforcement personnel as the probation officer may deem advisable, without a warrant. The defendant shall warn other residents or occupants that such premises or vehicle may be subject to searches pursuant to this condition.
18. The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed by the probation officer.
19. The defendant shall notify the probation officer within 72 hours of defendant's being arrested or questioned by a law enforcement officer.
20. The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the Court.
21. As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.
22. If the instant offense was committed on or after 4/24/96, the defendant shall notify the probation officer of any material changes in defendant's economic circumstances which may affect the defendant's ability to pay any monetary penalty.
23. If home confinement (home detention, home incarceration or curfew) is included you may be required to pay all or part of the cost of the electronic monitoring or other location verification system program based upon your ability to pay as determined by the probation officer.
24. The defendant shall cooperate in the collection of DNA as directed by the probation officer.
25. The defendant shall participate in transitional support services under the guidance and supervision of the U.S. Probation Officer. The defendant shall remain in the services until satisfactorily discharged by the service provider and/or with the approval of the U.S. Probation Officer.

## ADDITIONAL CONDITIONS:

26. The defendant shall submit to a mental health evaluation/treatment program under the guidance and supervision of the U.S. Probation Office. The defendant shall remain in treatment and maintain any prescribed medications until satisfactorily discharged by the program and/or with the approval of the U.S. Probation Office.
27. Throughout the period of supervision the probation officer shall monitor the defendant's economic circumstances and shall report to the court, with recommendations as warranted, any material changes that affect the defendant's ability to pay any court ordered penalties.
28. The defendant shall not have any contact with victim unless provided with specific authorization to do so in advance by the United States Probation Office.

Defendant: Charlie Wayne Bryant

Judgment-Page <u>4</u> of <u>6</u>

Case Number: DNCW311CR000072-001

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the Schedule of Payments.

| ASSESSMENT | FINE | RESTITUTION |
|---|---|---|
| $100.00 | $0.00 | $0.00 |

___ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

### FINE

The defendant shall pay interest on any fine or restitution of more than $2,500.00, unless the fine or restitution is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on the Schedule of Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

<u>X</u> The court has determined that the defendant does not have the ability to pay interest and it is ordered that:

<u>X</u> The interest requirement is waived.

___ The interest requirement is modified as follows:

### COURT APPOINTED COUNSEL FEES

___ The defendant shall pay court appointed counsel fees.

___ The defendant shall pay $_____ Towards court appointed fees.

Case 3:11-cr-00072-MOC   Document 52   Filed 11/13/12   Page 4 of 6

Defendant: Charlie Wayne Bryant                                    Judgment-Page 5 of 6
Case Number: DNCW311CR000072-001

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A ___      Lump sum payment of $ _____ Due immediately, balance due

___      Not later than _____ , or
___      In accordance ___ (C), ___ (D) below; or

B _X_      Payment to begin immediately (may be combined with ___ (C), _X_ (D) below); or

C ___      Payment in equal _____ (E.g. weekly, monthly, quarterly) installments of $ _____ To commence _____ (E.g. 30 or 60 days) after the date of this judgment; or

D _X_      Payment in equal _Monthly_ (E.g. weekly, monthly, quarterly) installments of $ _50.00_ To commence _60_ (E.g. 30 or 60 days) after release from imprisonment to a term of supervision. In the event the entire amount of criminal monetary penalties imposed is not paid prior to the commencement of supervision, the U.S. Probation Officer shall pursue collection of the amount due, and may request the court to establish or modify a payment schedule if appropriate 18 U.S.C. § 3572.

Special instructions regarding the payment of criminal monetary penalties:

___      The defendant shall pay the cost of prosecution.
___      The defendant shall pay the following court costs:
___      The defendant shall forfeit the defendant's interest in the following property to the United States:

Unless the court has expressly ordered otherwise in the special instructions above, if this judgment imposes a period of imprisonment payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalty payments are to be made to the United States District Court Clerk, 401 West Trade Street, Room 210, Charlotte, NC 28202, except those payments made through the Bureau of Prisons' Inmate Financial Responsibility Program. All criminal monetary penalty payments are to be made as directed by the court.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

Defendant: Charlie Wayne Bryant
Case Number: DNCW311CR000072-001

## STATEMENT OF ACKNOWLEDGMENT

I understand that my term of supervision is for a period of _____months, commencing on _____ .

Upon a finding of a violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

I understand that revocation of probation and supervised release is mandatory for possession of a controlled substance, possession of a firearm and/or refusal to comply with drug testing.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.


(Signed)  _____        Date: _____
          Defendant

(Signed)  _____        Date: _____
          U.S. Probation Office/Designated Witness


Case 3:11-cr-00072-MOC   Document 52   Filed 11/13/12   Page 6 of 6

United States of America

Charlie vs Wayne Bryant    Case No. 3:11-CR-72 MOC

Motion for Reasons of Appeal

I pray the court makes a quick decision on my judgement and sentence. To allow me a trial by jury or atleast to be sentenced under right guidelines. The reason I plead guilty at rule 11, court didn't explain nature of my indictment, because it never said anything about a dangerous weapon. First attorney Steven Slawinski denied my right to a timely trial. After having doctor come from Raleigh, N.C. to do evalution, she said I was comptent to stand trial. But he still had sent to BOP for another evalution which took 3 months. Then he took job in N.Y Oct. 2011 Ms. Angela Parrott became attorney and trial got put off 3 time. Then she discouraged to go to trial stating she wasn't a gambler. That jury would take guards side, if testified would get 2 more offense levels if lost, for obstruction charge; then lose 3 levels for exceptance of responsibity. Would wind up getting extra 46 months. You can see all this in 6 page letter wrote to Judge Cogburn JR. If not for erroneous constituted constitution ineffective assistance of counsel, I would have went to trial. She failed to let know goverment could enhance 3 levels for threat with dangerous weapon, or 6 for Offense. Again the pg. vio. § 3A1.2 she should have

Know. But I understand about 3 for weapon, Because I think she's right and goverment is wrong, No gun involved to cause Harm and never passesed or brandished a weapon. But she didn't figure, criminal history points, eigther just assumed what MR. Slawinski, figured, I thank he was right though, look at maybe 50, 51 & 52 in PSI where got 2 points 3&3 for total of 8! Actually should be only 3! Got arrested Aug. 24, 2006 other two charges instrumented from first charge, with No intervening arrested, Sat in safe keep for 14 months at central prison. They where not prior senten Those 3 charges got consolidated on Nov. 6, 2007! so 4A1.2 says, if sentence where impose on same day, count has single sentence. The add 1 point Ms. Hood missed for 30 days contenpt of court Nov. 22, 2010. Would be 12 Not 16? Then Ms. Parrott withdrew from counsel because her second letter said Aggravated Assault shouldn't apply, but Impedeing or Obstructing Officers. Would have been 13 offense levels Category V 30-37 months. She told me would get time serv or 24 months at most. So at PSI interv she changed her promise. M

Hood ask at end of interview if I wanted her to call my mother are had anything Id like the Judge to know, I said No. Then when got back to cell thought yea would like the Judge to know my side. Also ask Ms. Hood how do you get a Booker variance to get probation for mental illness or ineffective counsel. Well she sent letter to Ms. Parrott who withdrew from case. She told me the last time we talked was suppose to have comptence hearing, but never did. So June 7, 2012 I ask Judge Cayer how he let plead guilty without doing a comptence hearing and that I wanted to withdraw guilty plea. "US vs Matapras?" He said I couldn't it would be up to next attorney. Well US assistant attorney Jennifer Dillon submitted report from BOP then Judge Cogburn Jr. quickly filed a sealed order June 27, 2012 that I was comptent to stand trial. So new attorney Richard Tomberlin filed motion to withdraw guilty plea around July 19, 2012, but he hadn't fully gone over case. He failed to challenge statute 18 U.S.C. 111 in motion or argue the Moore's fourth factor of ineffective close counsel which Ms. Parrott gave very little. His only point

without comptence hearing. I sent both letters from Ms. Parrott. Then said might have insanity defense. After 2 doctors and Judge Cogburn Jr. done said was comptent. MR. Tomberlin waited to PSI objections said shouldn't be Aggravated Assault but minor assult which doesn't fall under statute 18 U.S.C. 111 but 112, 113 or 115 He couldn't find on vedio where gaurd and I made contact. Finally after I wrote letter to U.S. assistance Attorney Ms. Jennifer Dillon, Doc #44-1, To have MR. Tomberlin Removed from my case. Did he come for a contact visit. Then I read gaurd Siegle statement to agent long, where said I bumped with chest. Had back wards taught he told police officer Williams that, but 2 different versions said struck with right arm. Then you got the one agent Lon FABRACTED thats got my PSI totally wrong. But I showed MR. Tomberlin and if you look close can see, looks like MR. Siegle hits me first. My paralegal Ms. Schidlo notice that hi arm was over mine, which considers with CR Heather Stowes statement and she was about 5 feet from us and only witness goverment did have at sentencing hearing! Not like Ami Silver who was over 30 feet away. She'd testify but did not hit gaurd Siegle

When I was getting up to go MR. Siegle come over again, I was upset, done sat there for about 3 hours. Had talked with assistant manager Feb. 4, 2011, 4 days earlier. MR Mosley he said they owed me $1,588.00 for checks my deased wife Marilyn tore up in Feb., Mar, & April of 2004 not the copies of checks they sent MR. Slawinski from 2005. But CR Heather Stowe issued A $91.00 SSI check from Jan. then called me a liar said she thought I done got and cashed those checks. So before motion with draw guilty plea. I Ask MR. Tomberlin how could it be 2A2.2 Because says Definitions- for purpeses of this guidelines "Aggravated Assault" means A felonious assault that involved A) a dangera weapon with intent to cause bodily injury (i.e Not merely to frighten) with that weapon; B) serious bodily injury, or C) intent to commit another felony. I told him only wanted to scare gqure to get off me when touched his holster, that hi didn't even have ASP out yet! It did what I H because Hubert Davidson was twisting right leg. When put hand on MR. Siegle holster he g off me. Then Davidson told to use his A MR. Vallier helped him open it. Then hes ted Dck never reach for gun, I

Kept hands over head, because he struck
in face left big briuse on cheek. Then started
Kicking and grabbed ASP once. Then MR.
Vallier told me to quit fighting and let them
handcuff me. So I told him that to quit let-
ting them beat me. Then I rolled over and let
handcuff which they didn't have authority to
do. Ask MR. Tomberlin how get 3 for gun or
2A2.2? He said because I reached for gun, He
wanted to look like put hand on holster when was
getting beat. Which was not True! Then after
I showed him definition of 2A2.2 he said
it was ① cause was felony to reach for gun
Then in PSI arguees 3 levels for gun & says
2A2.3 minor assault outside of 18 U.S.C 111
Then argueed 3A1.2 which clearly falls under
2A2.2, but not 2A2.4 because already included
in base offense level 10 instead of 14 for 2A2
Would have been 16 instead of 26 range 46-5
instead of 130 months I got. I didnot get Fact
bases, objections until 6 days after I got sent
enced. If could get sentenced under n
guidelines in 18 USC 111 and get use of da
erous weapon taken off. The total offe
level of 13 with criminal history VI
then sentence Os range would be

33-41 months. I feel Ms. Parrott was right about Impeding or Obstructing officers, the court made grave error in sentencing! Their main witness should be stricken from record. Agent Long said I punched gaurd in mouth, then pushed to ground and try take his fire arm. Have two witness under oath says different plus Ms. Heather Stowes statement which would proved half his testamony wrong. But gouverment smart enough not to bring her. My lawyer stop short questioning Long about her statement, While under oath Mr. Tomberlin said I went at gaurd with hands open. Then U.S. attorney Ms. Dillon said how is that statement relevant to case? So they stopped right there, but I kept reading she said I swung at Mr. Siegle but missed then he hit me to protect his self. Look at exhbit # 1 picture 4. Then I didn't te agent Long try to get his "Glock" but couldn't get it out my intentions was to kill him be cause he was beating me. I did not know w. type of gun he carried. Then he lied said let not miss quate "But I should shoot your Ass supposely when leaveing the building, I told him it wasn't over yet, that I would see the Street. Mr. Tomberli

had records where went to Kings, Mtn. Hospital around 2:15am Feb. 8, 2011 seeking psychiatric help but put out on street at 4:15am same day, got arrested at social security office, But failed to tell reason I was off my medicine to start with!! Then when walked in courtroom said they done discussed that we where going to agree to part A of Aggravated Assault but, Object to part B. I hadn't been advised until last minute. I told him enhancement be will stick because of the inflicting bodily injury. He said 10-25-12 he would act like he didn't know Kept argueing about gun. But Judge said no matter how minor injury B still applies, plus said was guilty by Forcibly assault with use of a deadly weapon. Which I can not figure out how. Now with interview with agent long and special Agent Littlejohn on Feb. 1 2011 I'd like for courts to look how my mind was racing manic by looking at all crazy stuff wrote on request form about our chief's comm der President Obama, My statement should be allowed to be used in court. Because le than a week after talked with Agents Gaston County jail had to send to Centr Prison to keep to get stablized back

My medicine! Look at the facts of MR.
Siegle's testamony under oath on 10-26-12 at
my sentenceing hearing. Also look at pictures,
Exhbit 1 that MR. Tomberlin down loaded from vedio,
Watch the time picture 4 we are involved with
physcial contact, time 12:59,59 Now this is MR
Siegle 3rd version of what happen. He said, I bumped
him with my right shoulder. Then hit him in
head, he then hit me and thats when I punched
him in mouth. Now look at picture 5 and time
1:00 pm and MR. Siegle in his stance where he
rushes and tackles me into restroom. There is
no way all that happen in one second. Then
MR. Tomberlin ask did he try to detain me?
He said no that he didn't have the authority
too. So at 1:00 o'clock why didn't he call police
because if I accidently brushed with shoulder
thats not Forcible Assault. But when he came
charging human nature to defend myself. So
I hit him then his actions provoked harm done
Therefore he got mad and charged an Assault on
me, like decussed with first Attorney! I'm A United
States Veteran and I ask for Justice...
Sunday Nov. 11th of 2012     Very Truly Yours
                             C Bryt
Case 3:11-cr-00072-MOC Document 50 Filed 11/19/12 Page 9 of 9
Charlie W. Bryant
28599920958

-203-